## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

ENRIQUE MONTOYA, on behalf of
himself and all others similarly situated,

       Plaintiff,

                                    **CLASS ACTION**

v.                                     **JURY DEMAND**

PNC BANK, N.A., PNC MORTGAGE, ASSURANT,
INC., and AMERICAN SECURITY INSURANCE
COMPANY,

       Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiff ENRIQUE MONTOYA files this class action complaint on behalf of himself and all others similarly situated against PNC BANK, N.A. ("PNC"); PNC MORTGAGE, ASSURANT, INC. ("Assurant"); and AMERICAN SECURITY INSURANCE COMPANY ("American Security" or "ASIC").

## INTRODUCTION

### The Force-Placed Insurance Industry

1.     On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance.  The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers.

2.     Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.

Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

3. The arrangements revealed by *American Banker* comprise an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants. There are just two insurance companies that control the entire market for forced-placed policies in the country—Assurant and QBE.   Assurant works through its subsidiaries, including American Security. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks" of a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.

4. The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated force-placed insurance premiums by lenders. In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5. The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6.   Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market, which leads to artificially inflated premiums that are charged to consumers, resulting in premiums up to *ten times* greater than those available to the consumer in the open market.  *American Banker* reported that "[t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand."  *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER, Nov. 10, 2010, *available at,* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7.   At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

8.   Assurant, a named defendant here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011. Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks disguised as commissions and other benefits.

4

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

9.   It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and regulators.  For example:[2]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by

_____

[2] The Defendants' practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at*, http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

10.  Florida has now become the epicenter for these force-placed insurance schemes.  In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

---

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*, http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

## LPI Premium by State:  Florida Has Become Ground Zero

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                         August 9, 2012

11.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiff and the proposed class he seeks to represent.  This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by PNC, PNC Mortgage, Assurant, and ASIC.

<strong><u>PARTIES</u></strong>

**<u>Plaintiff</u>**

12.     Plaintiff ENRIQUE MONTOYA is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

**<u>Defendants</u>**

13.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth

in lender placed homeowner's insurance . . . .  The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender placed program." [5]

14.    Upon information and belief, Assurant owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including ASIC) to operate their force-placed insurance business under that name.

15.    Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  American Security often operates under the trade name "Assurant Specialty Property."  American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

16.    Upon information and belief, American Security passes much of its profits from force-placed insurance to its corporate parent, Assurant.

17.    Defendant PNC BANK, N.A. is a national banking association headquartered in Pittsburgh, Pennsylvania, which regularly conducts business in the State of Florida and throughout the United States.

18.    Defendant PNC MORTGAGE is a division of PNC Bank, N.A. also headquartered in Pittsburgh, Pennsylvania.  PNC Mortgage is registered to do business in the State of Florida and regularly conducts business here and throughout the United States.

---

[5] *See* Assurant Form 10-K for the fiscal year ending December 31, 2011, at 5, *available at* http://www.sec.gov/Archives/edgar/data/1267238/000119312512075371/d257568d10k.htm.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

20.     Plaintiff is a citizen of the State of Florida.  Defendants are citizens of various other states but are registered to do business in the aforementioned states.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

21.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

22.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

23.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all

times relevant hereto, Plaintiff resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

24.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

25.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements used by PNC and PNC Mortgage (together, the "PNC Defendants") include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

26.     What is unknown to borrowers and not disclosed in the mortgage agreements is that the PNC Defendants have exclusive arrangements with Assurant and its affiliates, including ASIC, to manipulate the force-placed insurance market and artificially inflate premiums.  The premiums are inflated to provide the PNC Defendants and their affiliates with kickbacks disguised as "commissions" or to provide the lender or servicer with lucrative reinsurance arrangements as well as to include unmerited charges.  The borrower is then forced to pay the inflated premiums.

## The Force-Placed Insurance Scheme

27.     The Assurant Defendants have exclusive arrangements with the PNC Defendants

to monitor their mortgage portfolios and provide force-placed insurance. In addition to the subsidized mortgage services they receive from the Assurant Defendants, the PNC Defendants and/or their affiliates are kicked back a percentage of the force-placed premium. The PNC Defendants receive additional compensation through captive reinsurance arrangements.

28.     The scheme works as follows.   The PNC Defendants purchase master or "umbrella" insurance policies that cover the entire PNC portfolio of mortgage loans.   In exchange, the Assurant Defendants are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. Assurant and its affiliates monitor the PNC Defendants' entire loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, an Assurant affiliate, (in Mr. Montoya's case, ASIC), sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

29.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the past premiums charged to the borrower.

30.     Once coverage is forced on the property, the PNC Defendants charge the borrower for the insurance premiums, which are either deducted from the borrower's mortgage escrow account by PNC's exclusive force-placed insurance vendors, or added to the balance of

the borrower's loan.[6]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

31.     The PNC Defendants pay the premiums to the insurers who then kick back a set percentage to PNC and or/ its affiliates as a "commission."  Upon information and belief, a percentage of that payment is then shared with the lender or servicer, sometimes in the form of "soft dollar" credits.

32.     The money paid back to PNC and its affiliates is not given in exchange for any services provided by it; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, the insurer discloses to the borrower that PNC affiliates may earn commissions or income as a result of the forced placement of new coverage.  In reality, however, no work is ever done by PNC affiliates to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.  As a result, no commission or income is "earned."

33.     Under this highly profitable force-placed insurance scheme, the PNC Defendants are incentivized to purchase and force place insurance policies with artificially inflated premiums on a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.

34.     The Assurant and PNC Defendants also enter into agreements for ASIC and other Assurant affiliates to provide servicing activities on the PNC Defendants' entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed

---

[6] On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the
lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire
cost to service the entire loan portfolio.

35.     In addition, the Assurant Defendants enter into essentially riskless "captive
reinsurance arrangements" with the PNC Defendants to "reinsure" the property insurance force-
placed on borrowers.  A recent *American Banker* article illustrated this reinsurance problem
using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance
> they buy on behalf of mortgage borrowers who have stopped paying for
> their own coverage. In JPMorgan's case, 75% of the total force-placed
> premiums cycle back to the bank through a reinsurance affiliate. This has
> raised further questions about the force-placed market's arrangements. . . .
>
> Over the last five years, Chase has received $660 million in reinsurance
> payments and commissions on force-placed policies, according to New
> York's DFS. . . .
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers
> pay to Assurant, the bank ends up keeping $58 in profit, DFS staff
> asserted. The agency suggested the bank's stake in force-placed insurance
> may encourage it to accept unjustifiably high prices by Assurant and to
> avoid filing claims on behalf of borrowers, since that would lower its
> reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry,
> noting that Assurant and QBE have undertaken acquisitions that give them
> long-term control of 90% of the market.  Further limiting competition are
> the companies' tendency to file identical rates in many states, Lawsky and
> his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May
18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-
regulator-attack-1049460-1.html.

36.     PNC's reinsurance program, like those of other lenders, is simply a way to funnel
profits, in the form of ceded premiums, to PNC at borrowers' expense.  While reinsurance can,

and often does, serve a legitimate purpose, here it does not.  On information and belief, PNC and/or its affiliates enter into reinsurance agreements with the Assurant Defendants that provide that the insurer will return to the PNC Defendants significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to PNC subsidiaries.  The ceded premiums are nothing more than a kickback to the PNC Defendants and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while the PNC Defendants and/or their affiliates purportedly provided reinsurance, they did not assume any real risk.

37.    The PNC and Assurant Defendants disclose that the new forced placement may result in a "financial benefit or loss" to a PNC Mortgage affiliate because the insurer will transfer a portion of the risk covered to the affiliate in exchange for a portion of the premium.  However, they then expressly misrepresent that this risk-sharing arrangement will not affect the amounts charged the borrower. Reinsurance profits are, in fact, bundled into these amounts and passed on to the borrower.  Moreover, they omit to disclose that no real risk is assumed by the PNC entities.

38.    The PNC Defendants may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

39.    The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when Defendants add the cost of the high-priced

premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

40.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive "premiums" for force-placed insurance. These premiums are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

41.     Plaintiff here does not challenge the PNC Defendants' right to force place insurance in the first instance. He challenges Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which the PNC Defendants purchase from the Assurant Defendants and then choose to pass on to the borrower. This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiff the excess amounts charged to him beyond the true cost of insurance coverage.

## Plaintiff Enrique Montoya

42.     Plaintiff Enrique Montoya took a mortgage loan from American Bancorp Mortgage Corp. on April 4, 2003, secured by a mortgage on real property in Miami, Florida. At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned and/or serviced by the PNC Defendants.

43.     Mr. Montoya's mortgage agreement provides as follows:

**5. Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included

15

within the term "extended coverage," and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires … If Borrower fails to maintain coverage described above, Lender may obtain insurance, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular amount or type of coverage … Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

.

44.     Mr. Montoya first had hazard coverage forced on his property in June 2008, when his loan was serviced by National City Mortgage Co. PNC Mortgage renewed Mr. Montoya's hazard coverage, which had at all times been placed through ASIC, in May 2010. The annual premium for the forced coverage was $3003.00.

45.     PNC again renewed Mr. Montoya's hazard insurance in May 2011, at an annual premium of $3134.00.

46.     The following year, Mr. Montoya provided proof of voluntary insurance and, as a result, PNC Mortgage cancelled his forced coverage, leaving a balance of $46.03 for a five-day lapse in coverage. After Mr. Montoya's voluntary coverage was cancelled months later, PNC Mortgage secured new forced coverage through ASIC for the Miami property in November 2012.

47.     PNC Mortgage "replaced" the November 2012 policy in May 2013 at an annual premium of $5326.76.

48.     Mr. Montoya was charged for and/or paid amounts for force-placed coverage in connection with each policy that the PNC Defendants placed or renewed on his property. At no time did any Defendant disclose to Mr. Montoya that the amounts charged him covered kickbacks to a PNC affiliate, reinsurance profits, bundled administrative costs, or any of the other impermissible charges described in this complaint.

49.     There are no material differences between these Defendants' actions and practices directed to Mr. Montoya and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

A.      **Class Definitions**

50.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiff seeks to represent the following classes:

Nationwide class:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property through the PNC Defendants and/or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

Florida Subclass as to Count V – Florida Deceptive and Unfair Practices Act:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State of Florida, through the PNC Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

51.     Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

52.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

B.      **Numerosity**

53.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in

the state of Florida, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**C.    Commonality**

54.    There are questions of law and fact that are common to Plaintiff's and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

a. Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

b. Whether the PNC Defendants breached the mortgage contracts with Plaintiff and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiff and the Class for servicing their loans;

c. Whether Defendants have been unjustly enriched at the expense of the Plaintiff and the Class;

d. Whether the PNC Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance premiums being charged to Plaintiff and the Class;

e. Whether Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiff and the Class;

f. Whether PNC affiliates perform any work or services in exchange for the

"commissions" or other "compensation" they collect;

g.   Whether the premiums charged are inflated to include kickbacks and unwarranted "commissions;"

h.   Whether the premiums charged are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiff and the Class under the terms of their mortgages;

i.   Whether the premiums charged are inflated to include the cost of a captive reinsurance arrangement;

j.   Whether the PNC Defendants violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.   Whether the PNC Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.   Whether an objective consumer would be deceived by PNC Motrgage's arrangement, which incentivizes Defendants to charge inflated and unnecessary fees for force-placed insurance, and therefore violates FDUTPA;

m.   Whether the Assurant Defendants intentionally and unjustifiably interfered with the Plaintiff's and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

n.   Whether Plaintiff and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.   <u>Typicality</u>**

55.   Plaintiff is a member the Class he seeks to represent.  Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

E.    <u>**Adequacy of Representation**</u>

56.    Plaintiff is an adequate representative of the class he seeks to represent and will fairly and adequately protect the interests of that class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them.   There is no hostility between Plaintiff and the unnamed class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

57.    To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F.    <u>**Requirements of Fed. R. Civ. P. 23(b)(3)**</u>

58.    The questions of law or fact common to Plaintiff's and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

59.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

60.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

G.    <u>**Superiority**</u>

61.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

20

(a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

### H.   Requirements of Fed. R. Civ. P. 23(b)(1) & (2)

62.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

63.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

### COUNT I

### BREACH OF CONTRACT
### (against the PNC Defendants)

64.     Plaintiff Enrique Montoya re-alleges and incorporates paragraphs 1-49, above as if fully set forth herein and further alleges as follows.

65.     Plaintiff and all similarly situated class members have mortgages that are owned and/or serviced by the PNC Defendants.

21

66.     Plaintiff and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by the PNC Defendants.   The force-placed provisions from Plaintiff's mortgage is set forth above in paragraph 43, and a true and correct copy of the mortgage agreement is attached to this complaint as **Exhibit A**.

67.     Plaintiff's mortgage requires that he maintain insurance on his property and provides that if he fails to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

68.     The PNC Defendants charge borrowers premiums that include unearned "commissions" or kickbacks, reinsurance premiums, as well as bundled administrative and other impermissible costs.   These costs are not costs of coverage, and are not applied to protecting the PNC Defendants' rights or risk in the collateral for borrowers' mortgage loans.   The PNC Defendants breached the mortgage agreements by, among other things, charging Plaintiff and class members the amounts beyond the actual cost of coverage.

69.     The PNC Defendants have also breached Plaintiff's and the Class members' mortgage agreements by charging Plaintiff and the Class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the PNC Defendants' rights in their collateral or cover their risk.

70.     Plaintiff and the Class members have suffered damages as a result of the PNC Defendants' breaches of contract.

**WHEREFORE**, Plaintiff Montoya, on behalf of himself and all similarly situated Class members, seeks compensatory damages resulting from the PNC Defendants' breach of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages.

Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

**COUNT II**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(against the PNC Defendants)**

71.    Plaintiff Montoya re-alleges and incorporate paragraphs 1-49, above as if fully set forth herein and further allege as follows.

72.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

73.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

74.    Plaintiff's and the Class Members' mortgage contracts allow the PNC Defendants to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

75.    The PNC Defendants are afforded substantial discretion in force-placing insurance coverage.  They are permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate any price for the coverage they procure.  The servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.  Plaintiff does not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

76.    The PNC Defendants breached the implied covenant of good faith and fair dealing by, among other things:

(a)   Manipulating the force-placed insurance market by selecting insurers (here, Assurant and its affiliates) that will artificially inflate premiums to include kickbacks to PNC affiliates and issue excess insurance coverage not necessary to cover the PNC Defendants' risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

(b)   Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

(c)   Assessing inflated and unnecessary insurance policy premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

(d)   Allowing PNC affiliates to collect a percentage of the premiums charged to Plaintiff and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)   Charging Plaintiff and the Class for commissions when the insurance is prearranged and no commission is due;

(f)   Charging Plaintiff and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiff or the Class;

(g)   Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h)   Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(i)   Charging Plaintiff and the Class an inflated premium due to the captive reinsurance arrangement.

77.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

**WHEREFORE**, Plaintiff Montoya, on behalf of himself and similarly situated Class members, seeks a judicial declaration that the premiums charged and the terms of the force-

placed insurance policies violate the duties of good faith and fair dealing.  Plaintiff also seeks compensatory damages resulting from the PNC Defendants' breaches of their duties.  Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (against the PNC Defendants)[7]

78.     Plaintiff re-alleges and incorporates paragraphs 1-49 above as if fully set forth herein and further allege as follows.

79.     The PNC Defendants and their affiliates received from Plaintiff and Class members benefits in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

80.     These Defendants entered into an agreement whereby the insurance vendor—here, Assurant's subsidiaries, including American Security—would provide force-placed insurance policies to the PNC Defendants for the portfolio of loans monitored on behalf of the PNC Defendants.  The PNC Defendants would then charge Plaintiff and the Class premiums that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

81.     These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

82.     The Assurant Defendants paid and collected significant monies in premiums,

_____
[7] Plaintiff pleads his unjust enrichment claim against the PNC Defendants in the alternative to their contractual claims against them.

kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).   Commissions or kickbacks were paid directly to the PNC Defendants and/or their affiliates in order to be able to exclusively provide force-placed insurance policies.   The Assurant Defendants were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the PNC Defendants and/or their affiliates.

83.     These payments directly benefitted the PNC Defendants and/or their affiliates and were taken to the detriment of the borrower.   The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower.   Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

84.     Further, the PNC Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

85.   As a result, Plaintiff and the Class have conferred a benefit on the PNC Defendants.

86.   These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

87.   These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, demand an award against the PNC Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT
### (against Assurant and American Security)

88.     Plaintiff re-alleges and incorporates paragraphs 1-49 above as if fully set forth herein and further allege as follows.

89.     The Assurant Defendants received from Plaintiff and the Class members benefits in the form of insurance premiums related to force-placed insurance policies.

90.     The Assurant Defendants paid significant monies to the PNC Defendants in kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).   Commissions or kickbacks were paid directly to the PNC Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

91.     The PNC Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

92.     On information and belief, the Assurant Defendants deducted the excess premiums directly from borrowers' escrow accounts.   In the alternative, the PNC Defendants were mere conduits for the delivery of insurance premiums to the Assurant Defendants.

93.     As a result, Plaintiff and the Class have conferred a benefit on the Assurant Defendants.

94.     These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

95.     These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these

Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, demands an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

**COUNT V**

**VIOLATION OF THE FLORIDA DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT
(against PNC Mortgage)**

96.     Plaintiff Montoya re-alleges and incorporates paragraphs 1-49 above as if fully set forth herein and further allege as follows.

97.     FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

98.     Plaintiff and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

99.     PNC Mortgage has engaged in, and continues to engage in, unconscionable acts or practices and have engaged in unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

100.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by the above-named Plaintiff and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for PNC Mortgage.

101.    Specifically, PNC Moertgage had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated premiums for force-

28

placed insurance policies, charge that amount to Plaintiff and the Florida Subclass, and then receive compensation through either kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

102.    PNC Mortgage's conduct of charging an inflated premium for their force-placed insurance to Plaintiff and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

103.    PNC Mortgage is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, neither entity is a bank or savings and loan association regulated by federal agencies.

104.    Plaintiff and the Florida Subclass have sustained damages as a direct and proximate result of PNC Mortgage's unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiff and the Florida Subclass a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

105.    Plaintiff and the Florida Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff Montoya, on behalf of himself and the Florida Subclass, demands judgment against PNC Mortgage for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

<u>COUNT VI</u>
<u>VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.*</u>
<u>(against the PNC Defendants)</u>

106.    Plaintiff Montoya re-alleges and incorporates paragraphs 1-49, above as if fully set forth herein and further allege as follows.

107.    Plaintiff's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

108.    The PNC Defendants are "creditors" as defined by TILA because they owned Plaintiff's mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the PNC Defendants were the creditors.

109.    Pursuant to TILA, the PNC Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

110.    The PNC Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when they: (i) added force-placed insurance to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving the PNC Defendants and/or their affiliates as a result of the purchase of force-placed insurance.

111.    When the PNC Defendants changed the terms of Plaintiff's mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of the PNC Defendants' interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, the PNC Defendants were then required to provide a new set

of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, the PNC Defendants increased the principal amount under Plaintiff's mortgage when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

112.    The PNC Defendants adversely changed the terms of Plaintiff's loan after origination in order to allow their affiliate to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  The PNC Defendants have never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

113.    The PNC Defendants also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

114.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because the PNC Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the PNC Defendants and their affiliates and was concealed from borrowers.

115.    Plaintiff and Class Members have been injured and have suffered a monetary loss arising from the PNC Defendants' violations of TILA.

116.    As a result of the PNC Defendants' TILA violations, Plaintiff and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

117.    Plaintiff and Class Members are also entitled to recovery of attorneys' fees and

costs to be paid by the PNC Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff Montoya, on behalf of himself and all Class members similarly situated, seeks a judgment in his favor against the PNC Defendants awarding actual damages and a penalty of $500,000.00 or 1% of the PNC Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by the PNC Defendants, as provided by 15 U.S.C. § 1640(a)(3).

<u>**COUNT VII**</u>

<u>**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**</u>
<u>**(against Assurant and ASIC)**</u>

118.   Plaintiff Montoya re-alleges and incorporates paragraphs 1-49, above as if fully set forth herein and further allege as follows.

119.   Plaintiff and the Class members have advantageous business and contractual relationships with the PNC Defendants pursuant to the mortgage contracts.  Plaintiff and the Class have legal rights under these mortgage contracts.  For example, Plaintiff and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

120.   Assurant and its subsidiaries, including ASIC, have knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiff and the Class and the PNC Defendants.  Assurant and ASIC are not parties to the mortgage contracts, nor are they third-party beneficiaries of the mortgage contracts.  Further, Assurant and ASIC do not have any beneficial or economic interest in the mortgage contracts.

121.   Assurant and ASIC intentionally and unjustifiably interfered with Plaintiff's and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with the  PNC Defendants and their affiliates, whereby they provide compensation (kickbacks, reinsurance, and low cost services) to the PNC Defendants in

exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiff and the Class.

122.    Plaintiff and the Class have been damaged as a result of the Assurant's and ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiff Montoya, on behalf of himself and all Class Members similarly situated, seeks a judgment in their favor against the Assurant Defendants for the actual damages suffered by them as a result of their tortious interference.  Plaintiff also seeks all costs of litigating this action, including attorneys' fees.

<u>**COUNT VIII**</u>

<u>**BREACH OF FIDUCIARY DUTY**
**(against the PNC Defendants)**</u>

123.    Plaintiff Montoya re-alleges and incorporates paragraphs 1-49, above as if fully set forth herein and further allege as follows.

124.    The PNC Defendants hold funds in escrow on behalf of borrowers whose mortgages they service.  These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiff and members of the Class under the terms of the mortgage agreements.

125.    The PNC Defendants are in a fiduciary relationship with Plaintiff and the Class because the PNC Defendants receive a greater economic benefit from these transactions than they would from a typical escrow transaction.  Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when the PNC Defendants took it upon themselves to manage borrowers' escrow accounts and then withdrew money from borrowers' escrow accounts to pay force-placed insurance premiums.  The PNC Defendants violated their fiduciary duties

when they arranged to receive unlawful kickbacks or other compensation under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgages.

126.    The PNC Defendants breached their fiduciary duties to Plaintiff and other members of the proposed class by: (1) not acting in borrowers' best interest when they profited from force-placed insurance policies that were purchased using escrow funds they held for the benefit of Plaintiff and Class members at the expense of Plaintiff and Class members; and (2) not disclosing the kickback scheme to Plaintiff and Class Members.

127.    These actions were undertaken by the PNC Defendants in bad faith for their own benefit and were not intended to benefit these Plaintiff or other proposed Class members.

128.    As a direct result of the PNC Defendants' actions and subversion of Plaintiff's interest to their own in reaping extravagant and outrageous fees, Plaintiff and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiff and the proposed class are entitled to damages for the PNC Defendants' breaches of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiff and the proposed class are entitled to punitive damages because the PNC Defendants acted in bad faith in deliberate or reckless disregard of both their rights and the PNC Defendants' obligation to hold their escrow funds in trust.

## COUNT IX

## Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Plaintiff against All Defendants)

129.    Plaintiff re-alleges and incorporates paragraphs 1-49 of this complaint as if fully set forth herein.

130.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

131.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the PNC Defendants, Assurant, and ASIC.

132.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiff and Class Members to pay unreasonably high premiums for force-placed insurance through a scheme that inflated such premiums to cover kickbacks and expenses associated with monitoring the PNC Defendants' entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

133.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

134.    The PNC Defendants, Assurant, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

135.    The PNC Defendants, Assurant, and ASIC conducted and participated in the

affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

136.     As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff and Class members with the intent to defraud and deceive Plaintiff and Class members.  For example, Assurant and ASIC, with the approval of the PNC Defendants, sent form letters to Plaintiff on PNC Mortgage letterhead, stating that PNC Mortgage would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.  These Defendants represented in the letters that PNC would purchase the required coverage and charge the borrower "the premium amount" or "the cost of th[e] insurance coverage."  In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that Plaintiff was charged represented the "cost" of the policies, when in fact such premiums also included kickbacks, reinsurance profits, and other costs returned to the PNC Defendants or their affiliates.  Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiff unreasonably high premiums and would have influenced Plaintiff's decisions whether to pay the premiums or contest them.  One such letter was sent to Plaintiff on November 15, 2012.

137.     Assurant and ASIC, with the approval of the PNC Defendants and on PNC Mortgage letterhead also sent Plaintiff force-placed insurance notices informing him that force-placed insurance had been purchased or renewed.  The letters represented that "annual premium will be/has been deducted from your escrow account" and discussed the "cost of coverage."

Renewal notices also informed the borrower of the "coverage amount" in dollars for the "lender-placed insurance we purchased last year." Letters including these misrepresentations were sent to the Plaintiff on May 16, 2010, May 13, 2011, May 30, 2012, April 9, 2013, and May 22, 2013.

138.    All of the aforementioned letters also warned that the forced placement of new coverage "m[ight] result in a financial benefit or loss to a PNC Mortgage affiliate because the insurance company w[ould] transfer a portion of the risk to the affiliate in exchange for a portion of the insurance premium." The letters then misrepresented that the "risk sharing arrangement (known as reinsurance) does not affect the amount of your insurance premium."

139.    The letters dated May 16, 2010 and May 13, 2011 also included the representation that "as a result of th[e] placement, affiliates of PNC Mortgage may *earn* commissions or income." This statement was inaccurate because the payments to PNC affiliates were, in fact, kickbacks, not earned income or commissions, and were not paid to the affiliates in connection with any work performed in connection with the new coverage forced on the borrower's property.

140.    For the purpose of executing the scheme to defraud, Defendants sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff and Class Members that they could charge Plaintiff and Class Members unreasonably high force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiff and Class Members, in violation of the wire fraud statutes.

141.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff and Class

Members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiff and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

<u>**COUNT X**</u>

<u>**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)**</u>
<u>**(Plaintiff against all Defendants)**</u>

142.    Plaintiff re-alleges and incorporates paragraphs 1-49 and 129-141 of this complaint as if fully set forth herein.  Plaintiff further alleges as follows.

143.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

144.    Defendants agreed that ASIC and Assurant would be the PNC Defendants' exclusive force-placed insurance providers and would extract unreasonably high premiums from the PNC Defendants' customers.  Defendants also agreed that the Assurant Defendants would pay kickbacks to PNC affiliates.

145.    The PNC affiliates pass much of its profits from this scheme to the PNC Defendants.

146.    ASIC passes much of its profits from this scheme to Assurant.

147.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

148.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class Members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiff and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and their counsel to be representatives of the Class and the Florida Subclass;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiff and the Class as a result of the PNC Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiff and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)     Awarding damages sustained by Plaintiff and the Class as a result of the Assurant Defendants' interference;

(8)     Awarding actual damages and a penalty of $500,000.00 or 1% of the PNC Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs,

as provided by 15 U.S.C. § 1640(a)(3);

(9)    Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 6th day of February, 2014.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &<br>THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiff* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>Stephen F. Rosenthal<br>srosenthal@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* |
| Lance A. Harke, Esq.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:      (305) 536-8220<br>Facsimile:       (305) 536-8229<br>*Counsel for Plaintiff* | Allan A. Joseph, Esq.<br>ajoseph@fuerstlaw.com<br>**FUERST ITTLEMAN DAVID &<br>JOSEPH, PL**<br>1001 Brickell Bay Drive, 32nd Floor<br>Miami, Florida 33131<br>Telephone: (305) 350-5690<br>Facsimile:  (786) 364-7995<br>*Counsel for Plaintiff* |

351514