### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE No. 14-20474-CIV-GOODMAN

### [CONSENT CASE]

ENRIQUE MONTOYA and
NEYSER COLONIA,

     Plaintiffs,

vs.

PNC BANK, N.A., et al.,

     Defendants.

_____/

### ORDER ON DEFENDANTS' MOTION TO DISMISS

In their 1991 hit song "Wind of Change," the German rock band Scorpions

explained that the future is "blowing with the wind of change."[1] Twenty-three years

later, then-Chief United States District Judge Federico A. Moreno, in an order

approving a class action settlement in a similar case, described as "significant" the

"headwinds" created by two recent appellate decisions rejecting claims brought in

connection with force-placed insurance coverage. *Saccoccio v. JP Morgan Chase Bank,*

*N.A.,* 297 F.R.D. 683, 693 (S.D. Fla. 2014). In fact, Judge Moreno noted that the legal

headwinds suggest that "it is not at all clear that Plaintiff would have succeeded at

trial." *Id.* at 692. But regardless of whether class force-placed insurance claims are now

confronting nasty headwinds or turbulent winds of change, there is no doubt that

---

[1]     *Wind of Change,* on CRAZY WORLD (Mercury Records 1991).

recent federal appellate decisions have changed the climate for Plaintiffs' class action attorneys pursuing force-placed insurance claims.

As outlined below, Plaintiffs' force-placed insurance claims confront a blustery legal atmosphere, which explains why the Court is **dismissing** a few of their claims now at the motion-to-dismiss stage -- and simultaneously noting that some of the remaining claims will need to weather the legal squalls which will later blow their way again in the inevitable summary judgment motions. Other counts have survived the motions to dismiss, while most of the dismissed counts have been dismissed without prejudice.

## I.     BACKGROUND[2]

Homeowners are often required by the terms of their mortgage contracts to maintain insurance coverage on the properties securing their loans. When the homeowner does not maintain the insurance, the lender is authorized by the mortgage contract to purchase new insurance to cover its interest in the property. Lenders do this by contracting with insurance providers. This is what is commonly referred to as

---

[2]     The Court can consider the documents attached to PNC Bank, N.A.'s motion because on a motion to dismiss "a court may consider the complaint, its attachments, and documents attached to the defendant's motion to dismiss if the attached documents are central to the plaintiff's claims and referred to by the plaintiff without converting the motion to a motion for summary judgment." *Brown v. One Beacon Ins. Co. Inc.,* 317 F. App'x 915, 917 (11th Cir. 2009) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1368–69 (11th Cir. 1997) (per curiam)). All the documents attached to PNC Bank N.A.'s motion are central to Plaintiffs' claims and are undisputed, or are public records which are appropriate for judicial notice.

lender-placed insurance ("LPI"), which is sometimes deemed (usually by plaintiffs) as force-placed insurance. This case is one of many[3] putative civil class actions that have been filed around the country against various lenders and servicers regarding their LPI programs. Many of these suits, like the one here, allege that lenders and their insurance providers have colluded together to create a nefarious scheme of kickbacks that artificially inflate LPI rates. [ECF No. 42, pp. 2-4]. According to Plaintiffs, this scheme results in LPI premiums that can be up to ten times greater than the market rate available to the unsuspecting homeowner. [ECF No. 42, ¶ 6].

Here, named Plaintiffs Enrique Montoya ("Montoya"), a Florida resident, and Neyser Colonia ("Colonia"), a New Jersey resident (collectively, "Plaintiffs"), assert that Defendant lenders PNC Bank, N.A. ("PNC") and PNC Mortgage ("PNC Mortgage") and Defendants Assurant, Inc. ("Assurant") and American Security Insurance Company ("ASIC") are liable to them for damages concerning the LPI placed on their homes because alleged "kickbacks" inflated the price of the LPI premiums that Plaintiffs were ultimately charged. [ECF No. 42]. Plaintiffs allege various theories of

---

[3]     The  district court decisions on these claims have not been uniform. Although many of the district court cases have permitted the lawsuits, at least at the motion to dismiss stage, not all district courts have followed this approach. To the extent that these rulings vary, even among judges in the same district, the different results are permissible and simply reflect the reality that not all district judges (and magistrate judges presiding with full consent) will fully agree on all legal issues in the absence of binding, non-distinguishable appellate authority. *See Camreta v. Green*, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (internal citation and quotations omitted).

liability, such as breach of contract, equity, tort, fraud, and state and federal statutory claims.

What makes this LPI case factually unique is that the LPI premiums Montoya paid were **actually lower than the ones he purchased himself on the open market**. Colonia's LPI premiums were at first more than the market rate insurance he obtained on his own, but his LPI premiums also ended up being slightly *less* than the market rate.

### A. <u>Plaintiff Montoya</u>

Montoya acknowledges that his mortgage agreement required him to maintain insurance on his home and that if he failed to do so, PNC was expressly authorized to purchase LPI and to charge him for the LPI premiums. [ECF No. 42, ¶ 46]. In particular, Montoya's mortgage agreement provides as follows:

> Borrower [Montoya] shall keep the improvements now existing or hereafter erected on the property insured . . . If Borrower fails to maintain any of the coverage described above [i.e., insurance], Lender [PNC] may obtain insurance coverage, at Lender's option, and Borrower's expense . . . Borrower acknowledges that the costs of the [Lender's] insurance coverage so obtained **might significantly exceed** the cost of insurance the Borrower could have obtained.

[ECF No. 56-2, § 5 (emphasis added)].

Montoya's insurance lapsed on his Miami, Florida property on May 4, 2008. [ECF No. 56-4]. He had been paying the Gulfstream Property and Insurance Company an annual premium of $6,170.00, including a $5,981.00 annual premium for dwelling coverage of $164,075. [ECF No. 56-5]. Following the lapse, PNC's predecessor-in-

interest, National City Mortgage Company ("National City"), sent a disclosure letter to

Montoya that stated, among other things:

> If we do not receive evidence of continuous . . . insurance coverage it will
> be necessary for us to secure coverage to protect **our** interest at **your**
> expense. The cost of such coverage may be **substantially higher** than the
> amount you would normally pay . . . [Our] [a]ffiliates **may earn
> commission or income** in conjunction with the placement of this
> coverage.

[ECF No. 56-6 (emphasis added)].

After not hearing from Montoya or receiving any evidence of insurance, National

City purchased LPI for Montoya's property that provided $164,100 of dwelling

coverage for an annual premium of $3,099.09 -- nearly **$3,000 *less than* the $5,981.00**

**premium that Montoya had paid for the expired Gulfstream Policy**.[4] [*See* ECF No. 56-

8]. The one-year policy, which was written by ASIC, was made effective retroactive to

May 4, 2008, the date of the Gulfstream Policy's lapse, and National City charged

Montoya's escrow account for the amount of the LPI premium. [*Id.*].

The LPI on Montoya's property was renewed annually, at roughly the same

premium and dwelling coverage amount. [ECF Nos. 56-9 ($3,075.07); 56-10 ($3,075.07);

56-11 ($3,240.56); 56-12 ($3,254.16)]. In May 2012, Montoya notified PNC that he had

obtained his own insurance coverage from Universal Property and Casualty Insurance

Company, effective May 9, 2012, with a dwelling coverage amount of $264,948 at an

---

[4]      Montoya never elected to pay an additional premium of approximately $250.00
per year for $40,000 of personal property coverage and $25,000 of personal liability
coverage.

annual premium of **$5,849.00**. [ECF No. 56-14].

Montoya's own insurance was short lived. In October 2012, PNC received notice that Universal was canceling Montoya's policy and declaring it void *ab initio*, on the basis that there had been an "[i]ncorrect statement on the application." [ECF No. 56-16]. With no insurance on the property, PNC again dispatched notice letters to Montoya and eventually purchased LPI from ASIC, effective May 9, 2012, providing dwelling coverage in the amount of $264,948  (the identical dwelling coverage amount as the now-void Universal policy) at an annual premium of $5,177.40 --  nearly $700 less than Universal's dwelling coverage premium. [ECF Nos. 56-17; 56-18; 56-19]. In 2013, after providing advanced notice, PNC increased the LPI dwelling coverage to $272,631, which raised the premium to $5,326.76 --- still significantly less than what Montoya was able to secure on the market on his own. [ECF Nos. 56-20; 56-21].

### B.  Plaintiff Colonia

Like Montoya, Colonia's mortgage agreement required him to maintain insurance and authorized the lender to purchase insurance if he failed to do so. [ECF No. 56-23, §§ 2, 4, 7]. Colonia's insurance lapsed on his Elizabeth, New Jersey property on February 9, 2013. [ECF No. 56-26]. The lapsed Scottsdale Insurance Company policy had provided Colonia with $585,000 of property coverage at an annual premium of $4,175.00. [ECF No. 56-27]. When his Scottsdale policy lapsed, Colonia, like Montoya, received a disclosure letter that stated, among other things:

> **Because hazard insurance is required on your property, we [PNC] plan to buy insurance for your property. . . . The insurance we buy: may be more expensive than the insurance you can buy yourself . . . The insurance we obtain . . . is primarily for the benefit of PNC . . . if we purchase insurance for you, an affiliate of PNC . . . may benefit.**

[ECF No. 56-28 (bold emphasis in *original*)].

On February 6, 2014, after sending Colonia several disclosure letters regarding LPI and receiving no evidence of insurance coverage, PNC purchased LPI for his property at an annual total charge of $5,577.75 for $585,000 of coverage, effective back to February 9, 2013 --  the Scottsdale policy's cancelation date -- and charged that amount to Colonia's escrow account. [ECF Nos. 56-28; 56-29; 56-30]. Unlike Montoya, Colonia's LPI premium was approximately $1,400 more than the insurance he obtained on his own. The one-year policy was renewed on March 27, 2014, effective to February 9, 2014, for the same dwelling coverage but for a significantly reduced premium: $4,170.00 -- five dollars *less* than the premium on Colonia's expired Scottsdale policy. [ECF No. 56-31].

## II.    LEGAL STANDARD AND APPLICABLE LAW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take all well-pleaded facts in the plaintiff's complaint and all reasonable inferences drawn from those facts as true. *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). "A pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78

(2009) (quoting Fed. R. Civ. P. 8(a)(2)). While detailed factual allegations are not always necessary in order to prevent dismissal of a complaint, the allegations must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a court must accept as true a plaintiff's allegations, a court may dismiss a complaint on a dispositive issue of law. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

Both mortgages in this case contain a clause stating that they "shall be governed by federal law and the law of the jurisdiction in which the Property is located." Florida law and New Jersey law thus govern Montoya's and Colonia's common-law claims.

## III.   DISCUSSION

Before discussing the merits of Plaintiffs' First Amended Complaint (the "FAC"), the Court will address Defendants' case-dispositive arguments. First, the Court will address PNC Mortgage and Assurant's arguments that they are not proper parties to this action. Second, the Court will examine ASIC's filed rate doctrine argument. Third, the Court will examine ASIC's argument that Montoya's claims are barred by his failure to exhaust his administrative remedies. Fourth, the Court will address Defendants' damages and causation argument. Finally, the Court will examine whether two recent appellate court decisions require dismissal of the FAC.

A. **The Proper Parties to This Action**

    1. *PNC Mortgage is Dismissed From This Case*

Plaintiffs' FAC unequivocally alleges that PNC Mortgage is a **division** of PNC, not a separate entity. [ECF No. 42, ¶ 19]. Plaintiffs conceded at oral argument that being a corporate "division" does not justify separate legal status generating the ability to sue or be sued. Consequently, PNC Mortgage must be dismissed from this case because it is not an entity that legally exists. It therefore cannot be sued. *W. Beef Inc. v. Compton Inv. Co.*, 611 F.2d 587, 591 (5th Cir. 1980) (quoting *Stotter & Co. v. Amstar Corp.*, 579 F.2d 13, 18 (3d Cir. 1978)) ("A division of a corporation is not a separate entity but is the corporation itself.").

The Court will, however, dismiss PNC Mortgage from this case *without* prejudice. If during discovery Plaintiffs uncover grounds to support the conclusion that PNC Mortgage may be sued, then, consistent with Plaintiffs' counsel's Federal Rule of Civil Procedure 11 obligations, they may move to add PNC Mortgage back into the lawsuit as a party.

    2. *Assurant is Dismissed From This Case*

Assurant is ASIC's parent company. Assurant claims that it is not a proper party to this case because it does not contract with lenders or servicers to provide LPI. Accordingly, it moved to dismiss all claims against it **with prejudice**, arguing that Article III causation and redressability are lacking and, therefore, Plaintiffs lack

standing and this Court lacks subject matter jurisdiction. In support of its motion, Assurant submitted the Declaration of Jessica M. Olich, a Vice President and Assistant Secretary of Assurant. [ECF No. 57-1].[5]

In response, Plaintiffs argue that Assurant's 10-K and 10-Q forms, and its status as a signatory to a settlement with the New York Department of Financial Services demonstrate that Assurant "played some role in the force-placed insurance practices." [ECF No. 76 pp. 4-8]. Plaintiffs also requested jurisdictional discovery to determine if Assurant is a proper party. [ECF No. 102, pp. 103-06].

Assurant and Plaintiffs each cite to non-binding authority which supports their respective arguments. *Compare Roberts v. Wells Fargo Bank, N.A.*, No. 4:12-CV-200, 2013 WL 1233268, at *6-7 (S.D. Ga. Mar. 27, 2013) (analyzing similar declaration from Ms.

---

[5]      Ms. Olich attested to, among other things, the following: Assurant "is not, and has never been, an insurance company, and has never sold, underwritten, issued, or marketed insurance policies;" Assurant "does not contract, and has never contracted, with PNC Bank, N.A. and/or PNC Mortgage, to provide lender-placed insurance or to provide any services relating to lender-placed insurance;" Assurant "does not pay, and has never paid, commissions to" PNC; Assurant "is not, and has never been, involved in ASIC's daily decision-making or business operations;" Assurant "maintains separate books and corporate records from ASIC, and ASIC generates its own business;" and Assurant "is not now, nor has it ever been, a party to any agreement with" Montoya and Colonia. [ECF No. 57-1].

In response to a Court Order [ECF No. 101], Plaintiffs advised that they do not object to the Court considering Ms. Olich's Declaration. [ECF No. 106, Ex. B]. The Court can also consider Ms. Olich's Declaration because Assurant has filed a Rule 12(b)(1) motion that factually challenges this Court's jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) ("matters outside the pleadings, such as testimony and affidavits," may be considered in evaluating a Rule 12(b)(1) factual challenge).

Olich and dismissing, with prejudice, Assurant as a party), *with Simpkins v. Wells Fargo Bank, N.A.*, No. 12-CV-00768-DRH-PMF, 2013 WL 4510166, at *11-12 (S.D. Ill. Aug. 26, 2013) (rejecting Assurant's argument and denying motion to dismiss Assurant as a party).

To be sure, Assurant has set forth credible and unrefuted evidence that it is not a proper party to this case. On the other hand, according to Plaintiffs, the reason that Assurant's evidence is unrefuted is because they have not been given the opportunity to conduct discovery and test the sufficiency of Ms. Olich's declaration. [ECF No. 102, pp. 108-10]. The Court, however, cannot ignore the fact that Assurant has been dismissed as an improper party in other cases **after** jurisdictional discovery was conducted. *Cochran-May v. Wells Fargo Bank, NA*, No. 2:12-CV-240, 2014 WL 361177, at *1, 3 (S.D. Tex. Feb. 3, 2014) (dismissing Assurant as a party after permitting jurisdictional discovery).

As a result, the Court will strike a balance between these two competing needs. The Court will dismiss, without prejudice, Assurant as a party to this case. Plaintiffs, however, will be allowed to take Ms. Olich's deposition and the deposition of Assurant's Rule 30(b)(6) representative to explore their hunch that Assurant is a proper party to this case. These depositions will take place within 3 weeks of this Order. If, after taking these limited-purpose depositions, Plaintiffs believe they have sufficient grounds to establish that Assurant should be a party to this case, then, consistent with their Rule 11 obligations, they may move to add Assurant back in as a party.

**B.  The Filed Rate Doctrine**

"[T]he filed rate doctrine recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." *Taffet v. So. Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992). Under this doctrine, "any 'filed rate'-- that is, one approved by the governing regulatory agency -- is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994).

ASIC argues that its Florida and New Jersey rates were duly approved by the appropriate state regulatory bodies and, as such, Plaintiffs are barred from challenging the rates. Plaintiffs respond that the filed rate doctrine is inapplicable for two reasons. First, they are not the ratepayers, PNC is. Second, they are not challenging the rates charged, they are challenging ASIC's manipulation of the force-placed insurance *process*. ASIC contends that Plaintiffs' arguments are semantics to hide their true challenge to ASIC's approved rates.

The Court has examined the authority for and against dismissal. *Compare Rothstein v. GMAC Mortg., LLC*, No. 12 CIV. 3412 AJN, 2013 WL 5437648, at *3-6 (S.D.N.Y. Sept. 30, 2013) (denying motion to dismiss based on filed rate doctrine), *with Decambaliza v. QBE Holdings, Inc.*, No. 13-CV-286-BBC, 2013 WL 5777294 (W.D. Wis. Oct. 25, 2013) (finding filed rate doctrine bars plaintiffs' claims). The issue is a close one. After examining the applicable case law, the Court finds Judge Middlebrooks' approach

in *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2012 WL 2003337 (S.D. Fla. June 4, 2012) sound and logical.

There, at the motion to dismiss stage, Judge Middlebrooks accepted, as a court should, the plaintiffs' arguments and repeated allegations that they were not challenging the filed rate. *Id.* at *2-3. Put another way, Judge Middlebrooks did not do what ASIC wants the Court to do now: look under the proverbial hood of Plaintiffs' allegations and frame them in a way Plaintiffs have not.

At the later class certification phase, however, Judge Middlebrooks found that despite plaintiffs' representations to the contrary, plaintiffs' arguments indeed implicated the filed rate doctrine. *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2013 WL 139913, at *11-12 (S.D. Fla. Jan. 10, 2013). In doing so, he noted that his decision at the motion to dismiss stage was not dispositive of the issue and that his review of the filed rate doctrine at the class certification stage was more expansive than his earlier review.

The Court will accept, for now, Plaintiffs' strenuous arguments that they are not challenging ASIC's filed rates. ASIC, however, may raise the filed rate doctrine as an affirmative defense or as an objection to class certification and may raise the matter again before the Court.[6]

---

[6]     By referencing Judge Middlebrooks' later decision on class certification in *Kunzelmann,* the Court is not stating or implicitly suggesting that it would rule the same way on a class certification issue. In addition, by noting its view that Judge

### C. **Montoya's Administrative Remedies**

As part of its filed rate doctrine argument, ASIC argues that because Montoya is challenging its filed rates, his claims should be dismissed because he failed to exhaust his administrative remedies under Fla. Stat. § 627.371. This argument fails for two reasons.

First, § 627.371 sets forth complaint procedures for "[a]ny person aggrieved by any rate charged, rating plan, rating system, or underwriting rule followed or adopted by an insurer[,]" and allows such persons to request that the insurer or rating system review the manner in which the rate, plan, system, or rule has been applied. Fla. Stat. § 627.371. Here, the Court has accepted, for now, Montoya's assertion that he is not challenging ASIC's rates. Thus, § 627.371 would not apply.

Second, the plain text of the statute makes clear that the remedy provided by § 672.321 is available to plaintiffs claiming violations of Florida's insurance code. *See* Fla. Stat. §§ 627.371(1), 627.371(2). Indeed, even the primary case that ASIC cites involved a plaintiff alleging a violation of Florida's insurance code. *Serchay v. State Farm Fla. Ins. Co.*, 25 So. 3d 652, 653 (Fla. 4th DCA 2010) ("The plaintiff sued his homeowner's insurer, State Farm, in circuit court, alleging in various causes of action that State Farm violated sections 627.0629 and 627.711."). Here, there is no such claimed violation.

---

Middlebrooks' decision is logical and sound, the Court is referring only to his order on the filed rate theory at the initial motion-to-dismiss stage.

D. **Plaintiffs' Causation and Damages Theory**

This case presents the unusual situation where the LPI policies that PNC purchased for Montoya were actually less expensive than the policies that Montoya had purchased on his own. Moreover, although Montoya argues that the LPI policy that PNC purchased for him was not comparable because it did not cover personal liability and contents, he was provided the opportunity, but declined, to purchase additional coverage that would have made the coverages comparable. Even then, the total premium would still have been far lower than the premiums that he obtained on his own. In short, it appears that Montoya actually **benefitted**, economically, as a result of PNC's LPI. Colonia, on the other hand, did initially have to pay more. But, as noted earlier, Colonia's rate for the LPI policy ultimately was slightly lower than the premium for the policy that he had purchased himself.

Based on these facts, the question that ASIC and PNC raise is: so, where are the damages? That is easy to answer for Colonia because he did pay, albeit for a short while, a purportedly inflated rate. The answer is not so easy for Montoya, who at all times *saved* money and Plaintiffs' counsel has had difficulty cobbling together a theory of damages.

It appears that Plaintiffs' counsel have settled on the following damages theory: Plaintiffs, like Montoya, would have **saved even more money** had the LPI premiums they paid not been loaded with "kickbacks." [ECF No. 75, p. 16]. Put another way, they

contend that although the LPI premiums charged to Montoya were far lower than the rates Montoya secured (i.e., the market), they are not reflective of the actual market rates because they were still riddled with kickbacks.

In addition, Plaintiffs argue, in their response to ASIC's motion to dismiss, that "it is unlikely they would have paid the premiums without protest" if they had "known that their premiums had been artificially inflated to include amounts not properly charged them." [ECF No. 76, p. 32]. Under the practical reality of this theory, Montoya would have protested about paying lower premiums if only he had known that the lower premiums were inflated. This specific argument appears to conflict with common sense and the Court is not persuaded by the addition of the adjective "unlikely."

Setting aside the "unlikely-to-pay-without-protest" theory, the underlying damages theory (i.e., the premiums should have been even lower) is still, on its face, plausible enough to state a claim.

It very well could be that the rates secured by Montoya were not reflective of the market rate or that the LPI premiums he was charged are far greater than the then-market rate. These hypothetical facts, and other similar facts, would help support Plaintiffs' counsel's damages theory that the LPI premiums were loaded with kickbacks and that is why they are still high. And presumably Plaintiffs' counsel, who are well known to the Court for their skill in this area of the law, would have investigated these factual issues before concluding they have an adequate basis to make this assertion in

their written filings and at oral argument.

While the Court is not persuaded that this theory will ultimately carry the day, the Court is not currently faced with a summary judgment motion to fully consider this issue. Rather, the Court is now only at the motion to dismiss stage, where its review is limited. At this stage, the Court finds that Plaintiffs' stated damages theory is sufficient, albeit barely. *See Yaskot v. Int'l Natural, LLC,* No. 4:10-CV-490-CWD, 2011 WL 2036688, at *3 (D. Idaho May 24, 2011) (noting that the sufficiency of a complaint on a motion to dismiss "is dependent on the facts alleged in the claim for relief, not on the . . . allegations of damages or [the] theory of damages") (internal citation and quotations omitted).

### E.  *Feaz* **and** *Cohen*

PNC and ASIC contend that that the Seventh and Eleventh Circuit's recent opinions in *Cohen v. Am. Sec. Ins. Co.,* 735 F.3d 601 (7th Cir. 2013) and *Feaz v. Wells Fargo Bank, N.A.,* 745 F.3d 1098 (11th Cir. 2014) dispose of Plaintiffs' claims here. Plaintiffs contend that these cases are distinguishable.

In *Feaz*, the Eleventh Circuit affirmed the dismissal of claims arising under Alabama law concerning the forced placement of flood insurance. Defendants rely on the Eleventh Circuit's holding that the plaintiff's breach of fiduciary claim, based on allegations of "kickbacks" or "other compensation," was foreclosed by her mortgage lender's disclosure that she would "incur higher costs if it force-placed insurance for

her." *Feaz*, 745 F.3d at 1110-11. PNC also relies on language from *Cohen*, quoted with

approval by the *Feaz* court:

> [S]imply calling a commission a kickback doesn't make it one. The
> defining characteristic of a kickback is divided loyalties. But [the lender]
> was not acting on behalf of [the borrower] or representing her interests.
> The loan agreement makes it clear that the insurance requirement is for *the
> lender's* protection.

*Feaz*, 745 F.3d at 1111 (quoting *Cohen*, 735 F.3d at 611) (emphasis and brackets in

original).

Plaintiffs contend that the Court should distinguish both *Feaz* and *Cohen* because

the plaintiffs' allegations in those cases lacked ultimate facts to support the conclusion

that the payments made by the force-placed insurer to an affiliate of the lender were, in

fact, kickbacks rather than legitimate commissions. [ECF Nos. 75, pp. 12-15; 76, pp. 10-

11]. They argue that, unlike their allegations here, the *Cohen* and *Feaz* plaintiffs

described legitimate commissions in their complaints and simply labeled them

"kickbacks" in order to state a claim. They contend that the FAC is different because it

contains detailed allegations showing how and why payments made to PNC were

unearned/illegitimate commissions, i.e., kickbacks.

Plaintiffs asked this Court to consider the proposed third amended class action

complaint considered by the Seventh Circuit in *Cohen* and the first amended complaint

considered by the Eleventh Circuit in *Feaz*. [ECF Nos. 75-1; 75-2]. The Court reviewed

those pleadings.

Contrary to Plaintiffs' claims, the *Cohen* complaint is not wholly conclusory and detail-free. To the contrary, it contains some detailed allegations regarding alleged improper "kickbacks" by the insurance company to the bank. For instance, the *Cohen* complaint expressly references, at Paragraph 6, and incorporates by reference and attaches, a November 10, 2010 article in the *American Banker* discussing many of the alleged "abuses" regarding lender-placed insurance that Plaintiffs complain of in the FAC. [ECF No. 75-1, ¶ 6]. That article expressly discusses "kickbacks," reinsurance agreements, and commissions that are expressly referred to as being unearned. These are precisely the same type of underlying allegations in the FAC. To provide another example, the *Cohen* complaint discusses how "kickbacks" can come in the form of reinsurance agreements. [*Id.* at ¶ 14]. Coincidentally, the FAC says something similar at paragraphs 3 and 27. [ECF No. 42, ¶¶ 3, 27].

Regarding the *Feaz* complaint, Plaintiffs concede that the class action complaint there specifically alleged that "kickbacks, commissions, or other compensation that [the bank] received in connection with force-placed flood insurance were ***not legitimately earned***." [ECF Nos. 75, p. 14 (emphasis added); 75-2, ¶ 63].

To accept Plaintiffs' position would mean that any skilled lawyer could escape unfavorable precedent by rephrasing rejected allegations such as "not legitimately earned" to "unearned." But that is too narrow a view of our jurisprudential system that "like facts will receive like treatment in a court of law." *Birdwell v. City of Gadsden, Ala.,*

-19-

970 F.2d 802, 807 (11th Cir. 1992) (internal citation omitted). The Court, therefore, does not find persuasive Plaintiffs' contention that the holdings in *Cohen* and *Feaz* were based on a failure to allege that the kickbacks were unearned.

While the Court does not find Plaintiffs' first argument persuasive, the Court does reach a different conclusion about their other arguments and finds that *Feaz* and *Cohen* are distinguishable and do not compel dismissal of the FAC.

First, while *Feaz* is binding on this Court, *Cohen,* while persuasive, is not. Second, as United States District Judge James I. Cohn noted, *Feaz* and *Cohen* were decided under different state laws than the ones applicable here. *Hamilton v. Suntrust Mortg. Inc.*, No. 13-60749-CIV, 2014 WL 1285859, at *8-10 (S.D. Fla. Mar. 25, 2014). Specifically, *Feaz* and *Cohen* were decided under Alabama and Illinois law, respectively. Plaintiffs' claims here arise under Florida and New Jersey law. As will be seen below, there are subtle, yet significant, differences between how each state's law treats Plaintiffs' claims. To say, as Defendants impliedly do, that *Feaz* and *Cohen* decided all matters of state law regardless of the applicable state law is too broad a reading of those decisions.

Third, it is not so clear to the Court that the Eleventh Circuit fully "embraced" all of *Cohen's* conclusions, i.e., interpretation of the notices, etc. *Feaz* cites *Cohen* only for one underlying proposition: "[S]imply calling a commission a kickback doesn't make it one." And even then, when the *Feaz* court did so, it did it by specifically citing, one time, the precise page of *Cohen* discussing the Illinois Consumer Fraud Act in the

context of its analysis of Feaz's breach of fiduciary duty claim. *Feaz*, 745 F.3d at 1111 (citing *Cohen,* 735 F.3d <u>at 611</u>). The *Feaz* court did not cite to *Cohen* in any other part of its opinion, though it appears to the Court that it certainly would have done so if it deemed it relevant. To contend, as Defendants do, that this singular pincite constitutes the Eleventh Circuit's full "embrace" of every proposition articulated in *Cohen* is, in the Court's view, a stretch.

Finally, with regards to *Feaz,* the crux of that opinion was the interpretation of provisions in the plaintiff's mortgage contract that govern force-placed flood insurance and excess flood insurance in light of federal requirements. *Feaz*, 745 F.3d at 1101-10. Indeed, only the last half of the last paragraph of the *Feaz* opinion analyzed the issues at play in this litigation.

To use a sports analogy, the Court does not find, as Defendants contend, that *Feaz* and *Cohen* are the homeruns that end all similar class actions. The Court, however, does not find, as Plaintiffs suggest, that *Feaz* and *Cohen* are merely foul balls that have no effect on similar class actions. Rather, the Court finds that while those opinions are favorable to Defendants, they are, to continue the baseball reference, in play and therefore must be analyzed in the specific context of the facts and issues before the Court.

F. **The Merits of the FAC**[7]

    1. *Count I – Breach of Contract Against PNC*

Count I claims that PNC breached the mortgages in purchasing LPI for Plaintiffs' properties. The Court finds this claim fails for the same reasons that the same claim failed in *Cohen*.[8]

First, Plaintiffs concede that their respective mortgages "require that they maintain insurance on their property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, 'force place' the coverage, and charge the borrower . . ." [ECF No. 42, ¶ 75.] This is *precisely* what occurred in this case. [*Id.* at ¶¶ 47-50, 55]. Thus, PNC did not breach Plaintiffs' mortgages.

Plaintiffs, however, contend that this is not the breach they complain of. They say they do not challenge PNC's right to force coverage; they instead challenge the costs beyond that of coverage that PNC deducts from their escrow accounts, i.e., the kickbacks. [ECF No. 75, p. 12]. The problem for Plaintiffs, as the Court sees it, is that their agreements do not say that PNC cannot charge them these extra costs. To the contrary, they say the opposite. Just like in *Cohen*, Plaintiffs' agreements and "related

---

[7]    Because PNC Mortgage and Assurant are being dismissed, without prejudice, as parties to this action, the Court is only analyzing Plaintiffs' claims as against the remaining defendants, PNC and ASIC.

[8]    At oral argument, PNC withdrew its argument that Plaintiffs' breach of contract claim is barred because they breached the mortgage agreements first.

notices" "specifically contemplate" -- and "warned [the plaintiffs] accordingly" -- that the lender would receive a benefit or income "when lender-placed insurance becomes necessary." *Cohen*, 735 F.3d at 612.

Accordingly, as in *Cohen*, because "the loan agreement and related notices and disclosures specifically contemplate" the actions allegedly taken by PNC of which Plaintiffs now complain, "[Plaintiffs have] not alleged a viable breach-of-contract claim against [PNC]." *Id.* at 613. Consequently, the Court dismisses Count I with prejudice.

2.   *Count II – Breach of Implied Covenant of Good Faith Against PNC*

Plaintiffs allege that PNC breached the implied covenant of good faith and fair dealing by abusing the substantial discretion afforded to it by their mortgage contracts to enter into "back room" deals with ASIC, foster a noncompetitive market for force-placed coverage, and pass impermissible amounts on to borrowers, among other things. [ECF No. 42, ¶ 84]. PNC raises several arguments it contends warrant dismissal.

Both Florida and New Jersey law recognize, and PNC does not dispute, that every contract carries with it the implied provision that the parties act in accordance with principles of good faith and fair dealing. In other words, "[t]hrough implication, each party to a contract 'promises to perform' his 'part of the bargain in good faith' and 'expects the other party to do the same.'" *Wallace v. NCL (Bahamas) Ltd.*, 891 F. Supp. 2d 1343, 1352 (S.D. Fla. 2012) (Jordan, J.), *aff'd*, 733 F.3d 1093 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 1520 (2014) (citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 4th

DCA 1999). "This promise applies when a question is not resolved by the terms of the contract or when one party **has the power to make a discretionary decision without defined standards**." *Id.* (internal citation and quotation omitted) (emphasis added). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo v. UPS Co.*, 420 F.3d 1146, 1151–52 (11th Cir. 2005) (quotations omitted).

As noted in *Hamilton*, "where a contract gives a party substantial discretion to promote that party's self-interest, the implied covenant of good faith serves as a 'gap-filling default rule.'" 2014 WL 1285859, at *6 (internal citation omitted).  In filling the gaps, the implied covenant of good faith "limits that party's ability to 'act capriciously to contravene the reasonable contractual interpretations of the other party.'" *Id.* (internal citations omitted).

PNC argues that the Court should dismiss Montoya's claim because Florida law requires him to also identify a breach of an express provision of the contract. [ECF No. 56, pp. 28-29]. The Court does not find that to be a fully accurate statement of the law. Such a rule would allow immunity for putative defendants to exercise their contractual discretion in bad faith and all but eliminate this cause of action. Indeed, under PNC's view, it could do whatever it wished with the force-placed coverage because the contract authorized such coverage. Conceivably, PNC's approach would permit it to

obtain LPI at 50 times the market rate, retain commissions of 25 times the premium and pass the entire charge on to the borrower. To quote *Hamilton*, this approach would effectively "eliminate any reasonable limit on the amount of force-placed insurance that [the lender] may lawfully charge to its borrowers" -- an approach "the Court declines to do." 2014 WL 1285859, at *10.

The Court finds that the better position is that Plaintiffs here need not show a specific breach of the contract to allege a breach of the implied covenant of good faith as long as there is a viable contract in effect and the alleged breach concerns the contract. *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278 (S.D. Fla. 2009) (allowing plaintiffs to proceed because "the failure to perform a discretionary act in good faith may be a breach of the implied covenant of good faith and fair dealing"); *Kunzelmann*, 2012 WL 2003337, at *5 (allowing breach of implied covenant claim in absence of breach of contract claim).

As succinctly explained in *Burger King Corp. v. Weaver*, Florida courts have refused to allow a cause of action for breach of the implied covenant of good faith and fair dealing under two circumstances: (1) "where the party alleged to have breached the implied covenant has **in good faith** performed all of the express contractual provisions[;]" and (2) "where the implied duty of good faith alleged to have been breached would vary the express terms of the contract." 169 F.3d 1310, 1316-17 (11th Cir. 1999) (emphasis added). Neither of these two exceptions apply here.

PNC also argues that Plaintiffs' implied covenant claim calls for the Court to vary the express terms of their mortgage agreements. But, as noted, Plaintiffs do not challenge the amount of coverage that will be provided under the mortgage agreements and the circumstances under which coverage may be imposed.

The Court rejects PNC's contention that Plaintiffs have not sufficiently pled bad faith or that its conduct was in good faith. As to the former, the FAC is replete with allegations of bad faith. [ECF No. 42, ¶¶ 29, 30, 33, 51, 56]. *See McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 958 (N.D. Cal. 2012) (applying New Jersey law and denying motion to dismiss implied covenant of good faith claim); *accord Kunzelmann*, 2012 WL 2003337, at *5 (applying Florida law). As to the latter, a determination of whether PNC's conduct was in good faith is not appropriate at the motion to dismiss stage.

### 3.  *Count III – Unjust Enrichment Against PNC*

PNC contends that Plaintiffs cannot plead an unjust enrichment claim because they concede that an express contract governs this dispute, i.e., Plaintiffs' mortgage agreements. [ECF No. 56, pp. 33-34]. In response, Plaintiffs argue that their unjust enrichment claim was pled in the alternative, as permitted by Federal Rule of Civil Procedure 8(d). [ECF Nos. 42, p. 27 n. 8; 75, p. 23].

At the motion to dismiss stage, the Court finds that Rule 8(d) expressly permits pleading in the alternative, even if Plaintiffs' theories are inconsistent. *Kunzelmann*, 2012

WL 2003337, at *6 (denying motion to dismiss unjust enrichment claim at motion to dismiss phase). Moreover, there is some support in both Florida and New Jersey law for allowing Plaintiffs to simultaneously plead claims for unjust enrichment and breach of contract. *Real Estate Value Co., Inc. v. Carnival Corp.*, 92 So. 3d 255, 263 n. 2 (Fla. 3d DCA 2012), *reh'g denied* (July 19, 2012) ("Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment.") (citing *Hazen v. Cobb*, 117 So. 853, 857–58 (Fla. 1928)); *Shapiro v. Solomon*, 126 A.2d 654, 659 (N.J. Super. Ct. App. Div. 1956).

   4.   *Count IV – Unjust Enrichment Against ASIC*

   In Count IV, Plaintiffs allege that ASIC was unjustly enriched because it received the LPI premiums. [ECF No. 42, pp. 29-30]. ASIC contends that Montoya and Colonia's respective claims should be dismissed. [ECF No. 57, pp. 57-61]. Because the substantive law and ASIC's arguments differ as between Montoya and Colonia, the Court will examine their unjust enrichment claims separately.

   i.   <u>Montoya's Unjust Enrichment Claim</u>

   To the extent that ASIC contends that Montoya's claim is barred because it is based on a written contract, that argument fails for the same reason PNC's unjust enrichment argument fails (i.e., Plaintiffs can plead in the alternative under Rule 8). Furthermore, there is no allegation that there is a written agreement between ASIC and Montoya.

To allege an unjust enrichment claim in Florida, a plaintiff must allege that: (1) the plaintiff conferred a "direct benefit" on the defendant, (2) the defendant had knowledge of the benefit, (3) the defendant accepted or retained the benefit, and (4) it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Hamilton v. Suntrust Mortg. Inc.*, No. 13-60749-CIV, 2014 WL 1285868, at *3 (S.D. Fla. Mar. 25, 2014) (citations omitted). ASIC argues that Montoya has not pled that he conferred a direct benefit on ASIC because Montoya paid PNC, who then paid ASIC. ASIC also argues that there are insufficient facts to show that it would be inequitable for ASIC to retain the benefit Montoya conferred.

The Court does not conclusively agree that Montoya has not sufficiently alleged that he conferred a direct benefit on ASIC. The first sentence of ¶ 101 of the FAC states that ASIC "deducted the excess charges directly from borrowers' escrow accounts." [ECF No. 42, ¶ 1]. Accepting this allegation as true would mean that PNC never really passed on any of Montoya's payments to ASIC. Rather, ASIC took it directly from Montoya's account at PNC. While this allegation falls a tad short of saying outright that Montoya directly conferred a benefit on ASIC, it is very close.

Setting aside the first sentence of ¶ 101, the second sentence states that PNC was a conduit for the delivery of the LPI premiums to ASIC. As some courts have noted, "[i]t would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before

being conferred on a defendant." *Williams v. Wells Fargo Bank, N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011). ASIC attempts to bypass this logic by citing *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329 (11th Cir. 2012).

In *Virgilio*, the plaintiffs did not seek to recover a benefit that they had paid the defendant in question.  Instead, they focused on money that *another* defendant had paid to its co-defendant "under an entirely separate services contract." 680 F.3d at 1337. Here, Montoya seeks to recover amounts deducted from *his* escrow account and paid to ASIC for forced coverage. These allegations suffice to plead an unjust enrichment claim and to show that it would be inequitable for ASIC to retain the benefit conferred. *See Hamilton*, 2014 WL 1285868, at *3-5 (citing cases distinguishing *Virgilio* on similar grounds) (internal citations omitted).

ii.   Colonia's Unjust Enrichment Claim

To state a claim for unjust enrichment in New Jersey, a plaintiff must allege that "1) at plaintiff's expense; 2) defendant received a benefit; and 3) such benefit was received under circumstances that would make it unjust for defendant to retain [the] benefit without paying." *Donnelly v. Option One Mortg. Corp.*, No. CIV.A. 11-7019 ES, 2014 WL 1266209, at *14 (D.N.J. Mar. 26, 2014) (internal citations omitted). A plaintiff must also allege that "plaintiff expected remuneration from the defendant, **or** if the true facts were known to plaintiff, he would have expected remuneration from defendant, at

the time the benefit was conferred." *Castro v. NYT Television*, 851 A.2d 88, 98 (N.J. Super. Ct. App. Div. 2004) (emphasis added) (internal citations and quotations omitted).

ASIC contends that Colonia has failed to allege that he had an expectation of remuneration from ASIC at the time the benefit was conferred. [ECF No. 57, p. 43]. Colonia counters by saying that the law forgives this requirement if he would have expected remuneration had he known the true facts. [ECF No. 76, pp. 47-48]. While Colonia is correct on the law, ASIC is correct that there is no such allegation in the FAC, i.e., that Colonia expected remuneration or would have expected remuneration had he known the true facts. Indeed, Colonia wants the Court to read into the FAC that allegation based on the earlier allegation that he did not know of these impermissible costs in his LPI premiums. [ECF No. 76, p. 49; *see also* ECF No. 42, ¶ 56]. The Court declines that invitation and notes that 'what's sauce for the goose is sauce for the gander.' In other words, the Court has repeatedly declined Defendants' requests to read into the FAC what is not there. *See, e.g., supra III.B, Filed Rate Doctrine Analysis*; *infra III.F.V, FDUPTA Analysis*. Likewise, while the Court must give every reasonable inference to Plaintiffs, the Court is not going to read into the FAC what is not there.

Accordingly, Colonia's unjust enrichment claim is **dismissed without prejudice** because it is insufficiently pled.

### 5.   *Count V – FDUPTA Claim by Montoya Against PNC Mortgage*

Count V names *only* PNC Mortgage -- *not* PNC -- in claiming a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA" or "FDUPTA"), Fla. Stat. § 501.201, *et seq.* [ECF No. 42, ¶¶ 105-14]. However, as noted above, PNC Mortgage is dismissed without prejudice from this case as a party because it is merely a division of PNC. Accordingly, Count V is likewise dismissed without prejudice.

While PNC would like the Court to read Count V to allege a FDUPTA claim against PNC and find that PNC is beyond FDUPTA's reach, the Court declines that invitation. Montoya is clear in the FAC and his response in opposition to PNC's motion to dismiss that Count V is against only PNC Mortgage, not PNC. Montoya is bound by the allegations in the FAC and the Eleventh Circuit has cautioned trial courts to not amend a party's allegations when ruling on substantive motions. *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("it goes without saying that the court is barred from amending a plaintiff's claim").

### 6.   *Counts VI and VII – NJCFA Claim by Colonia Against PNC and ASIC*

In Counts VI and VII of the FAC, Colonia asserts that PNC and ASIC violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. 56:8-1, *et seq.* As will be explained, the Court finds that under the New Jersey Supreme Court's opinion in *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557 (N.J. 2011), the NJCFA encompasses the conduct attributed to PNC and ASIC.

In *Gonzalez*, the plaintiff and her late husband mortgaged their home to secure a loan. After an initial default (and the death of her husband), the plaintiff entered into a series of forbearance agreements with the lender and was subjected to various heavy-handed collection activities by the lender. The collection activities included what the court characterized as "*force–placed insurance.*" *Gonzalez*, 207 N.J. at 567, 584. The New Jersey Supreme Court held that force-placed insurance is within the ambit of the NJCFA. *Id.* at 584. Indeed, the New Jersey Supreme Court expressly noted that charges for unnecessary force-placed insurance would constitute an "ascertainable loss" under the NJCFA. *Id.*

Here, Colonia alleges that PNC and ASIC deceived him and engaged in unconscionable commercial practices by charging him and borrowers for kickbacks, captive reinsurance costs, and subsidies for administrative services, and failing to disclose or misrepresenting the true nature of the charges. [ECF No. 42, ¶¶ 27-44, 51, 56]. As a result of these charges, Colonia alleges that he paid more than he was contractually bound to for force-placed insurance and had funds to which he was entitled to withdrawn from his PNC escrow account. Thus, it would seem that Colonia's allegations would fit under the NJCFA's umbrella after *Gonzalez*.

PNC and ASIC attempt to distinguish *Gonzalez*. They contend that *Gonzalez* addressed a post-foreclosure agreement, that it did not determine that LPI is a "sale" or "advertisement" of "merchandise" or "real estate," and that the alleged

misrepresentations were not made in the marketing of the LPI directly or indirectly to the public for sale. In addition to these arguments, ASIC asserts that Colonia cannot show causation and that the economic loss doctrine bars his claim. These distinctions are not persuasive at this stage of the litigation.

First, before finding that the forced-place insurance fell within the ambit of the NJCFA, the *Gonzalez* court discussed the NJCFA's sale/advertisement of goods/services directly or indirectly to the public requirement. 204 N.J. at 577, 584. There is nothing in *Gonzalez* that indicates that the defendant lender and its servicer advertised or sold the services to the public. Thus, these PNC and ASIC arguments fail.

Second, as to PNC and ASIC's other arguments, courts have rejected similarly narrow readings of *Gonzalez. See McNeary-Calloway*, 863 F. Supp. 2d at 963 (rejecting causation argument and finding that plaintiffs stated NJCFA claims by alleging that lender had charged for kickbacks, captive reinsurance premiums, and other costs, without disclosure and as part of exclusive scheme with insurer); *see also Laughlin v. Bank of Am., N.A.*, No. CIV.A. 13-4414, 2014 WL 2602260, at *5-6 (D.N.J. June 11, 2014) (rejecting argument that loan modification was not based on sale or advertisement and finding that mortgage loan modifications fall under NJCFA after *Gonzalez*).

Consequently, the Court denies ASIC and PNC's motions to dismiss Colonia's NJCFA claims.

7. *Count VIII – TILA Violation Against PNC*

The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), "requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights . . . and it prescribes civil liability for any creditor who fails to do so[.]" *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 54, (2004). The statute charges the Federal Reserve Board with implementation of TILA, and the agency has imposed even more precise disclosure requirements via Regulation Z.

Plaintiffs allege that PNC violated TILA by failing to provide disclosures when it charged their escrow accounts for the LPI premiums. In particular, Plaintiffs allege that PNC changed the terms of Plaintiffs' mortgage agreements when it charged the LPI premiums to Plaintiffs. [ECF No. 42, p. 39]. PNC argues, and the Court agrees, that no TILA disclosures were needed here.

First, Plaintiffs' argument that the LPI changed the terms of their mortgage agreements is unpersuasive. Even the cases Plaintiffs cite do not support their argument. [ECF No. 75, p. 32 (citing, e.g., *Morris v. Wells Fargo Bank, N.A.,* No. 2:11-cv-474, 2012 WL 3929805, at *12 (W.D. Pa. Sept. 7, 2012); *Wulf v. Bank of Am., N.A.,* 798 F. Supp. 2d 586, 598 (E.D. Pa. 2011))]. In those cases, the LPI was "unauthorized" by the terms of the mortgage agreement. Here, PNC was authorized by the mortgage contracts to purchase LPI for Plaintiffs' properties and charge Plaintiffs for the LPI premiums. Because PNC's action was authorized, it did not constitute a finance charge which

required disclosure. *Gordon v. Chase Home Fin., LLC*, No. 8:11-CV-2001-T-33EAJ, 2013 WL 256743, at *8 n. 3 (M.D. Fla. Jan. 23, 2013) ("*Wulf* is readily distinguishable because, in *Wulf*, the mortgage did not explain that the lender could force-place insurance. In the present case, the Mortgage authorizes Defendant's forced-placement of flood insurance.").

Second, under TILA, "[i]f information disclosed . . . is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part." 15 U.S.C. § 1634. The Federal Reserve Board's Official Staff Interpretation directly addresses the lender-placed insurance scenario and states that "when the consumer fails to fulfill a prior commitment to keep the collateral insured and the creditor then provides the coverage and charges the consumer for it, such a change does not make the original disclosures inaccurate." Truth in Lending; Official Staff Commentary, 46 FR 50288-01. Thus, LPI cannot be deemed a finance charge, which may, under certain circumstances, require disclosure. These are the facts here, and accordingly PNC had no TILA disclosure obligation.

Because PNC was not required to make TILA disclosures to Plaintiffs in connection with the LPI, Count VIII fails to state a claim for a TILA violation and is

dismissed with prejudice.[9]

        8.   *Count IX – Tortious Interference With a Business Relationship Against ASIC*

Plaintiffs allege that ASIC tortiously interfered with their mortgage contracts by entering into an exclusive relationship with PNC and paying PNC and its affiliates kickbacks, subsidies for below-cost services, and other benefits, knowing that these amounts would be passed on to Plaintiffs and other borrowers. [ECF No. 42, ¶¶ 148-51]. Based on New Jersey and Florida law, ASIC makes separate arguments about why Montoya and Colonia's respective claims fail.

        i.     <u>Montoya's Claim</u>

"To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must allege: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the

---

[9]     In *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1046 (N.D. Cal. 2013), the court allowed a similar TILA claim to proceed because it reasoned that kickbacks are not premiums for insurance and thus would have to be disclosed as part of the finance charge. The Court understands the *Cannon's* court reasoning on this point, but notes that only paragraphs earlier the court stated that: "[f]rom the Court's perspective, it is not clear how either alleged failure to disclose could constitute a violation of TILA. Nothing about TILA or its implementing regulations seems to require such disclosures." *Id.* at 1045. Thus, as the *Cannon* court first recognized, you do not get to the finance charge disclosure issue unless there was an underlying disclosure obligation. What appears to have driven the *Cannon* court to reach the finance charge issue is the plaintiffs' argument that they would not have purchased the additional flood insurance, which had the kickbacks, if it was not for the lender's *unauthorized* efforts to have plaintiffs purchase this additional flood insurance. *Id.* at 1046. Here, there are no such unauthorized efforts by PNC.

relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Hamilton,* 2014 WL 1285868, at *5 (citing *Univ. of W. Fla. Bd. of Trs. v. Habegger,* 125 So. 3d 323, 326 (Fla. 3d DCA 2013)).

ASIC argues that Montoya cannot state a claim because the amounts charged to him were based on filed rates, and ASIC's conduct was justified and privileged because it acted to protect its own business interests with PNC. [ECF No. 57, pp. 44-45].

The Court rejects ASIC's first argument for the same reasons the Court rejected ASIC's filed-rate doctrine argument.

Next, the Court rejects ASIC's justified and privileged conduct argument. First, the Court finds that this argument is better considered later on in the case as an affirmative defense, rather than at the motion to dismiss stage. *See, e.g., Se. Integ. Med., P.L. v. N. Fla. Women's Physicians, P.A.,* 50 So. 3d 21, 24 (Fla. 1st DCA 2010) (noting that privilege to interfere is generally a matter to be raised as an affirmative defense and reversing trial court for considering it on a motion to dismiss).

Second, this "privilege to interfere" theory does not protect parties if they do so in bad faith and with conspiratorial motive. *Hamilton,* 2014 WL 1285868, at *7. Much like in *Hamilton,* when this Court views the allegations of the FAC in the light most favorable to Montoya, the allegations sufficiently allege that ASIC acted in bad faith and with conspiratorial motive. *Id.* (internal citations omitted). As such, the Court denies ASIC's motion to dismiss Montoya's tortious interference claim.

ii.   Colonia's claim

The elements of a claim for tortious interference with contractual relations under New Jersey law are: "(1) the existence of the contract . . .; (2) interference which was intentional and with malice; (3) the loss of the contract **or** prospective gain as a result of the interference; and (4) damages." *See Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997) (emphasis added) (internal citations omitted). ASIC challenges Colonia's pleadings with respect to the second and third elements only.

With respect to the second element, New Jersey courts have explained that malice does not mean "ill will," but rather that "the harm was inflicted intentionally and without justification or excuse." *Velop, Inc.*, 693 A.2d at 926 (internal citations omitted). Colonia has alleged that ASIC interfered knowingly and unjustifiably and was aware of the illegal charges that were passed on to him. [ECF No. 42, ¶¶ 27-44, 150]. Accordingly, the Court finds that Colonia has sufficiently alleged this element.

As to ASIC's argument that Colonia has not sufficiently alleged loss of a contract or economic gain, New Jersey law requires a plaintiff to show that had there been no interference, there was a reasonable probability that the plaintiff would have received the anticipated economic benefits of the contract. *Leslie Blau Co. v. Alfieri*, 157 N.J. Super. 173, 185-86 (N.J. Super. Ct. App. Div. 1978). Colonia has alleged that funds designated to pay insurance, taxes, and other items were deducted from his escrow account and

used to pay non-designated costs. [ECF No. 42, ¶¶ 30-31. 148-49]. These allegations suffice to adequately allege loss of an economic gain due to ASIC's interference.

9.   *Count X – Breach of Fiduciary Duty Against PNC*

Montoya and Colonia each allege that PNC breached a fiduciary duty it owed to them when it charged their respective escrow accounts for the amount of the LPI premiums, because the premiums contained kickbacks. [ECF No. 42, pp. 41-42]. PNC contends that neither Montoya nor Colonia has sufficiently stated such a claim. In their response, Plaintiffs lump together Colonia and Montoya in their legal analysis. But Florida and New Jersey law considerably differ on this point. Accordingly, the Court will analyze Montoya and Colonia's respective claims separately.

i.   <u>Montoya's Claim</u>

Under Florida law, a lender does not ordinarily owe a fiduciary duty to its borrower. *Gordon v. Chase Home Fin., LLC*, No. 8:11-CV-2001-T-33EAJ, 2012 WL 750608, at *4-5 (M.D. Fla. Mar. 7, 2012) (citing *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994)). However, there are special circumstances that may give rise to a fiduciary relationship between a bank and its customer. *See Jaffe v. Bank of Am., N.A.*, 395 F. App'x 583, 590 (11th Cir. 2010). These special circumstances may include, among others, "where the lender 1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises extensive control." *Capital Bank,* 644 So. 2d at 518. Generally, to determine whether a special

circumstance exists, the Court must make specific factual findings. *Id.* at 518. These findings, of course, are difficult for the Court to make on a motion to dismiss.

Here, Montoya has specifically alleged the second special circumstance. He alleges that PNC received a greater economic benefit than what was contemplated under the mortgage. [ECF No. 42, ¶ 154]. To be sure, one district court in this circuit has found that a similar allegation was not sufficient. *Nehrer v. Bank of Am., N.A.*, No. 6:11-CV-50-ORL-31DAB, 2011 WL 4376776, at *3 (M.D. Fla. Sept. 2, 2011). The *Nehrer* opinion, however, is not particularly persuasive because it provides no reasoning for its summary conclusion.

Similarly, PNC's reliance on *Feaz* is not persuasive. Yes, *Feaz* did affirm the dismissal of the borrower's breach of fiduciary claim. 745 F.3d 1110-11. The *Feaz* court, however, was clear that it was dealing with Alabama law, not Florida law. *Id.* at 1110. And it does not appear that Alabama has a greater-economic-benefit exception like Florida. *Id.* Moreover, the underpinning of the *Feaz* court's rationale was its rejection of the argument that the lender's use of the escrow funds to pay the kickback-laden LPI premiums constituted a breach of a fiduciary duty. *Id.* at 1110-11. While Montoya asserts that same argument, the Court need not reach that issue because it finds that Montoya has sufficiently alleged the greater economic benefit exception.

Accordingly, the Court opts to follow the lead of other courts that have reasoned that allegations like Montoya's state a cause of action for breach of fiduciary duty under

Florida law and, therefore, denies PNC's motion to dismiss Montoya's claim. *Gordon,* 2012 WL 740608, at *4-5; *Cannon*, 917 F. Supp. 2d at 1054-55 (finding that plaintiffs adequately stated breach of fiduciary duty claim and declining to follow *Nehrer* because of the lack of any reasoning in reaching conclusion).

ii.   <u>Colonia's Claim</u>

Like Florida, under New Jersey law, a lender does not ordinarily owe a fiduciary duty to its borrower. *United Jersey Bank v. Kensey*, 704 A.2d 38, 45 (N.J. Super. Ct. App. Div. 1997). But just like Florida, New Jersey also provides that certain "special circumstances" may give rise to a fiduciary duty. This can be where the lender "'knows or has reason to know that the customer is placing his trust and confidence in the [creditor] and relying on the [creditor] so to counsel and inform him.'" *Laffan v. Santander Bank, N.A.*, No. CIV.A. 13-4040, 2014 WL 2693158, at *5 (E.D. Pa. June 12, 2014) (quoting *Kensey,* 704 A.2d at 45-46).

Unlike Florida, however, New Jersey does not appear to have a greater-economic-benefit exception that Colonia can use. And PNC is correct that Colonia has not alleged that he placed any trust in PNC. [ECF No. 42, ¶¶ 152-157]. Indeed, Colonia does not really contest that fact. Rather, he counters with the argument that he is traveling under the theory that because PNC acted as his escrow agent it had a fiduciary duty to him and breached that duty when it used the escrow funds to pay the kickback-laden LPI premiums.

As noted, *Feaz* rejected Colonia's very same argument, albeit while applying Alabama law (and possibly Georgia law). *Feaz,* 745 F.3d at 1110-11. In that regard, PNC has not pointed the Court to a case applying New Jersey law which echoed *Feaz's* rebuke to this argument. On the other hand, Colonia has pointed to the *Laffan* decision. There the court considered the same argument under similar facts and reasoned that plaintiff stated a claim under New Jersey law. *Laffan,* 2014 WL 2693158, at *5-6. At this stage, the Court will follow *Laffan* and deny the motion to dismiss Colonia's claim. But like the *Laffan* court, this Court notes that it only finds that the "claim was sufficiently pled and survives." *Id.* at *5 n. 6 (citing *Margulies v. Chase Manhattan Mortg. Corp.*, No. A-4087-03T3, 2005 WL 2923580 (N.J. Super. Ct. App. Div. 2005) (affirming summary judgment in bank's favor on breach of fiduciary duty claim)).

10. *Counts XI and XII – RICO Violation and Conspiracy Against PNC and ASIC*

The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful to conspire to violate any of the RICO provisions contained in § 1962(a)-(c). In order to state a RICO violation, plaintiffs must allege "(1)

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,*

*S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

In order for a person to "'conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs,' § 1962(c), [he or she] must participate in the

**operation or management** of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170,

185. (emphasis added). "[T]he word 'participate' makes clear that RICO liability is not

limited to those with primary responsibility for the enterprise's affairs, just as the

phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with

a formal position in the enterprise, but *some* part in directing the enterprise's affairs is

required." *Id.* at 179 (emphasis in original).

*In re Managed Care Litigation,* 298 F. Supp. 2d 1259 (S.D. Fla. 2003) is instructive on

the type of allegations that are sufficient to state that defendants participated in the

operation or management of a RICO enterprise. There, the plaintiffs survived a Rule

12(b)(6) motion on their second amended complaint because they offered specific

factual assertions as to how the defendants participated in the operation or

management of the RICO enterprise. *Id.* at 1276-77.

Here, Plaintiffs allege that ASIC paid "kickbacks" -- "unearned" commission and

reinsurance payments to PNC, which they contend could constitute ASIC participating

in the operation or management of the affairs of the enterprise. [ECF No. 76, pp. 32-34].

Even accepting Plaintiffs' argument at face value, Plaintiffs have only alleged that ASIC

and PNC are participating in an enterprise. They have not sufficiently pled who is directing the affairs of the enterprise. For example, in *In re Managed Care Litigation,* the plaintiffs alleged, among other things, that "[d]efendants played a part in directing the affairs of the enterprise by developing guidelines and standards to use as criteria to deny claims . . ." 298 F. Supp. 2d at 1277. The Court does not have before it those kinds of allegations. For instance, there are scant allegations regarding whether ASIC, or even, for that matter, PNC, had any part in *directing* and *controlling* the alleged enterprise, which plaintiffs allege "is an association in fact enterprise consisting of" all Defendants. [ECF No. 113-1, ¶ 6.a]. This failure is fatal to Plaintiffs' substantive RICO claim at this stage. *See Comcast of So. Fla. II, Inc. v. Best Cable Supply, Inc.*, No. 07-22335-CIV, 2008 WL 190584, at *7-8 (S.D. Fla. Jan. 22, 2008) (dismissing plaintiffs' RICO claim because they failed to sufficiently allege defendants' participation in the management or operation of the enterprise).

Because Plaintiffs fail to state a substantive RICO claim and their RICO conspiracy count does not contain additional allegations, their RICO conspiracy claim necessarily fails as well. *See Rogers v. Nacchio,* 241 F. App'x 602, 609 (11th Cir. 2007) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004)).

In sum, Plaintiffs have taken a broad brush approach in pleading their RICO claims. But RICO claims based on fraud, like Plaintiffs' claims, require a finer brush as they "must be pleaded with particularity, in accordance with [Rule 9(b)]." *Liquidation*

*Comm'n of Banco Intercont'l, S.A. v. Alvarez Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008). Here, the Court finds that Plaintiffs have not sufficiently pled how PNC and ASIC directed or managed the affairs of the alleged enterprise. Therefore, because of this pleading deficiency, the Court **denies without prejudice** Plaintiffs' RICO claims. The Court does not reach PNC or ASIC's other arguments regarding the RICO claims. If Plaintiffs amend their RICO claims, then ASIC and PNC are free to raise these arguments again, e.g., McCarran-Ferguson Act reverse preemption, etc.

## IV.    CONCLUSION

Getting back to those legal headwinds, as Bob Dylan once sang, "you don't need to be a weather man to know which way the wind blows."[10] Thus, under the Defendants' view, *Cohen* and *Feaz* demonstrate that the legal forecast is for a climate more favorable to defendants. On the other hand, Plaintiffs might be tempted to point to Bob Seger and the Silver Bullet Band's well-known lyrics -- "I'm older now but still runnin' against the wind."[11]

At this motion to dismiss stage, the Court is not prepared to conclude that the legal weather is so inhospitable that it precludes Plaintiffs from pursuing **all of their claims**. The legal winds forged by *Cohen* and *Feaz* may be blustery, but they have not yet reached that level to permanently wipe out all counts in the FAC. Therefore, for the

---

[10]    *Subterranean Homesick Blues*, on BRINGING IT ALL BACK HOME (Columbia 1965).

[11]    *Against the Wind*, on AGAINST THE WIND (Capitol 1980).

reasons outlined above, Defendants' motions to dismiss are **granted in part and denied in part** as follows:

1)  Assurant and PNC Mortgage are dismissed, without prejudice, as parties to this case;

2)  Count I is dismissed with prejudice;

3)  Count II is not dismissed;

4)  Count III is not dismissed;

5)  Count IV is not dismissed as to Montoya. Count IV, however, is dismissed without prejudice as to Colonia;

6)  Count V is dismissed without prejudice;

7)  Count VI and VII are not dismissed;

8)  Count VIII is dismissed with prejudice;

9)  Count IX is not dismissed;

10)  Count X is not dismissed; and

11)  Counts XI and XII are dismissed without prejudice.

If Plaintiffs wish to file a second amended complaint, then they must do so within 14 days from entry of this Order.

**DONE AND ORDERED** in Chambers, in Miami, Florida, August 27, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All Counsel of Record