**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE No. 14-20474-CIV-GOODMAN**

**[CONSENT CASE]**

ENRIQUE MONTOYA, NEYSER
COLONIA and XI CHEN LAUREN,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

vs.

PNC BANK, N.A., et al.,

      Defendants.

_____/

**ORDER ON DEFENDANTS' MOTIONS TO**
**DISMISS THIRD AMENDED COMPLAINT**

Plaintiffs have filed four versions of their complaint in this proposed class action

lawsuit concerning claims brought in connection with force-placed insurance coverage

on homes with mortgages. Defendants, a bank and an insurance company, have filed

motions to dismiss the Third Amended Complaint ("TAC"). Plaintiffs have responded

and Defendants have filed replies. In addition, the Court held a lengthy hearing and the

Parties submitted proposed final orders, which the Court considered.

1

For the reasons outlined in greater detail below, the Court grants in small part the bank's motion to dismiss (on the Ohio law claim for breach of an implied covenant of good faith and fair dealing) but denies the rest of the bank's dismissal motion and also denies the insurance company's motion. Nevertheless, some of the rulings are premised on the procedural posture -- evaluating motions to dismiss -- and later evaluations made in different settings will likely be more exacting and probing.

## I.      BACKGROUND

<u>PROCEDURAL HISTORY</u>

The Undersigned previously entered a comprehensive order [ECF No. 124] on motions to dismiss an earlier version of the complaint. Much of the background comes from that earlier order, which evaluated Plaintiffs' First Amended Complaint ("FAC"). The TAC [ECF No. 127-1] adds a new named plaintiff (i.e., Xi Chen Lauren) to the existing two plaintiffs (Enrique Montoya and Neyser Colonia) and also adds allegations for the existing RICO counts. The TAC is similar (but not identical) to the initial complaint at issue in the earlier order (which granted in part and denied in part the motions to dismiss). It does not pursue certain claims previously dismissed and it no longer names PNC Mortgage and Assurant, Inc. as defendants.

The three named Plaintiffs assert nine claims for:  breach of the implied covenant of good faith and fair dealing against Defendant PNC Bank, N.A. ("PNC") (Count I); unjust enrichment against PNC (Count II); unjust enrichment against Defendant

American Security Insurance Company ("ASIC") (Count III); violations of the New Jersey Consumer Fraud Act ("NJCFA") against PNC (Count IV) and ASIC (Count V); tortious interference with a business relationship against ASIC (Count VI); breach of fiduciary duty against PNC (Count VII); civil RICO against all Defendants (Count VIII); and civil RICO conspiracy against all Defendants (Count IX). All three named Plaintiffs are pursuing claims in Counts I, II, III, VI, VII, VIII and IX. Colonia is pursuing claims alone in Counts IV and V. The FAC had twelve counts; the TAC has nine.

In its motion to dismiss the TAC [ECF No. 129], ASIC seeks to dismiss all of Lauren's claims against ASIC and the repled RICO claims of Montoya and Colonia. In its partial motion to dismiss [ECF No. 133], PNC moves to dismiss with prejudice Counts VIII and IX in their entirety, Lauren's claims in Counts I and VII and all of Plaintiff's claims on behalf of a putative nationwide class in Counts I, II and VII.

The Court initially declined to dismiss Plaintiffs Montoya's and Colonia's claims for breach of the implied covenant of good faith and fair dealing, unjust enrichment, and breach of fiduciary duty against PNC, and tortious interference with a business relationship against ASIC in an order entered on August 27, 2014 [ECF No. 124 (the "August 27th Order")]; Plaintiff Lauren, an Ohio resident, still has those claims pending.  The Court also declined to dismiss Plaintiff Montoya's unjust enrichment claim against ASIC and Plaintiff Colonia's claims for violation of the NJCFA against

both Defendants, but dismissed Plaintiff Colonia's unjust enrichment claim against ASIC and both Plaintiffs' federal RICO claims without prejudice. [*Id.*].

The order dismissing without prejudice the RICO claims was based on Plaintiffs' failure to sufficiently allege how Defendants allegedly participated, directed and/or controlled the alleged RICO enterprise. In granting Plaintiffs leave to file an amended complaint, the order expressly stated that the Court was not ruling on Defendants' other substantive arguments about why they believed the RICO allegations were deficient. The order gave Defendants the ability to reassert those other arguments if Plaintiffs filed an amended complaint containing RICO claims (which they did).

<u>GENERAL FACTUAL OVERVIEW</u>

Homeowners are often required by the terms of their mortgage contracts to maintain insurance coverage on the properties securing their loans. When the homeowner does not maintain the insurance, the lender is authorized by the mortgage contract to purchase new insurance to cover its interest in the property. Lenders do this by contracting with insurance providers. This is what is commonly referred to as lender-placed insurance ("LPI"), which is sometimes deemed (usually by plaintiffs) as force-placed insurance.

This case is one of many putative civil class actions that have been filed around the country against various lenders, servicers and insurance carriers regarding the LPI programs. Many of these suits, like the one here, allege that lenders and their insurance

providers have colluded together to create a nefarious scheme of unearned kickbacks (disguised as commissions and other benefits) that artificially inflate LPI rates. [ECF No. 127, pp. 2-4]. According to Plaintiffs, this scheme results in inflated LPI premiums and, in many instances, backdated insurance coverage (which the borrowers must pay) to cover periods during which no claims were made or coverage exceeding the legal requirements. [ECF No. 127, ¶ 3].

<u>RELEVANT FACTS ABOUT THE NAMED PLAINTIFFS</u>

The facts concerning Montoya and Colonia are discussed in the earlier Order on the dismissal motions [ECF No. 124, pp.4-7] and will not (other than specifically mentioned below) be repeated here. The facts alleged in the TAC relating to Plaintiff Lauren are outlined below.

A.    **<u>Plaintiff Lauren</u>**

On October 15, 2003, Lauren obtained a $210,400 mortgage loan from PNC's predecessor, National City Mortgage Company, secured by a duplex located at 5381-5383 McKitrick Blvd., Columbus, Ohio (the "Mortgage"). [ECF Nos. 127-1, ¶ 58]. The Mortgage is a standard Fannie Mae form mortgage contract, Form 3036, and the relevant provisions regarding LPI are identical to those in Plaintiff Montoya's mortgage. [ECF No. 133-1; *compare* ECF No. 127-1, ¶ 46 *with* ¶ 59].

An Allstate hazard insurance policy that Lauren had purchased for the property expired on November 17, 2011. [ECF No. 127-1, ¶ 60]. Lauren failed to immediately

obtain replacement hazard insurance coverage, leaving Lauren's property uninsured for more than four months, until March 26, 2012, when Lauren purchased a State Farm Insurance policy.  [*Id.*, ¶ 63].

On or about November 23, 2012, PNC sent Lauren a notice letter. [*Id.*, ¶ 152]. That letter is the sole letter identified in the TAC to support Lauren's RICO allegations. [*Id.*, ¶ 152; ECF No. 133-4]. The November 23, 2012 letter to Lauren is the same form letter that PNC sent to Montoya on October 16, 2012, and provided Lauren with all of the disclosures that Montoya received. [*Compare* ECF Nos. 56-17; 133-4].

As the TAC acknowledges, before PNC's purchase of hazard insurance for Lauren's property, Lauren did not have an escrow account for the payment of insurance premiums. [ECF No. 127-1, ¶ 60]. The November 23, 2012 letter stated that if PNC was required to purchase insurance for Lauren's property, PNC would "establish an escrow account for the purpose of collecting funds for the payment of your insurance premium and your mortgage payments will be increased accordingly."  [ECF No. 133-4].

The TAC alleges that on or about December 25, 2012, PNC purchased from ASIC a 45-day insurance binder, indicating a retroactive inception date of November 22, 2011 -- five days following the lapse of Lauren's Allstate policy -- and an annual premium of $3,334.00 on dwelling coverage of $328,200.00.  [ECF No. 127-1, ¶ 61]. Lauren received notice of this temporary binder by a second notice letter from PNC dated December 25, 2012. [ECF No. 133-5]. The TAC alleges that Lauren's lapsed Allstate policy had also

provided dwelling coverage of $328,200.00, though at an annual premium of only $545.98. [ECF No. 127-1, ¶ 60]. The LPI premium was approximately six times as much as similar, homeowner-obtained coverage.

Lauren eventually provided evidence that she had purchased a hazard insurance policy from State Farm, effective March 26, 2012. [*Id*., ¶¶ 63-64]. The TAC does not allege how much Lauren paid for the State Farm policy. As the TAC acknowledges, PNC then cancelled the policy it had purchased for her and, consistent with the statements PNC had made in its November 23, 2012 letter to her, PNC charged her only for the premiums due for the period between November 22, 2011 and March 26, 2012, the period for which she had failed to maintain any hazard coverage for her property. [*Id*.].

As explained in the earlier order [ECF No. 124, pp. 4-7] concerning Montoya and Colonia, this LPI case is factually unique as to *their* specific situation. In particular, the LPI premiums Montoya paid were **actually lower than the ones he purchased himself on the open market**. And Colonia's LPI premiums were at first more than the market rate insurance he obtained on his own, but his LPI premiums also ended up being slightly *less* than the market rate.

B.    **PNC's LPI Disclosure Letters**

PNC stresses several points about the notice letters [ECF No. 149, p. 4]:

After Plaintiffs' respective insurance lapsed, but before PNC or National City purchased LPI for their properties and charged the cost of the premium to their escrow accounts, the bank sent each Plaintiff disclosure letters regarding LPI; an LPI disclosure letter was also sent with each yearly renewal of the LPI policy. Although the text and form of these LPI disclosure letters evolved over the years, they all contained the same material substance. Each letter reminded Plaintiffs of their contractual obligation to maintain insurance on their properties; warned them that the cost of LPI might be significantly more expensive than the insurance they could obtain on their own, that LPI might not provide the same coverage as the insurance they could obtain on their own and that a PNC affiliate might earn a profit via a commission or reinsurance premium through the bank's purchase of LPI; expressly encouraged them to obtain their own insurance; and informed them that LPI would be cancelled and a refund given if they provided evidence of their own insurance coverage, with instructions on how to provide such evidence to the bank.

Aside from the initial letters following Plaintiffs' respective insurance lapses, all of the LPI disclosure letters also specifically stated the term of the LPI coverage -- either a 60-day temporary binder or a one-year annual policy -- and the annual premium for that term. [*See* ECF Nos. 56-6 through 56-13; 56-15; 56-17 through 56-21; 56-28 through 56-33; 133-4; 133-5].

Not surprisingly, Plaintiffs have a far-different view of these notice letters:

According to Plaintiffs [ECF No. 159-1, p.11 n.4], the notice letters sent to borrowers were mailed in furtherance of Defendants' scheme even though they expressly encouraged borrowers to procure their own insurance. Plaintiffs contend that the letters gave the scheme an air of legitimacy by suggesting that all charges connected with the forced coverage, should it be placed, went to coverage or other costs justifiably passed to the borrower. They suggested to borrowers that there was a legitimate reason for the inflated cost of LPI.

In Plaintiffs' view, these letters also promoted the perception that PNC was acting in the borrower's interest when, in fact, it was not, and offered Defendants plausible deniability regarding the fraudulent nature of their scheme. Under Plaintiffs' interpretation of these letters, even though some borrowers might take heed and choose to procure their own insurance, others would not, placing trust in their mortgage lender's reputation and representations.

Moreover, Plaintiffs allege further that Defendants intentionally did not disclose certain allegedly improper charges and sent *misleading* notices to borrowers suggesting that the charges were proper, giving the scheme an air of legitimacy.  [ECF No. 127-1, ¶¶ 26, 51, 56, 143, 149-156]. These allegations, Plaintiffs say, support their conclusion that they were damaged by reason of Defendants' scheme -- they paid charges they did not legitimately owe (or had such charges deducted from escrow), and thus suffered an

economic loss, because Defendants buried those charges in the amounts invoiced to them for forced coverage. [ECF No. 159-1, p. 11].

Plaintiffs claim it is immaterial whether they relied on the notices, or even read them, for that matter -- because they suffered a loss "by reason of" Defendants' scheme, which was furthered by the mailing of notices of insurance that included "half-truths" incorrectly suggesting that all charges were legitimate. [*Id*.].

THE SPECIFICS OF THE ALLEGED SCHEME

Plaintiffs allege that the scheme begins when PNC purchases a master insurance policy that covers the entire PNC portfolio of mortgage loans. [ECF No. 127-1, ¶ 29]. In exchange, ASIC is given the exclusive right to force its own insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. [*Id*.]. ASIC (and its affiliates) monitor PNC's entire loan portfolio for lapses in borrowers' insurance coverage. [*Id*.]. Once a lapse is identified, ASIC sends notice to the borrower, **on letterhead purporting to be from PNC,** advising that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. [*Id*.]. If a lapse continues, then the insurer notifies the borrower, again on PNC letterhead, that insurance is being force-placed at his or her expense. [*Id*.].

Plaintiffs allege that no individualized underwriting ever takes place for the force-placed coverage. [*Id*., ¶ 30]. Instead, they say insurance is *automatically* placed on

10

the property and after the servicer pays the premium, the servicer then passes along the charges to the borrower. [*Id.*]. In many instances, Plaintiffs allege, the insurance lapse is not discovered for months or even years after the fact. [*Id.*]. However, due to the terms of the master policy between the Defendants, coverage is placed on the date of the alleged lapse (despite what the notices state), and, even though there were no claims or damage to the property during the period of lapse, the borrower is billed retroactively for the insurance placed on the property and the borrower is charged for the "cost" of the past coverage. [*Id.*].

Once coverage is forced on the property, PNC pays the insurer and charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account, sometimes by PNC's exclusive force-placed insurance vendors like ASIC, or added to the balance of the borrower's loan. [*Id.*, ¶ 31]. Plaintiffs say that the borrower's escrow account is depleted regardless of whether other escrow charges, such as property taxes, are also due and owing. [*Id.*].

PNC pays the premiums to the insurers, who then "kick back" a set percentage to PNC or their affiliates as a "commission." [*Id.*, ¶ 32]. Plaintiffs further allege, albeit upon information and belief, that a percentage of that payment is then shared with the lender or servicer, sometimes in the form of "soft dollar" or other credits. [*Id.*].

Plaintiffs claim that the money paid back to PNC and its affiliates is not given in exchange for any services provided by them; rather, the money is simply "grease"

which is paid to keep the force-placed machine moving. [*Id.*, ¶ 33]. In an attempt to mask the so-called kickback as legitimate, ASIC, while "masking itself as PNC on letters to the borrowers," discloses to the borrower that PNC affiliates may *earn* commissions or income as a result of the forced placement of new coverage. [*Id.*]. In reality, however, no work is ever done by PNC affiliates to procure insurance for that particular borrower because the coverage comes through the master policy already in place. [*Id.*]. As a result, no commission or income is "earned" and PNC does not incur any costs in relation to the force-placement of insurance for any particular borrower. [*Id.*].

Under this highly profitable LPI arrangement, which Plaintiffs brand as a "scheme," Plaintiffs allege PNC is incentivized to purchase high-priced force-placed insurance for a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback. [*Id.*, ¶ 34].

The TAC further alleges that Defendants also enter into agreements for ASIC and other affiliates to provide servicing activities on PNC's entire loan portfolio at below cost. [*Id.*, ¶ 35]. The servicing costs are added into the force-placed premiums, which are then unlawfully passed on to the borrowers, who have no obligation to pay such servicing costs. [*Id.*]. The insurers are able to provide these services at below cost because of the enormous profits they make from the inflated premiums charged for force-placed insurance. [*Id.*].

However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, Plaintiffs allege that borrowers who pay these amounts unfairly bear the full cost to service the entire loan portfolio. [*Id.*]. These charges, Plaintiffs contend, which are passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of *all* the loans and the loan servicers are already compensated for these activities. [*Id.*].

Thus, Plaintiffs allege, the small percentage of borrowers who are charged for LPI shoulder the costs of monitoring PNC's entire loan portfolio, effectively resulting in a kickback. [*Id.*, ¶ 36].

In addition, Plaintiffs allege that ASIC enters into essentially riskless "captive reinsurance arrangements" with PNC affiliates to "reinsure" the property insurance force-placed on borrowers. [*Id.*, ¶ 37]. Therefore, Plaintiffs conclude, PNC's entire reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to PNC and its affiliates at the borrowers' expense. [*Id.*, ¶ 38].

Plaintiffs concede that reinsurance can, and often does, serve a legitimate purpose, but they contend it does not accomplish legitimate goals here. [*Id.*]. PNC affiliates enter into reinsurance agreements with ASIC or ASIC's affiliates that provide that the insurer will return significant percentages of the amounts charged to borrowers

by way of ceded reinsurance premiums to PNC affiliates. [*Id*.]. PNC affiliates in turn pass the ceded reinsurance premiums to PNC in the form of soft-dollar or other credits. [*Id*.]. Plaintiffs allege that the ceded premiums are, therefore, nothing more than a kickback to PNC and a method for Defendants to profit from the forced placement of new coverage. [*Id*.]. Indeed, Plaintiffs allege, while PNC and/or their affiliates purportedly provided reinsurance, they did not assume any real risk. [*Id*.].

As they must, Plaintiffs acknowledge that the notice letters reveal that Defendants disclosed that the new forced placement may result in a "financial benefit or loss" to a PNC Mortgage affiliate because the insurer will transfer a portion of the risk covered to the affiliate in exchange for a portion of the premium. [*Id.*, ¶ 39]. However, Plaintiffs allege, the notice letters then expressly *misrepresent* that this risk-sharing arrangement will not affect the amounts charged the borrower. [*Id*.]. In fact, Plaintiffs allege that reinsurance profits are, in fact, bundled into these amounts and passed on to the borrower as an insurance premium expense. [*Id*.]. Moreover, Plaintiffs also object to the procedure because they say the notice letters fail to disclose that no real risk is assumed by the PNC entities. [*Id*.].

The TAC further alleges that PNC overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement. [*Id.*, ¶ 40]. According to the TAC, either of these clauses typically protects the lender for a period of at least ten days after the

termination of the homeowner's voluntary insurance policy. [*Id.*]. Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause. [*Id.*]. This, Plaintiffs say, means the borrower is charged for coverage for which the lender or servicer has no exposure. [*Id.*].

Plaintiffs also allege that the amounts charged to borrowers are inflated by the interest that accrues on the amounts owed for force-placed coverage; when PNC adds the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender. [*Id.*, ¶ 41].

Plaintiffs emphasize that borrowers like themselves have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies. [*Id.*, ¶ 43]. Plaintiffs stress that force-placed policies are commercial insurance policies intended to protect lenders or mortgage servicers and their terms are determined by the lender or servicer (PNC) and the insurer  (ASIC). [*Id.*].

 Plaintiffs say they do not challenge PNC's right to force place insurance. Instead, they challenge the **discretion** provided to lenders and mortgage servicers to purchase force-placed insurance, as well as the Defendants' purported manipulation of the force-placed insurance market, with an eye toward artificially inflating amounts for force-placed premiums and placing unnecessary coverage, which PNC purchases from ASIC

and then chooses to charge to the borrower. [*Id.*, ¶ 44]. Plaintiffs allege that servicers, like PNC, are financially motivated to use the insurer, like ASIC, that offers it the best financial benefit in terms of "commissions," direct payments, discounted tracking services, or ceded reinsurance premiums. [*Id.*].

DEFENDANTS' EXPLANATION OF THEIR ACTIVITIES

At bottom, Defendants contend that the disclosure letters were more than adequate and were not fraudulent. In its motion to dismiss, PNC notes that "no disclosure letter could reasonably be expected to disclose **all** the facts that might be related to the lender-placed insurance program." [ECF No. 133, p. 7 (emphasis in original)]. PNC compared the disclosures made in this case with the disclosure letters in *Cohen v. American Security Insurance Co.*, 735 F.3d 601 (7th Cir. 2013), where the Seventh Circuit held that the "substance of the transaction was clearly and fully disclosed; no material fact was omitted.'" PNC classifies the letters here as being "even more detailed and robust" than the disclosure letters at issue in *Cohen*. [ECF No. 133, p. 7].

ASIC adopts these arguments, noting that "all material disclosures were made to the plaintiffs and there was no deception at work." [ECF No. 157-1, p. 5].

Defendants also underscore the fact (which they deem significant) that Plaintiffs never alleged that they actually *read* any or all of the letters of which they complain. They also challenge the viability of Plaintiffs' new allegation that they "would not have paid or would have contested the amounts for force-placed insurance" if only they had

been aware of facts which they allege were not disclosed to them. [ECF No. 127-1, ¶ 149]. In addition to challenging the Plaintiffs' interpretation of the facts (as being illogical and therefore not plausible), Defendants also raise specific legal arguments on a count-by-count basis, and the Court will also analyze the TAC on this basis.

## II.    LEGAL STANDARD AND APPLICABLE LAW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take all well-pleaded facts in the plaintiff's complaint and all reasonable inferences drawn from those facts as true. *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). "A pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). While detailed factual allegations are not always necessary in order to prevent dismissal of a complaint, the allegations must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action. *Twombly,* 550 U.S. at 555. *See also Iqbal,* 556 U.S. at 678 (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint

rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557 (alteration in original)).

The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible on its face**.'" *Iqbal,* 556 U.S. at 678. (quoting *Twombly,* 550 U.S. at 570) (emphasis added); *see also Am. Dental Assoc. v. Cigna Corp.,* 605 F.3d 1283, 1288–90 (11th Cir. 2010).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Moreover, when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* (internal quotations omitted).

While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555; *Iqbal,* 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Magluta v. Samples,* 375 F.3d 1269, 1273 (11th Cir. 2004) (quoting *Conley,* 355 U.S. at 45–46). Although, as noted, a court must accept as true a plaintiff's allegations, a court may

dismiss a complaint on a dispositive issue of law. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## III.    ANALYSIS

The arguments concerning the RICO counts took up the most amount of space in the motions and briefs and proposed orders, and the Court's perception is that this issue also dominated the oral argument. Therefore, the Court will first analyze the motions to dismiss the RICO counts.

### A.    Plaintiffs Have Sufficiently Alleged That ASIC Participated in the Operation or Management of a RICO Enterprise.

As noted above, the Court's earlier order on the motions to dismiss the FAC [ECF No. 124] dismissed without prejudice the RICO claims because Plaintiffs had not sufficiently pled who was directing the affairs of the alleged RICO enterprise. The Undersigned noted then that there are "scant allegations regarding whether ASIC, or even, for that matter, PNC, had any part in *directing* and *controlling* the alleged enterprise." [*Id.* at p. 44]. The Court found that Plaintiffs "have not sufficiently pled how PNC and ASIC directed or managed the affairs of the enterprise." [*Id.* at p. 45].

Plaintiffs beefed up their allegations in the TAC, but ASIC contends that Plaintiffs still have not adequately pled its participation in the operation or management of a RICO enterprise.  [ECF No. 129, pp. 9-11].

ASIC concedes that the TAC provides a "laundry list of activities," but argues that they are "nothing more than reformulated allegations that this Court has already

found were insufficient to state" a substantive RICO claim. [*Id.* at p. 11]. Plaintiffs respond that allegations that ASIC paid kickbacks to PNC, and committed predicate acts by mailing notices that furthered the alleged RICO scheme, meet the applicable standard. [ECF 139, pp. 9-12].  For purposes of evaluating a dismissal motion, Plaintiffs are correct.

Section 1962(c) makes it unlawful to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  To state a RICO claim, a plaintiff must plead facts to suggest that the defendants had "some part in directing the affairs of the enterprise.'" *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*, 534 F. Supp. 2d 1326, 1338 (S.D. Fla. 2008) (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284-85 (11th Cir. 2006)).

"[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original). *see also, e.g., Ouwinga, v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) ("Although *Reves* does not explain what it means to have some part in directing the *enterprise's* affairs, . . . our sister circuits have persuasively explained that it can be accomplished either by making

decisions on behalf of the enterprise *or by knowingly carrying them out*") (citation omitted; emphasis in original).

In *Reves*, the Supreme Court held that the operation or management test may be met by alleging that one associated with the enterprise "exerted control over it as, for example, by bribery." 507 U.S. at 184; *see also Rothstein*, 2013 WL 5437648, at *17 (courts "consistently recognize[]" that allegations of bribery or kickbacks satisfy the requirement). And in *United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995), the Eleventh Circuit found the commission of predicate acts sufficient to "establish that each had some part in directing the affairs" of the enterprise. 55 F.3d at 1548.

Plaintiffs specifically allege that ASIC (and PNC) directed and controlled the enterprise. [ECF No. 127-1, ¶ 146]. They allege that ASIC managed the day-to-day operations of Defendants' RICO scheme by, for example tracking PNC's portfolio for lapses, [ECF No. 127-1, ¶¶ 29], mailing notices to borrowers that included misleading "half-truths" and lent the scheme an air of legitimacy [*id.*, ¶¶ 29, 149-155], and distributing profits among the various players, [*id.*, ¶¶ 27, 32-38, 147]. *Cf. Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1541-42 (10th Cir. 1993) (parent company participated in operation or management of subsidiary's enterprise where, *inter alia*, board chairman and CEO of both companies had managed day-to-day operations of subsidiary).

Plaintiffs also allege that ASIC paid kickbacks to PNC in order to secure its exclusive relationship with PNC and propel the scheme forward. [ECF No. 127-1, ¶¶

26, 27, 32-33, 38]; *see, e.g., Rothstein v. GMAC Mortg. Corp.*, No. 12 Civ. 3412(AJN), 2013 WL 5437648, at *17 (S.D.N.Y. Sept. 30, 2013) (courts "consistently recognize[]" that bribery or kickback allegations satisfy participation requirement). These allegations meet RICO's pleading requirements, as outlined in *Reves*.

### B.  Plaintiffs Have Sufficiently Alleged RICO Causation.

Plaintiffs contend that a civil RICO claim does not require **reliance** by *anyone*, and they argue that they have sufficiently alleged their injury was caused "by reason of" a RICO scheme.  They advance the argument that reliance and causation are distinct concepts, even though reliance is frequently used to *show* causation. In other words, Plaintiffs say, their TAC need only allege that Defendants' RICO activities *caused* their injury, not that they specifically *relied* on any particular false statement or other predicate act of racketeering activity.

Defendants, however, focus on the lack of a reliance allegation.  In particular, they point to Plaintiffs' failure to even allege that they read the supposedly false and misleading notice letters to support the notion that the RICO claim is defective.

Plaintiffs have the better argument, at least at the motion to dismiss stage. But the parties spent considerable time evaluating the causation/reliance concepts and the Court therefore believes it appropriate to discuss the arguments in some detail.

The analysis of the causation/reliance distinction begins with *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The parties also rely on *Wallace v. Midwest*

*Financial & Mortgage Services, Inc.*, 714 F.3d 414 (6th Cir. 2013), though they adopt

dramatically different interpretations.

*Bridge* concerned public auctions of tax liens by Cook County, Illinois. 553 U.S. at

642. The auctions are marked by "stiff competition" because properties acquired

through this process can often be sold at a significant profit over the amount paid for

the lien. *Id*. To allocate properties fairly and to prevent bidders from placing multiple

bids on the same parcel through agents, the county adopted the "Single Simultaneous

Bidder Rule," which prohibits bidders from submitting bids through agents, employees

or related entities. *Id*. at 643. Each bidder was also required to submit a sworn affidavit

affirming that it complied with the Single Simultaneous Bidder Rule. *Id*.

In July 2005, Phoenix Bond & Indemnity Co. sued Bridge for RICO violations,

alleging that Bridge had fraudulently participated in the auctions by having related

firms submit bids, and directing them to file false attestations that they complied with

the Single Simultaneous Bidder Rule. The District Court dismissed the complaint in part

because Phoenix was not the "recipient" of the alleged misrepresentations -- Cook

County was. *Id*. at 644-45. The Seventh Circuit reversed, and Bridge petitioned the

Supreme Court, which granted certiorari to decide "whether **first-party reliance** is an

element of a civil RICO claim predicated on mail fraud." *Id*. at 646. (emphasis supplied).

Because the Supreme Court agreed "that a showing of first-party reliance is not

required," it affirmed the Court of Appeals. *Id*. at 642.

The Supreme Court undertook an extensive analysis of first-party reliance, *id*. at

647-58, and concluded that:

> Of course, none of this is to say that a RICO plaintiff who alleges injury
> "by reason of" a pattern of mail fraud can prevail without showing that
> *someone* relied on the defendant's misrepresentations.

*Id*. at 658 (italics the Supreme Court's).  In *Bridge*, that someone was Cook County.

Defendants focus on that one sentence, arguing that it means that reliance by

**someone** is required.  Defendants stress that Plaintiffs did not allege reliance by anyone,

and, contend, instead, that a civil RICO claim can be asserted without showing reliance

by anyone.

Plaintiffs, on the other hand, cite the penultimate sentence of *Bridge* for its

position that reliance is not necessary: "For the foregoing reasons, we hold that a

plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an

element of its claim or as a prerequisite to establishing proximate causation, that it

relied on the defendant's alleged misrepresentations." *Id*. at 661; [ECF No. 139, p. 5].

Defendants argue that Plaintiffs ignore the critical fact that the entire analysis in

*Bridge* addressed Bridge's contention that *first-party reliance* was necessary to state a civil

RICO claim. The question presented in *Bridge* was "whether *first-party reliance* is an

element of a civil RICO claim predicated on mail fraud."  *Id*. at 646 (emphasis added).

And *Bridge* held that "a showing of *first-party reliance* is not required" to state a civil

RICO claim.  *Id*. at 642 (emphasis added).  Defendants contend that, when read as a

whole, *Bridge* holds that a civil RICO claim need not allege *first-party reliance*, but, contrary to Plaintiffs' contention, reliance by *someone* needs to be alleged.

Defendants also contend that Plaintiffs misread *Wallace*.  In *Wallace*, the plaintiff sued his lender, mortgage broker and others concerning a subprime mortgage that was based on a fraudulently inflated appraisal of his home. 714 F.3d at 415-16. Wallace sought financing to build out his basement and was induced into a high-cost, adjustable rate mortgage ("ARM") for a much higher loan amount than he wanted, and was "injured in the amount of the fees, interest costs, and other expenses tied to the option ARM." *Id*. at 416-17, 420.

Wallace's causation theory was that the defendants "committed fraud by producing and sending through the mail a false appraisal of his home that inflated its value . . . [and] gave rise to the illusion of substantial equity against which Wallace intended to borrow[.] Based on that illusion, [a defendant] was able to convince Wallace to enter into a large option ARM . . . ." *Id*. at 420. "[T]he inflated appraisal itself *played a significant role* in the negotiations between [the defendant] and Wallace.  Indeed, one of Wallace's first priorities was 'seeing if [he] had enough equity in [his] home' to finance the build-out project." *Id*. (emphasis added).  "The nub of this scheme was the appraisal," which "*induced* [Wallace] and borrowers like him to enter into larger loans with higher interest rates than they could reasonably afford." *Id*. at 418 (emphasis added). According to Defendants' argument, the Sixth Circuit made clear that the

fraudulent appraisal "*induced*" Wallace to enter into the transaction, proximately **causing** his injuries. Because Wallace's complaint so alleged, the Sixth Circuit found he had sufficiently alleged a civil RICO claim. *Id*.

ASIC's discussion of reliance is misplaced at the motion to dismiss stage, and Plaintiffs have the more-persuasive interpretation of *Bridge*.

As the Supreme Court made clear in *Bridge*, "a plaintiff asserting a RICO claim predicated on mail fraud need not show, *either as an element of its claim or as a prerequisite to establishing proximate causation*, that it relied on the defendant's alleged misrepresentations." 553 U.S. at 661 (emphasis added). *See also United States v. Graham*, 477 F. App'x 818, 824 (2d Cir. 2012) (after *Bridge*, common-law reliance "'ha[s] no place in the federal fraud statutes[]' . . . because [they] criminalize the 'scheme to defraud,' rather than the completed fraud'").

Defendants argued at the hearing on their pending motions (and again in their post-hearing proposed orders) that a party must plead at least third-party reliance -- that *someone* (if not the plaintiff himself) **relied** on a misrepresentation by the defendant -- in order to state a RICO claim, but Plaintiffs challenge this reading of *Bridge*. The *Bridge* Court was unequivocal: "[O]ne can conduct the affairs of a qualifying enterprise through a pattern of [racketeering activity indictable as mail fraud] without *anyone* relying on a fraudulent misrepresentation." *Bridge*, 553 U.S. at 649 (emphasis added).

To be sure, the Supreme Court in *Bridge* did in fact discuss third-party reliance, observing that "in *most* cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation[,]" but ultimately concluded that "the fact that proof of reliance is often used to *prove* an element of the plaintiff's cause of action, such as the element of causation, **does not transform reliance itself into an element of the cause of action.**" *Id.* at 658-59 (emphasis supplied).

Therefore, *Bridge* establishes that the Supreme Court (1) views the requisite causation element as one involving proof at trial, and (2) recognizes the practical consequences of a plaintiff who cannot prove some type of reliance. These consequences *may* arise later, but they do not doom a RICO complaint which does not allege reliance (as long as proximate causation is appropriately alleged).

Other courts have followed this reading of *Bridge*. In *Wallace*, *supra*, the Sixth Circuit discussed proof of RICO proximate causation, and reasoned that, after *Bridge*, "[f]or RICO purposes, reliance and proximate cause remain distinct -- if frequently overlapping -- concepts[,]" and though reliance is often used to show causation, "that does not mean it is the only way to do so[.]" 714 F.3d at 419-20. Noting that the proximate cause requirement, "despite its flexibility," tends to "invite confusion in cases involving mail and wire fraud as the predicate acts," (like the TAC allegations here), *id.*, the Sixth Circuit concluded: "A plaintiff need only show use of the mail in

furtherance of a scheme to defraud and an injury proximately caused by the scheme." *Id.* at 420.

Similarly, the Tenth Circuit recently adopted the *Wallace* Court's reasoning, noting that "reliance is not an explicit element of a civil RICO claim." *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1089 (10th Cir. 2014). But the *CGC Holding* Court also noted the practical ramifications of a civil RICO plaintiff who cannot show reliance in a fraud-based claim: "Put simply, causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct." *Id.* But, as noted, this potential consequence concerning actual proof of proximate causation is not an issue on a motion to dismiss.

Nevertheless, in the spirit of providing a complete evaluation of the competing arguments, the Court notes that Plaintiffs' allegations *barely* nudge their RICO claims past the plausibility threshold. In its earlier order, the Court noted that Plaintiffs' claim and causation theory seemed somewhat illogical, especially concerning Montoya, whose LPI premiums were *less* than the premiums on the policy he procured on his own. [ECF No. 124, p. 16]. Moreover, another district judge in this district very recently granted in part motions to dismiss and held that the RICO allegations were *insufficient.* Specifically, in *Wilson v. EverBank, N.A.*, No. 14-CIV-22264, 2015 WL 265648, at *14 (S.D. Fla. Jan. 6, 2015), the Court held that the RICO allegations are "implausible" because

they did not demonstrate how the bank's "'scheme' proximately caused injury to Plaintiffs." *Id.*

Many of the lawyers representing Plaintiffs in the instant case also represent the plaintiffs in *Everbank.* In addition, ASIC is a defendant in both cases, with the same law firm representing it in both cases. The RICO allegations in both cases are substantially similar.  The briefing is substantially similar. But in *Everbank,* U.S. District Judge Beth Bloom dismissed the claims based on an analysis which **could well be applicable here.**

Specifically, Judge Bloom held that the plaintiffs failed to state with particularity[1] how the defendants' conduct about the misrepresented or concealed kickback charges were "material to Plaintiffs' decisions not to procure the voluntary insurance coverage required under their mortgage agreements but, instead, to default under their agreements and conceded to [the bank's] forcibly placed insurance coverage and the ensuing charges." *Id.* Similarly, Judge Bloom also held that the plaintiffs failed to state with particularity "how [the bank's] communications were reasonably calculated to deceive its borrowers in making their decisions not to obtain coverage and to pay the amounts charged by [the bank] as force-placed insurance costs."

To be sure, *EverBank* noted that another district (in California) held that similar allegations in another force-placed insurance case *were* plausible. *Cannon v. Wells Fargo*

---

[1]     Because the RICO allegations in *Everbank* are based on allegations of fraud (similar to the allegations here), Judge Bloom noted that the allegations must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b), which requires that the plaintiff must state the fraudulent circumstances "with particularity."

*Bank, N.A.*, No. C–12–1376 EMC, 2014 WL 324556, at *3 (N.D. Cal. Jan. 29, 2014). But it also cited other district court cases agreeing that the causation allegations did not pass muster.

For purposes of a motion to dismiss, the Undersigned is adopting a flexible approach to the plausibility requirement for the proximate causation allegations necessary for the RICO counts. But Plaintiffs' causation theory may confront strong headwinds, as recently noted in *Cicero-Loudon v. Green Tree Service, LLC*, No. 14-21384, 2014 WL 4219587, at *3 (S.D. Fla. Aug. 25, 2014) (concluding that plaintiffs in similar LPI class action case "fail to explain how or why Defendants' purported mail and wire frauds proximately caused insurance to be placed **when the same insurance would have been placed regardless of the alleged fraud**") (emphasis supplied). Moreover, the *Cicero-Loudon* Court also explained that "the direct 'cause' of the alleged injury here is the LPI placement, not the supposedly inaccurate letters sent in the mail"). *Id.*[2]

Indeed, Judge Bloom's cautionary comment in *EverBank* when discussing the breach of contract allegations (as opposed to the RICO claims, which the Court dismissed there) against the bank may well be appropriate here too: "Plaintiffs are forewarned, however, that the allegations and facts presented in their Complaint [or

---

[2]     Plaintiffs filed an amended complaint in *Cicero-Loudon.* Defendants filed motions to dismiss and, according the docket sheet posted on CM/ECF [ECF No. 65], the Court held a hearing on March 3, 2015.

their TAC] may not suffice at later stages in this litigation." *Everbank*, 2015 WL 265648, at *6.

Given that Plaintiffs have not alleged reliance on the purportedly fraudulent letters by anyone, their ability to establish proximate causation may well be tested later in this case. *Cf. Gustafson v BAC Home Loans Servicing, LP*, No. SACV-11-915-JST, 2012 WL 7071488, at *7 (C.D. Cal. Dec. 26, 2012) (describing plaintiffs' argument as "circular," and dismissing with prejudice RICO claims against lender where lender warned borrowers that they would be charged for force-placed insurance costs and that lender and its affiliates would profit from the insurance placement). *See also Weinberger v. Mellon Mortg. Co.*, No. CIV.A. 98-2490, 1998 WL 599192, at *5 (E.D. Pa. Sept. 10, 1998) (dismissing RICO claims and explaining that "the Court cannot see how letters that warn of an imminent bad deal and urge one to seek better, could possibly be calculated to deceive anyone.").

For example, Plaintiffs likely will need to confront the argument that letters urging them to obtain their own insurance and warning them of the adverse financial consequences of LPI could be deemed the *last* thing a bank bent on perpetrating a fraudulent scheme based on its residential borrowers' failure to maintain adequate insurance would pursue.

For now, though, the allegations, though problematic and not intuitively logical, are just sufficient to state a plausible causation theory for the two RICO counts. To use a

sports metaphor, if Plaintiffs needed to achieve a first down in order to establish plausibility at the pleadings stage for the required RICO proximate causation, then the Court was required to bring out the chains for a measurement and found that a first down had been made by an eighth of an inch.  This razor-thin margin suggests that another measurement with the chains and a different referee could result in a different conclusion about whether Plaintiffs had plausibly made a first down on the RICO causation issue.

   As actor Al Pacino said in his role as coach Tony D'Amato in the 1999 Oliver Stone-directed movie *Any Given Sunday*,[3] "you find out life's this game of inches. So is football.  Because in either game, life or football, the margin for error is so small. I mean, one half step too late or too early, and you don't quite make it.  One half second too slow, too fast, you don't quite catch it."  Plaintiffs could likely add the causation theory required for their RICO claims in this LPI litigation to the life/football group of scenarios where one inch either way could make the difference between success and failure.[4]

   On the other hand, there is case law suggesting that Plaintiffs' theory may pass muster and may wind up on the claimant side of the inches analogy. For example, one

---

[3]      *Any Given Sunday*, Dir. Oliver Stone. Perf. Al Pacino. Warner Bros., 1999.

[4]      Although the Supreme Court did not expressly use the football analogy in *Twombly*, it held that plaintiffs must "nudge[] their claims *across the line* from conceivable" to plausible in order to state a claim. *Twombly*, 550 U.S. at 570 (emphasis added).

district court explained that "payment [of inspection charges automatically imposed by mortgage servicer] may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoice amount was honestly owed." *Huyer v. Wells Fargo & Co.,* 295 F.R.D. 332, 348 (S.D. Iowa 2013) (certifying RICO class suing mortgage servicer for excessive charges). *Huyer,* however, involved borrowers who paid fees for drive-by property inspections for certain delinquent mortgage loan accounts, not LPI involving allegedly false or misleading notice or disclosure letters. The claim there is that the borrowers were automatically charged for inspections without any prior determination that the inspections were necessary to protect the lender's interest in the property.

At bottom, despite the factual distinction between this case and *Huyer* and despite the less-than-obvious causation theory, the TAC sufficiently alleges for now a plausible proximate cause theory for the RICO claims for the limited purpose of surviving motions to dismiss.

### C.   Plaintiffs Have Alleged the Organization of a RICO Enterprise Separate From the Pattern of Racketeering Activity in Which it Engaged.

In its motion to dismiss, ASIC argues that Plaintiffs have failed to plead the existence of a RICO enterprise separate from the pattern of racketeering activity in which it is alleged to have engaged.  [ECF No. 129, pp. 11-12]. But it seems as though ASIC may have now abandoned the argument. It did not assert the argument in its

reply memorandum. [ECF No. 145]. Moreover, ASIC's draft order summarizes the grounds upon which its dismissal motion should be granted, but the argument was not listed there either. [ECF No. 157-1].

On the other hand, ASIC has not formally withdrawn the argument, nor has it given notice that it is no longer pursuing it or that it considers the argument to be weak. Therefore, the Undersigned concludes that the argument needs to be addressed here. The mere fact that ASIC did not further discuss the argument in its reply or proposed order after raising it in the initial motion does not automatically mean that the Court can safely just ignore the argument.

As noted, ASIC contends that Plaintiffs have failed to plead the existence of a RICO enterprise separate from the pattern of racketeering activity in which it is alleged to have been engaged. In order to evaluate the argument, the Court must first see how Plaintiffs define the "enterprise" and the pattern of racketeering activity at issue.

A RICO plaintiff must plead an enterprise and a pattern of racketeering activity as two distinct elements, though the evidence used to prove them "may in particular cases coalesce." *Boyle v. U.S.*, 556 U.S. 938, 947 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

The federal RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The enterprise is an

entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct[,]" *Turkette*, 452 U.S. at 583, and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Goldin*, 219 F.3d 1271, 1275 (11th Cir. 2000) (citation omitted).  A RICO enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach. That is, simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as [a] racketeering organization for other purposes." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1274 (S.D. Fla. 2003).

However, a RICO enterprise need not have a "hierarchical structure or 'chain-of-command'; decisions may be made on an ad hoc basis and by any number of methods, . . . [and] [m]embers of the group need not have fixed roles[.]" *Boyle v. U.S.*, 556 U.S. 938, 941, 948 (2009) (affirming approval of jury instructions that led to RICO conviction, where enterprise at issue was "loosely and informally organized[,] . . . did not appear to have had a leader or hierarchy[,]" and it did not "appear that the participants ever formulated any long-term master plan or agreement").

The **pattern** of racketeering activity, on the other hand, is "a series of criminal acts defined by the statute." *Turkette*, 452 U.S. at 583 (citing 18 U.S.C.  § 1961(1)).  It "is proved by evidence of the requisite number of acts of racketeering committed by the

participants in the enterprise . . . . The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.* "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate [acts], that is, the pattern of racketeering activity requisite to the RICO violation." *Id.*

In the TAC, Plaintiffs allege an enterprise comprised of PNC, Assurant (who is no longer a party, as the Court dismissed it in an earlier order on a prior version of the Complaint, ECF No. 124) and ASIC, who have associated to force insurance coverage on borrowers' properties, thereby protecting PNC's interest in the collateral for its mortgage loans. [ECF No. 127-1, ¶¶ 141, 143, 145]. They allege that ASIC, Assurant, PNC, and PNC affiliates joined forces on an ongoing basis for the common purpose of developing a force-placed insurance program that they would ultimately use to extract unearned profits from PNC borrowers. [*Id.*, ¶¶ 2-4, 10, 27-44, 146-155].

As a continuing unit, they allegedly devised various mechanisms for passing the money among the participants to give the scheme an air of legitimacy and maintain the exclusive relationship between the lender and insurer -- they implemented a riskless reinsurance scheme that passed profits to PNC, passed kickbacks disguised as commissions through ASIC to a PNC affiliate, and contracted for below-cost administrative services, among other things. [*Id.*, ¶¶ 27-44, 146]; *see, e.g., Perryman v.*

*Litton Loan Servicing, LP*, No. 14-cv-02261, 2014 U.S. Dist. LEXIS 140479, at *45-46 (N.D.

Cal. Oct. 1, 2014) (similar allegations sufficed to plead RICO enterprise in LPI case).

Plaintiffs have also alleged a distinct pattern of racketeering activity -- mail and

wire fraud. [ECF No. 127-1, ¶¶ 148-155]. They allege that ASIC mailed them multiple

notices in furtherance of the enterprise's purpose. *Rothstein v. GMAC Mortg.Corp.*, No.

12 Civ. 3412(AJN), 2013 WL 5437648, at *10-19 (S.D.N.Y. Sept. 30, 2013).

ASIC contends that Plaintiffs have not alleged the existence of an organization

separate from a pattern of racketeering activity because they have not shown that

Defendants are "organized in a fashion that would enable them to function as a

racketeering organization for other purposes." [ECF No. 129, p. 11 (quoting

*VanDenBroeck v. Commonpoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000); *Millette v.*

*DEK Techs., Inc.*, No. 08-60639-CV, 2008 WL 5054741, at *4 (S.D. Fla. Nov. 25, 2008)].

They then argue that Plaintiffs have not alleged that the force-placed scheme described

in the TAC was organized *to* function for other purposes, but rather to forge exclusive

relationships that would allow its participants to artificially inflate insurance premiums

and reap extraordinary profits. [*Id.*]

Not only is this not the case, but ASIC misunderstands the question presented --

it is not for what purpose the enterprise was formed, but rather, it is whether the

structure of the enterprise is definite enough to *enable* it to function as a racketeering

organization for other purposes. *See, e.g., Millette*, 2008 WL 5054741, at *4 (asking if

defendants "organized in a fashion that would enable them to function as a racketeering organization for other purposes") (citation omitted).

Cases discussing this requirement, including those cited by ASIC, confirm this to be the correct reading. In *In re Managed Care Litigation*, the court analyzed the requirement more comprehensively than in *Millette*, explaining that a RICO enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach. That is, simply conspiring to commit a fraud is not enough to trigger the Act *if the parties are not organized in a fashion* that would enable them to function as [a] racketeering organization for other purposes." 298 F. Supp. 2d at 1274 (emphasis added). The court concluded that the managed care enterprise described by the plaintiffs satisfied the RICO enterprise requirement on a motion to dismiss because the plaintiffs "ha[d] not bundled a random assortment of contracts and labeled it an enterprise[,]" as "[e]ach of the entities [we]re tied together with the common purpose established by the Defendants." *Id.* at 1275.

So too, here, Plaintiffs have described an organized system with multiple players bound by a common purpose. They allege that PNC and ASIC forged an exclusive relationship with the common purpose of artificially inflating force-placed charges, and enlisted their affiliates to forward that goal. [ECF No. 127-1, ¶¶ 2, 27-44, 145]. The structure of the enterprise is clear and each member's role is defined: PNC pays ASIC premiums pursuant to a master policy, and ASIC then kicks back a portion of those

premiums to PNC or an affiliate as an unearned "commission" or reinsurance payment, all of which is covered by the amounts charged the borrower. [*Id.*, ¶¶ 27-44]. ASIC also moves the scheme forward by tracking PNC's portfolio, providing this service below cost, and sending misleading notices to borrowers on PNC letterhead. [*Id.*, ¶¶ 27, 29, 35-36, 149-155]. Moreover, PNC, ASIC, and their affiliates have not associated only to inflate force-placed charges -- they have also associated to protect PNC's interest in its collateral, [*id.*, ¶¶ 1, 4-5, 25], monitor borrowers' loans, [*id.*, ¶ 27], implement a force-placed insurance program (which Plaintiff does not challenge in and of itself) [*id.*, ¶ 44], and for other purposes -- legitimate or illegitimate -- that may be revealed through discovery.

In contrast to the allegations in the TAC, the enterprises alleged in the cases cited by ASIC were not defined sufficiently to pass the relevant test. In *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 551 (S.D.N.Y. 2014), a force-placed insurance case, the court dismissed the RICO claim because the participants' roles were not defined; the complaint "lacked allegations about the role of the other insurance producers and entities involved in force-placing insurance on behalf of the [lender]-defendants." (internal quotations omitted).

Similarly, in *City of Cleveland v. Woodhill Supply, Inc.*, 403 F. Supp. 2d 631, 637 (N.D. Ohio 2005), city employees joined a plumbing supply company in a plan to defraud the city. The plumbing supply company provided the employees with

appliances for their homes and, in exchange, the employees helped the company invoice the city for goods that were never delivered, among other things. *See id.* The court dismissed the city's RICO claim for failure to sufficiently allege an enterprise because the participants in the alleged enterprise had not joined forces for any purpose other than to perpetrate a simple fraud -- they had conspired only to commit the fraud, and the association they had formed was not sufficiently organized to "function as a racketeering organization for other purposes." *See id.* at 635-37.

Likewise, the plaintiffs in *Millette* alleged only a simple fraud conspiracy implemented by actors who had associated only for the purpose of perpetrating the fraud. 2008 WL 5054741, at *5 ("it appears that this group of individuals and entities associated only for this project"). The relationships at issue there would terminate with the conclusion of the fraudulent scheme.

But PNC, ASIC, Assurant, and their affiliates came together to develop and implement a force-placed insurance program that would protect PNC's interest in borrowers' properties, provide mechanisms by which lapses could be identified, and provide notice to borrowers, among other things. The enterprise was sufficiently definite in its structure and the participants' roles sufficiently defined that the enterprise could regroup to form new mechanisms to overcharge borrowers should, for example, its kickback scheme be terminated. If the participants in the scheme were forced to stop inflating the amounts charged to borrowers, then their association would continue for

*other* purposes and they would be able, should they so choose, to engage in other business practices, including, according to Plaintiffs' theory, a different pattern of racketeering activity.

Thus, the enterprise alleged is not a discrete conspiracy to defraud -- it will not be extinguished by a ruling in Plaintiffs' favor.  Rather, it is an **ongoing** association with a definite structure that will (or could) continue to function in any event.  Plaintiffs have therefore stated RICO claims under Section 1962(c), and the Court denies ASIC's motion to dismiss the RICO claims on the enterprise-different-than-pattern argument.

### D.   The McCarran-Ferguson Act Does Not Bar Plaintiffs' RICO Claims.

ASIC argues that the McCarran-Ferguson Act ("MFA"), 15 U.S.C. §§ 1011, *et seq.*, bars Plaintiffs Montoya's and Lauren's RICO claims. [ECF No. 129, pp. 13-23]. Specifically, it argues that the two RICO counts are "reverse-preempted" by applicable Florida and Ohio insurance statutes under the authority of the MFA.

The MFA requires that no federal statute "be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance[.]" 15 U.S.C. § 1012(b).

ASIC contends that Florida and Ohio have enacted laws regulating insurance, that those laws regulate the conduct alleged here, and that applying RICO would

impair Florida and Ohio's insurance statutes and methods of regulating ASIC's conduct.

Plaintiffs argue that the MFA does not apply because Plaintiffs' claims do not relate to the business of insurance and application of RICO would not conflict with Florida or Ohio insurance regulations. [ECF No. 139, pp. 17-23]. The Court finds Plaintiffs' arguments persuasive.

Plaintiffs Montoya and Lauren do not challenge conduct that touches on the ordinary business of insurance. They do not challenge, for example, ASIC's pricing determinations or the rates that it sets for the coverage that it sells to PNC. Indeed, Plaintiffs allege expressly that they take no issue with ASIC's activities typical of the "business of insurance" -- they do not challenge the rates, the cost of the insurance *per se*, or the amounts or type of coverage provided, nor do they take issue with the master policy that ASIC sells to PNC. [ECF No. 127-1].

The allegations against ASIC are not directly related to the ordinary business of insurance. ASIC is alleged to have paid bribes to PNC to maintain its exclusive relationship with the lender. Plaintiffs accuse it of misconduct related to its performance of loan-servicing functions that it takes on for PNC, such as offering the lender below-cost administrative services (that are outsourced to ASIC but properly performed by the loan servicer) and sending allegedly misleading notices to borrowers *purporting to be PNC*. [ECF No. 127-1, ¶¶ 2, 26-44, 149-155].

These allegedly improper activities appear to be beyond the reach of the Supreme Court's definition of the "business of insurance" as it applies to the MFA, as they (1) do not have the effect of transferring or spreading a policyholder's risk; (2) are not an integral part of the policy relationship between the insurer and insured; and (3) are not limited to entities within the insurance industry. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S 205, 211-21 (1979). Therefore, Ohio and Florida insurance regulations do not "reverse preempt" Plaintiffs' federal RICO claims.

Even were this not the case, analyzing the factors that the Supreme Court articulated in *Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999), demonstrates that RICO's application in the TAC would not impair, invalidate, or supersede Florida or Ohio insurance regulations. ASIC contends that application of RICO would impair Florida's regulations because the Florida Legislature has regulated insurance premiums under Fla. Stat. § 627.371, prohibiting misrepresentations regarding policy terms in § 626.9541(1)(a), false statements relating to insurance in § 626.9541(1)(b) & (e), and "[i]llegal dealings in premiums" in § 626.9541(1)(o).

The first group of regulations -- Fla. Stat. §§ 627.371, 626.9541(1)(a), (b), and (e) -- do not provide for a private right of action against insurers who violate them. ASIC suggests that the lack of a private right of action alone establishes that application of RICO here would "impair" state law. But in *Humana*, the Court held that "[w]hen federal law is applied in aid or enhancement of state regulation, and does not frustrate

any declared policy or disturb the State's administrative regime, the [MFA] does not bar the federal action." *Id*. at 303. The Court then went on to analyze whether federal RICO frustrated Nevada laws regulating insurance, and found that it did not even though the Nevada laws regulated the same conduct challenged by the plaintiff's RICO claim. *See id*. at 313. To be sure, while the *Humana* Court noted that the Nevada laws at issue provided for a private right of action, that was but one of several factors it considered in rejecting the defendant's MFA argument.  *See id*. Accordingly, the lack of a private right of action here is hardly dispositive, and the issue is whether RICO's application would frustrate Florida law, which arguably regulates the same conduct challenged by Plaintiffs here. It does not.

Notably, in enacting the above insurance regulations, the Florida Legislature made clear that all state common law and statutory remedies were preserved.  *See* Fla. Stat. §§ 624.155(7), 626.9631.  This means a plaintiff is free to bring a common law fraud claim challenging conduct prohibited by Florida's insurance regulations.  Such a plaintiff may also seek punitive damages.  *See* Fla. Stat. § 768.72.  Accordingly, a RICO claim -- even with its treble damages provision -- challenging conduct the Florida Legislature has prohibited will not frustrate Florida's interest in regulating that conduct, but will, in fact, *further* that interest.

But Florida Statutes § 626.9541(1)(o) (titled "illegal dealings in premiums; excess or reduced charges for insurance") *does* provide a private right of action -- through Fla.

Stat. § 624.155(1)(a)(1). ASIC points to the pre-suit notice requirement and class action bar contemplated by § 624.155(3) and (6), and argues that, because RICO does not contain similar provisions, its application here would frustrate the state's policy of requiring notice and prohibiting class actions in suits challenging the regulated conduct. But ASIC has not adequately established that these factors "frustrate any declared policy or disturb the State's administrative regime."[5]

Likewise, RICO's application in the TAC would not impair Ohio's insurance regulations.  There is no articulable state policy in Ohio that suggests that RICO claims would conflict, frustrate, or impede state regulations or substantive policy. Similar to the Nevada statutory scheme analyzed in *Humana*, the Ohio scheme prohibits unfair or deceptive insurance acts or practices. Ohio Rev. Code Ann. § 3901.21, *et seq*. The Ohio state insurance commissioner has the authority to issue penalties, and may issue cease and desist orders.  Ohio Rev. Code Ann. § 3901.21 (penalties; cease and desist orders). The Ohio state statute also broadly prohibits, for example, the making of misrepresentations to the public. Ohio Rev. Code Ann. § 3901.21(A). When viewed in its

---

[5]     The parties have noted that three decisions in this Court have addressed a similar issue in the context of life insurance, with one finding that there was no MFA preemption, *see Burstein v. First Penn-Pacific Life Ins. Co.*, No. 01-985-CIV-GRAHAM-TURNOFF, 2002 WL 34186960 (S.D. Fla. Feb. 11, 2002), and two finding that there was MFA preemption, s*ee Braunstein v. Gen. Life Ins. Co.*, No. 01–6040–CIV, 2002 WL 31777635 (S.D. Fla. Nov. 19, 2002); *Weinstein v. Zurich Kemper Life*, No. 01–6140–CIV, 2002 WL 32828648 (S.D. Fla. Mar. 15, 2002). The Undersigned does not consider these three cases to have collectively generated a specific answer to the MFA issue here concerning Florida regulations, however.

entirety, this statute fully promotes the application of RICO to remedy the type of conduct alleged in this case.  *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 927 F. Supp. 2d 870, 890 (C.D. Cal. 2013) (Ohio unfair insurance practices statutes are advanced by RICO).

Further, nothing in the Ohio statute bars tort claims based on, for example, misrepresentation, and Ohio has various common law remedies available to Plaintiff. *See also Schultz v. Lincoln Nat'l Life Ins. Co.*, No. 69499, 1996 WL 732449, at *10 (Ohio App. Dec. 19, 1996) (upholding claims for fraud, negligent misrepresentation, and bad faith in connection with insurance policy);  *Negrete*, 927 F. Supp. 2d at 890 (rejecting MFA reverse preemption); *Dental Care Plus Inc. v. Sunderland*, 735 N.E.2d 19, 22 (Ohio App. Nov. 5, 1999) (despite lack of private right, Ohio UTPA did "not deprive persons affected by [deceptive] acts or practices of their right to an action for damages for defamation or interference with their business activities").

The MFA does not bar Plaintiff Montoya's or Plaintiff Lauren's RICO claims.

### E.     The Written Disclosures Provided to Plaintiffs do not at this Preliminary Pleadings Stage Obviate their RICO Claims.

PNC argues that two appellate cases doom the RICO claims because it contends that these authorities reject the argument that fraud claims can exist when the bank disclosed the substance of its LPI program and issued disclosure notices which conclusively defeat any fraud claim: *Cohen v. American Security Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) and *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014). Basically,

PNC notes that the RICO claims are based on mail and wire fraud, which sound in fraud, and that *Cohen* held that the disclosures in the notices mailed to the borrowers defeated any fraud claim.

Plaintiffs argue that *Cohen* and *Feaz* are distinguishable from this case because the Seventh and Eleventh Circuits did not address RICO claims, which are materially different from common law fraud or misrepresentation claims in at least one important respect: while a plaintiff bringing a claim for common law fraud or misrepresentation must plead justifiable reliance on the misrepresentation, no such requirement attaches to a federal RICO claim.   [ECF No. 138, pp. 4-8].  Plaintiffs again have the better argument.

PNC premises its argument on the incorrect conclusion that Plaintiffs' RICO claims are "substantively indistinguishable" from common law fraud or misrepresentation claims, [ECF No. 133, p. 12], such as the claims at issue in *Cohen*. However, RICO claims premised on mail and wire fraud are fundamentally different from common law fraud claims in that the federal RICO and mail and wire fraud statutes do not require a plaintiff to prove or plead reliance:

> [T]he predicate act here is not common-law fraud, but mail fraud.  Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim. "Reliance is not a general limitation on civil recovery in tort; it 'is a specialized condition that happens to have grown up with common law fraud.'" That "specialized condition," whether characterized as an

element of the claim or as a prerequisite to establishing proximate causation, simply has no place in a remedial scheme keyed to the commission of mail fraud, a statutory offense that is distinct from common-law fraud and that does not require proof of reliance.

*Bridge*, 553 U.S. at 655-656 (2008) (internal citations omitted).

Thus, although the plaintiff in *Cohen* was required to allege that she had relied on misrepresentations or omissions in the deficiency notices she had received from her mortgage lender, Plaintiffs here were not so bound, and needed to allege only an injury by reason of Defendants' RICO scheme.

Moreover, this Court is not bound by the Seventh Circuit's opinion in *Cohen*, and *Feaz*, the only potentially binding opinion on which PNC relies, did not involve a common law fraud claim. As this Court observed once before, the Eleventh Circuit did not "fully embrace" the *Cohen* opinion in *Feaz* -- it relied on one sentence of the opinion and only for the limited purpose of analyzing a fiduciary duty claim under Alabama law. [ECF No. 124, pp. 20-21]. That claim is distinct from Plaintiffs' fiduciary duty claims in this case because under Alabama law, a breach of fiduciary duty cannot arise from a lender's mismanagement of escrow funds, nor do the relevant exceptions to the rule that a creditor owes no fiduciary duty to a debtor pertain. *See, e.g., Selman v. CitiMortgage, Inc.*, No. 12–0441–WS–B, 2013 WL 838193, at *10-11 (S.D. Ala. Mar. 5, 2013) ("That special relationships yielding a fiduciary duty may arise in conjunction with particular arrangements in which an entity holds funds for the benefit of another in no

way supports a general rule . . . that mortgage servicers owe fiduciary duties to mortgagors").

Therefore, as explained in the earlier Order, *Cohen* and *Feaz* do not automatically preclude Plaintiffs' RICO claims. Nevertheless, as noted above, Plaintiffs need to plausibly demonstrate and prove proximate causation between the predicate acts of racketeering activity -- the mail and wire fraud -- and their injuries. As succinctly noted in *EverBank*, "articles from *Businessweek* or *American Banker* won't be enough to hold liable the specific defendants named here." 2015 WL 265648, at *6.[6]

But PNC also emphasizes another, slightly nuanced point: it focuses on the fact that Plaintiffs' RICO claims are "entirely dependent on allegations of fraud." [ECF No. 133, p. 12]. Therefore, PNC argues, regardless of whether Plaintiffs read the notice/disclosure letters and regardless of whether they relied on them and regardless of whether they can show proximate causation, Plaintiffs still must plausibly allege an underlying **_fraudulent_ scheme**. PNC stresses its view -- shared by several district courts -- that there is no underlying fraudulent scheme on which to base the mail fraud and wire fraud predicate acts of racketeering alleged in the RICO counts. Specifically, PNC takes the position that the notice letters are not, as a matter of law, fraudulent.

---

[6]     Similar to the plaintiffs in *EverBank,* the plaintiffs here also quoted these articles in their TAC. This is hardly surprising. Many of the same attorneys represent the plaintiffs in both cases, and the allegations in the two cases are frequently substantially similar, and, in many instances, identical.

A pattern of racketeering activity consists of at least two related, qualifying predicate acts listed in 18 U.S.C. § 1961(1). *See Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1151 (11th Cir. 2011). The TAC alleges that the predicate acts consisted of mail and wire fraud (18 U.S.C. §§ 1341, 1343), based on allegedly misleading notices of lender placement of insurance. [ECF No. 127-1, ¶¶ 148-155]. A claim for mail or wire fraud must "allege with particularity the defendants' intentional participation in [1] a scheme . . . to defraud . . . and [2] use of either the mails or wires to execute the scheme." *Douglas Asphalt*, 657 F.3d at 1151 (internal quotations omitted). Also, "the predicate acts alleged here—mail and wire fraud . . . —each require proof of scienter." *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1354 (11th Cir. 2008).

In this case, the alleged predicate acts of mail fraud *are* the series of notice letters that PNC sent to Plaintiffs. In its Partial Motion to Dismiss, PNC included a detailed chart comparing the relevant statements and disclosures in the notice letters sent to the Plaintiffs in this case with those contained in the letters that were at issue and were considered by the Seventh Circuit in *Cohen*. [ECF No. 133, pp. 8-11].

In their Opposition, Plaintiffs argue, for the first time, relying on *Schmuck v. United States*, 489 U.S. 705 (1989), and *United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003), that they do not have to show that the notice letters themselves contained any actual false or misleading statements to adequately plead a RICO claim. [ECF No. 138,

pp. 6-7]. *Schmuck* and *Hasson* stand for the proposition that communications sent through the mails or wires need not themselves be fraudulent if they are integral to executing a scheme based on other explicit fraudulent statements or acts. *See Schmuck*, 489 U.S. at 711-12; *Hasson*, 333 F.3d at 1272-73. The only statements and documents identified in Plaintiffs' TAC that purport to be fraudulent are the notice letters from PNC.

Plaintiffs have now filed four complaints in this case, all of which alleged that the notice letters contained false and misleading statements or omissions that support their RICO claim. The Court also previously required Plaintiffs to submit a RICO Case Statement. There, the Plaintiffs relied exclusively on the notice letters. [ECF No. 113-1, pp. 5-9].

At the hearing on the motion to dismiss the TAC, the Undersigned expressed surprise that Plaintiffs were advancing the argument that the letters need not themselves be fraudulent in order to support the RICO claims based on mail and wire fraud. But when questioned about this apparent change in position at oral argument, Plaintiffs' counsel reiterated their prior position that the notice letters **were** fraudulent because of alleged omissions.[7]

--------------------------------------------------

[7]     Plaintiffs' counsel explained that "our position . . . is that these letters contained omissions and were misleading." [ECF No. 153, p. 6]. He noted that the mail fraud law does not require the letters to actually contain "misleading statements or any misrepresentations." But he explained that "our allegations are that there was a scheme to defraud here, primarily of omission, coupled with some misrepresentations in those

So for purposes of the RICO allegations, it is clear that Plaintiffs' allegations about the underlying fraudulent scheme concern the statements or omissions in the notice letters.

In its Notice of Supplemental Authority [ECF No. 195], ASIC relies on an order dismissing a similar force-placed insurance putative class action lawsuit in *Meyer v. One West Bank, F.S.B.,* Case No. CV 14-05996, slip op. (C.D. Cal. Mar. 18, 2015) [ECF 195-1]. The *Meyer* Court dismissed the mail fraud component of the RICO claim and held that the "relatively straightforward language" in the letters "cannot plausibly be read as evincing fraudulent intent." *Id.* at 14. The *Meyer* Court relied upon *Gustafson v. BAC Home Loans Servicing, LP,* No. SACV 11-915-JST, 2012 WL 7051318, at *6-7 (C.D. Cal. Dec. 20, 2012), where the court, in dismissing the RICO claim with prejudice, explained that it "fails to see how Defendants' failure to inform Plaintiffs and class members that force-placed insurance practices also generated profits for Defendants is a material omission 'reasonably calculated to deceive' Plaintiffs."

Judge Bloom relied upon *Gustafson* when dismissing similar RICO claims in *Everbank,* and the Undersigned certainly appreciates that these decisions (and others) are far from illogical.

---

letters. That's our theory." [*Id.,* at p. 7]. Significantly, counsel also explained that there would be no RICO claims "if there's full disclosure" [including information about the alleged kickbacks being partially responsible for a higher premium]. *Id.,* at 9.

But Plaintiffs have advanced allegations, which the Undersigned must accept at the motion to dismiss stage, that the omissions were deceptive and part of a fraudulent scheme. They say the notice letters sent to borrowers were mailed in furtherance of Defendants' scheme even though they expressly encouraged borrowers to procure their own insurance. Plaintiffs contend that the letters gave the scheme an air of legitimacy by suggesting that all charges connected with the forced coverage, should it be placed, went to coverage or other costs justifiably passed to the borrower. Plaintiffs describe the letters as suggesting to borrowers that there was a legitimate reason for the inflated cost of LPI. They also allege that the letters promoted the perception that PNC was acting in the borrower's interest when, in fact, it was not, and offered Defendants plausible deniability regarding the fraudulent nature of their scheme. And, Plaintiffs further say, even though some borrowers might take heed and choose to procure their own insurance, others would not, placing trust in their mortgage lender's reputation and representations.

At bottom, Plaintiffs' allegations about the fraudulent scheme necessary to support the mail and wire fraud theories of their RICO counts are sufficient to nudge the claims slightly beyond the plausibility line at this motion to dismiss stage. But Coach D'Amato is on the sideline, ready to invoke his "game of inches" caveat and jump into the legal competition should the need arise at a later stage to set this Plaintiffs' theory on the legal hash marks.

### F.       The Filed-Rate Doctrine Does Not Bar Lauren's Ohio Claims.

Similar to the arguments raised in the motion to dismiss an earlier version of this lawsuit, ASIC argues that the filed-rate doctrine bars Plaintiff Lauren's claims. The earlier version of the complaint did not involve Ohio law, however, and ASIC now argues that the doctrine precludes Lauren's claim.  In an effort to address the reality that this Court previously rejected its filed-rate doctrine argument in the earlier order denying the motions to dismiss, ASIC emphasizes that Plaintiffs' lawyers have now conceded that their LPI damages model seeks recovery of filed and approved components of the LPI premiums (i.e., commissions and tracking expenses).

To be sure, Plaintiffs' counsel have made statements which ASIC argues are inconsistent with their official, formal position that Plaintiffs (which now includes Lauren) are not challenging ASIC's filed rates. But these statements were made earlier in the case, before Lauren was added as a named Plaintiff. Moreover, Plaintiffs still assert that they are not attacking the approved rates.

The Court's prior ruling on the filed-rate doctrine was not based on the nuances of Florida or New Jersey law, and there is therefore no need to evaluate Ohio law in order to assess ASIC's motion to dismiss Lauren's claim based on the same filed-rate doctrine. For all practical purposes, the Court's earlier ruling was based on the procedural posture: the arguments were being raised in a motion to dismiss, and Plaintiffs were stridently contending that they were not challenging the rates

54

themselves. For the same reason, the Court now denies ASIC's motion to dismiss once again.

However, as mentioned in the earlier ruling [ECF No. 124, pp. 14-15], Defendants may raise the filed-rate doctrine again. *See e.g., Kunzelman v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2013 WL 139913, at *11-12 (S.D. Fla. Jan. 10, 2013) (denying motion to certify class in LPI lawsuit, rejecting Plaintiffs' argument that the Court already disposed of the filed-rate doctrine defense in an order denying a motion to dismiss and noting that determining "whether, and to what extent the filed-rate doctrine is applicable would require an analysis of each state's formulation of the doctrine and may require examination of the regulatory proceedings involved in approving the rate filed"). The Court notes that ASIC has raised the filed-rate doctrine in its memorandum [ECF No. 184] opposing Plaintiffs' motions (one redacted and one filed under seal) for class certification [ECF Nos. 164; 165]. In fact, ASIC relies on *Kunzelman* to support its argument that application of the filed-rate doctrine means that class certification would be improper.

The Court will therefore need to again confront the filed-rate doctrine argument when analyzing the class certification motion (and may need to grapple with the argument again if ASIC were to file a summary judgment motion raising the theory). *See generally Everbank,* 2015 WL 265648, at *21 (noting that the plaintiffs disclaim a challenge to the reasonableness of the filed rates themselves, pointing out that the

plaintiffs instead allege manipulation of the force-placed insurance market, highlighting that the claims and facts alleged in the Complaint must be construed in a light most favorable to the plaintiffs, noting that the defendants are not foreclosed from pursuing the defense, and emphasizing that another consideration at a later stage "will not be as limited when not based solely on the pleadings").

### G.   *Cohen* and *Feaz* Do Not Bar Lauren's Claims.

ASIC contends that *Cohen* and *Feaz* bar Lauren's claims because all material disclosures were provided to her, thereby negating any viable claim. But the Court previously rejected these arguments. ASIC has not provided sufficient grounds for a reconsideration of the earlier order. *Miccosukee Tribe of Indians v. U.S.*, 680 F. Supp. 2d 1308, 1312 (S.D. Fla. 2010) (motion for reconsideration must set forth facts or law "of a strongly convincing nature to induce the court to reverse its prior decision").

Technically, ASIC has not filed a motion for reconsideration. But it has, for all intents and purposes, sought the very type of relief which a motion for reconsideration seeks. Most district court opinions in this district analyzing *Cohen* and *Feaz* in the forced place insurance context have taken the same position as this Court adopted in its earlier order. *See generally EverBank,* 2015 WL 265648; *Novell v. Bank of Am. Corp.*, No. 14-cv-80672-RLR (S.D. Fla. Dec. 3, 2014) [ECF No. 156-1]; *Persaud v. Bank of Am., N.A.*, No. 14-21819-CIV, 2014 WL 4260853 (S.D. Fla. Aug. 28, 2014). ASIC has not convinced the

Undersigned to change the earlier ruling, so the motion to dismiss on this ground is denied.

### H.     Lauren has stated a claim under Ohio law for breach of fiduciary duty against PNC.

PNC argues that the Court should dismiss Lauren's claim for breach of fiduciary duty in Count VII of the TAC because Ohio law negates the argument that a fiduciary relationship existed between Lauren and PNC. Specifically, PNC contends that an Ohio statute[8] precludes the formation of a fiduciary relationship between a bank and its obligor unless the relationship is "expressly agreed in writing."

But PNC already raised this argument unsuccessfully when Lauren's Ohio claims were before the Western District of Pennsylvania. In fact, in *Lauren v. PNC Bank, N.A.*, No. 2:13-cv-762, 2013 WL 5565511, at *6 (W.D. Pa. Oct. 8, 2013), the district court denied PNC's motion to dismiss and noted that, under Ohio law, "a fiduciary role may be assumed by formal appointment or it may arise *de facto* from a more confidential relationship." (internal quotations omitted). The district court noted that the inquiry is "fact intensive" and therefore "not amenable to resolution at the motion to dismiss stage." *Id.* In addition, it also held that Lauren's theory -- that PNC "used escrow funds under its management and control to enrich itself at the borrower's expense" -- is one

---

[8]     Ohio Rev. Code Ann. § 1109.15(E) provides that, "Unless otherwise expressly agreed in writing, the relationship between a bank and its obligor, **with respect to any extension of credit**, is that of a creditor and debtor, and creates no fiduciary or other relationship between the parties." (emphasis added).

which "goes beyond the traditional lender-borrower relationship and is sufficient to survive" at the motion to dismiss stage. *Id.*

Setting aside the reality that another district court already ruled that Lauren stated a claim against PNC for breach of fiduciary duty and denied a similar dismissal motion,[9] the statute on which PNC relies is expressly limited to "the relationship between a bank and its obligor, *with respect to any extension of credit*[.]" Ohio Rev. Code Ann. § 1109.15(E) (emphasis added). Plaintiff Lauren does not claim, however, that PNC's "extension of credit" to her created a fiduciary relationship; rather, she alleges that such a relationship arose from PNC's management of her escrow account and selection of a lender-placed insurer, the fact that PNC receives a greater economic benefit from LPI transactions than it would from a typical escrow transaction, and the fact that PNC was aware that borrowers placed their trust and confidence in PNC. [ECF No. 127-1, ¶ 135].[10]

---

[9]    The Pennsylvania district court denied PNC's motion for reconsideration of the ruling on the fiduciary duty claim. *Lauren v. PNC Bank, N.A.*, No. 13-762, 2013 WL 6123084, at *2 (W.D. Pa. Nov. 21, 2013). In doing so, it acknowledged that the argument PNC made about the Ohio statute "is not without force" and appears to be based "on one plausible interpretation of the statute." *Id.* Nevertheless, the district court ultimately concluded that reserving a final decision on the contours of a fiduciary duty claim pending further development of the record would be "prudent." The district court further explained that the theory is "difficult to resolve at the motion to dismiss stage." *Id.*

[10]    PNC argued at the hearing that it did extend Lauren credit when it purchased her LPI policy, but it is not at all clear that charging a homeowner for insurance coverage qualifies as an "extension of credit" under the statute.

Lauren notes that the Supreme Court of Ohio has held that Ohio Rev. Code Ann. § 1109.15(E) merely "codified the principle" established in prior decisions that "a fiduciary duty does not arise between a bank and a prospective borrower unless there are special circumstances[.]" *Groob v. Key Bank*, 843 N.E. 2d 1170, 1175 (Ohio 2006). Lauren argues that *Groob* demonstrates that the statute did not dramatically alter the law. Indeed, Lauren argues that the fact that the *Groob* Court examined the entirety of the circumstances presented in that case, and did not merely rest its decision on the absence of an express written agreement, *id.* at 1175-76, demonstrates that a writing is not an absolute requirement in all cases.

Lauren's argument ignores the reality that the plaintiffs in *Groob* were **prospective** borrowers who never submitted a formal loan application and did not enter any written agreements with the bank, a situation which meant that they "were not obligors of the bank." 843 N.E. 2d at 1175. Because they were not obligors, the statute did not apply. Moreover, as the *Groob* Court noted, the plaintiffs' argument -- that a special limited duty of confidentiality created between a prospective borrower and a bank gives rise to a fiduciary duty -- was unpersuasive because it confused the duty of confidentiality with a fiduciary duty.

On the other hand, the *Groob* Court cited *Stone v. Davis*, 419 N.E. 2d 1094 (Ohio 1981), for authority for the rule that "a fiduciary duty does not arise between a bank and a prospective borrower unless there are special circumstances." 843 N.E. 2d at 1175.

In *Stone*, the court held that a fiduciary relationship between a bank and its customer "may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed," 419 N.E. 2d at 1098, as Lauren has alleged here. The *Stone* Court held that a bank acts as its customer's fiduciary when it advises its customer regarding mortgage insurance, due to the prior existence of a relationship between the parties, the bank's expertise in the area, and the fact that the bank receives a direct pecuniary benefit from the transaction. *Id.* at 1098-99.

Lauren argues that the same considerations support a finding that a fiduciary relationship arises between a bank and its customer when the bank exercises its discretion to select an insurer for the customer and forces new coverage. She also contends that the bank's exercise of discretionary control over the selection of an insurer and Lauren's escrow account support the formation of a fiduciary relationship here. *Burns v. Prudential Sec., Inc.*, 857 N.E. 2d 621, 635 (Ohio Ct. App. 2006) (a broker's discretionary control over an account made the broker a "fiduciar[y] in the broad sense").[11]

---

[11]     In contrast, as the Pennsylvania federal district court recognized, *Cairns v. Ohio Savings Bank*, 672 N.E. 2d 1058 (Ohio Ct. App. 1996), is distinguishable because the plaintiffs there failed to allege the existence of a "de facto fiduciary relationship," and PNC's alleged discretionary self-dealing here is different than "the more ministerial tasks of making payments to third parties that were at issue in *Cairns*," *Lauren*, 2013 WL 6123084, at *1.

But *Groob* can also be read for the proposition that the "special circumstances" are in fact **those specifically referenced in the statute** -- i.e., an express written agreement, which Lauren surely does not have. Under that reading, PNC's motion would have to be granted if the statute applies.

Based on the Pennsylvania federal district court's refusal on two occasions to dismiss Lauren's breach of fiduciary duty claim and the uncertainty over the issue of whether an extension of credit occurred here, the Undersigned declines to dismiss Plaintiff Lauren's breach of fiduciary duty claim.

However, PNC's reliance on the Ohio statute may ultimately prevail, assuming that the placement of LPI is considered an extension of credit. For now, however, the TAC survives the motion to dismiss Lauren's breach of fiduciary duty claim.[12]

---

[12]   PNC cites other Ohio cases (or federal cases interpreting Ohio law) to support its argument that Lauren's breach of fiduciary duty claim is simply unavailable under the Ohio statute because there is no writing to create the fiduciary relationship. But those cases involve situations where the plaintiff was, in fact, involved in an extension of credit scenario -- a circumstance which may (or may not) be present here. *Remnick v. Provident Bank,* No. 1:06cv820, 2008 WL 696893 (S.D. Ohio March 12, 2008) (pro se plaintiff had personal and business accounts at bank and obtained a short-term loan with the bank to pay for a truck); *Johnson v. Fifth Third Bank,* No. 1:09 CV 1976, 2010 WL 4739930 (N.D. Ohio Nov. 16, 2010) (plaintiffs obtained a construction loan and signed a construction loan agreement and bank made loan disbursements).

However, in *Fifth Street Bank*, the district court held that, "as noted in *Groob,* the special circumstances are those referred to in the statute, i.e., an express agreement in writing." 2010 WL 4739930, at *10. If this interpretation were to be followed and if the LPI was an extension of credit, then PNC's motion to dismiss the fiduciary duty claim would be persuasive and successful.

61

I.     **Lauren Has <u>Not</u> Stated a Claim under Ohio Law for Breach of the Implied Covenants of Good Faith and Fair Dealing.**

PNC relies primarily on federal decisions applying Ohio law to argue that Plaintiff Lauren's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because Ohio law does not permit an implied covenant claim to stand independently, absent a breach of an express term of the agreement.  In response, Lauren relies on *Littlejohn v. Parrish*, 839 N.E. 2d 49 (Ohio Ct. App. 2005), to argue that her claim is cognizable.  The Court concludes that Plaintiff has not pled a viable claim and that its reliance on *Littlejohn* is insufficient to convince me to the contrary.

In *Littlejohn*, a mid-level court of appeals in Ohio distinguished the line of authority on which PNC relies as merely "refus[ing] to recognize a separate tort cause of action for a breach of good faith in a contract," *id.* at 54, and expressly held that "a party can be found to have breached its contract if it fails to act in good faith." *Id.*; *accord Andrew v. Power Mktg. Direct, Inc.*, 978 N.E. 2d 974, 984-85 (Ohio Ct. App. 2012); *DiPasquale v. Costas*, 926 N.E. 2d 682, 709 (Ohio Ct. App. 2010).

Recognizing that she has styled her claim as one for breach of the implied covenant of good faith and fair dealing, and **not** a "breach of contract," Lauren argues that this distinction is immaterial. She contends that the federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346-47 (2014). Therefore, Lauren argues, the critical point is that Plaintiff Lauren has adequately

alleged that PNC acted in bad faith, which she says is sufficient to entitle her to relief under Ohio law.  *Id.* at 347.

*Littlejohn*, which Lauren relies upon, noted that Ohio law does not recognize a separate cause of action for the tort of breach of good faith in a contract. Instead, the Ohio mid-level appellate court held that the good-faith-and-fair-dealing requirement is **part of** the contract, not a separate tort claim. It also explained that a party can state a breach of contract claim by alleging a failure to act in good faith.

The *Littlejohn* Court then asked a practical question: What does it mean for a party to have breached its duty of good faith? It then answered its own question: every agreement "has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Id.* at 54.

So, is the difference between a breach of contract claim and an independent claim for breach of an implied covenant of good faith merely a hyper-technical, nitpicky difference which has no legal consequence? Or does it actually **matter** whether Lauren alleges an Ohio claim for breach of an implied covenant of good faith, or, instead, alleges a breach of contract claim based on a failure to act reasonably -- i.e., breaching the implied duty of good faith inherent in that same contract -- through the *same* conduct (or misconduct) alleged in the tort claim?

Lauren says no, but the Undersigned is not convinced.

First, recent federal cases construing Ohio law in LPI cases have rejected claims for breach of an implied covenant of good faith because Ohio law does not recognize such a claim independent of a breach of contract claim. *See e.g., Swain v. Wells Fargo Bank, N.A.,* No. 3:13 CV 1727, 2014 WL 4675363 (N.D. Ohio Sept. 18, 2014).

Second, Ohio courts have clearly ruled that there is no separate cause of action for breach of good faith, either as a contract claim or a tort claim.  Instead, "good faith is **part of** a contract claim and **does not stand alone**." *Lakota Local Sch. Dist. Bd. Of Educ. v. Brickner,* 671 N.E.2d 578, 583-84 (Ohio Ct. App. 1996) (emphasis supplied). *See also Macklin v. Citimortgage, Inc.,* No. 101077, 2015 WL 204062 (Ohio Ct. App. 2015) (dismissing mortgagor-borrower's claim for breach of the implied covenant of good faith because it is part of a contract claim and, because there was no contract, the good faith claim also failed).

Third, *Littlejohn* has received some negative treatment (or limitations) by courts in the years since it was decided. For example, as explained in *McCune v. National City Bank,* 701 F.Supp. 2d 797, 805-06 (E.D. Va. 2010) (dismissing borrowers' class action lawsuit because, among other reasons, the lender's subordination policy did not violate an implied duty of good faith), the current state of Ohio law on the implied duty of good faith was reviewed in detail in *DavCo Acquisition Holding, Inc. v. Wendy's International, Inc.,* No. 2:07–cv–1064, 2008 WL 755283 (S.D. Ohio Mar. 18, 2008). *McCune* provided a helpful summary of *DavCo*:

In *DavCo*, the United States District Court for the Southern District of Ohio considered a claim that a defendant franchisor breached an implied duty of good faith in the parties' franchise agreement when it refused to approve additional suppliers or certain departures from contractual requirements. Under the franchise agreement, the parties agreed that the plaintiff "shall not purchase from any supplier until, and unless, such supplier has been approved in writing by Franchisor." [2008 WL 755283, at *4]. It also provided that the plaintiff-franchisee was prohibited from certain actions or practices "without the Franchisor's prior written consent."

After reviewing Ohio law, the district court concluded that the "duty of good faith and fair dealing may not be invoked to override express contract terms." *Id.* at *6, 2008 U.S. Dist. LEXIS 27108 at *18. It further concluded that "the implied covenant of good faith and fair dealing does not apply where a party to the contract has the . . . absolute and exclusive authority to make the decision at issue." *Id.* at *7 (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826–827 (6th Cir. 2003)). In rejecting the claim that the franchisor's reserved right to consent was qualified in some way by an implied duty of good faith, the district court observed that the applicable language "imposes no express duty on [the franchisor] to investigate or apply any particular criteria in evaluating a proposed supplier." *Id.* at *5. The Court also relied on Ohio Supreme Court case law for the proposition that "there can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Id.* at *6. (quoting *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 714 N.E.2d 898 (1999)). [13]

*McCune*, 701 F. Supp. 2d at 805-06.

---

[13]   The Middle District of Pennsylvania also refused in a contract dispute under Ohio law to adopt an expansive reading of *Littlejohn* on the grounds, among others, that such an expansive reading would conflict with the Ohio Supreme Court's decision in *Ed Schory & Sons v. Francis*, 662 N.E. 2d 1074, 1082-83 (Ohio 1996) (although courts often refer "to the obligation of good faith that exists in every contractual relation, . . . this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document"). *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 712 (M.D. Pa. 2006) ("Ohio precedent belies [Plaintiff's] expansive interpretation of *Littlejohn*.").

Fourth, because the terms of the actual contract may well affect a breach of contract claim based upon a breach of the implied duty of good faith, the distinction between a breach of contract claim and one for the separate claim of a breach of an implied duty could affect the viability of the claim. The nature of the claim asserted may matter, and the Court does not accept Plaintiffs' theory that it stated a claim by merely alleging that PNC acted in bad faith. In addition, practical considerations dictate that the correct claim be asserted. *B-Right Trucking Co. v. Interstate Plaza Consulting*, 798 N.E.2d 29, 37 (Ohio Ct. App. 2003) (holding that the good faith requirement implied in the performance of contract under Ohio law "depends upon the language of the contract in each case").

Fifth, if a jury were deciding the claim, then the jury instructions would relate to a breach of contract and the implied duty of good faith -- not about a non-existent separate cause of action for an independent breach of a duty to act in good faith. And where would the jury instructions for a non-existent claim come from?

Sixth, *City of Shelby*, which Lauren relies on, reversed the order affirming summary judgment in favor of the defendant city -- but then noted that plaintiffs should, on remand, to promote "clarification," be permitted to add a citation to the missing statutory reference to their Complaint. Permitting Plaintiffs to amend their complaint to invoke the correct claim (for breach of contract, rather than an incorrect, non-existent independent claim for breach of the implied duty of good faith) would

promote the goal of obtaining clarity in the nature of the claim.  This goal is consistent with the result in *City of Shelby*.

Seventh, the TAC no longer contains a breach of contract count. It is one thing to argue that an existing breach of contract claim includes the idea that a defendant breached the contract by failing to abide by the covenant of good faith and fair dealing implied in that contract.  It is a different thing to argue that a separate claim for breaching the covenant implied in a contract should actually be construed as a breach of contract claim when no such claim has been asserted

The Court understands that *City of Shelby* noted the difference between the **factual** allegations a complaint must contain to survive a motion to dismiss and the pleadings philosophy that "it is unnecessary to set out a legal *theory*" once a plaintiff has alleged "facts sufficient to show that her claim has substantive plausibility." 135 S. Ct. at 347 (emphasis added).

So it is *possible* under *City of Shelby* that Lauren's allegation [ECF No. 127-1, ¶ 84] that PNC "breached the implied covenant of good faith and fair dealing" by engaging in nine categories of conduct is a sufficient **factual** assertion to state a claim for breach of contract notwithstanding that the TAC does not expressly invoke a breach of contract theory. But the Court finds that this possibility, if permitted, would be the legal equivalent of trying to fit a square peg into a round hole.  The potential risks which could flow from an incorrectly pled count significantly outweigh the consequences

arising from a ruling which requires Plaintiffs to amend their complaint in order to clearly articulate the breach of contract theory arguably available under Ohio common law. The choice is between improved clarity and potential confusion.

Therefore, the Undersigned grants PNC Bank's motion to dismiss Lauren's implied duty of good faith claim in Count 1 of the TAC. This dismissal is without prejudice. Plaintiffs may, consistent with their Rule 11 requirements, amend their Complaint to more-clearly allege an Ohio breach of contract claim for the breach of the implied good faith duty (and to remove the unavailable separate claim for breach of implied covenant of good faith and fair dealing).

## IV.    CONCLUSION

Defendants' motions to dismiss are **granted in small part and denied in large part,** as follows:

1)    ASIC's motion to dismiss Lauren's claim for breach of an implied covenant of good faith and fair dealing under Ohio law is granted, and the claim is dismissed without prejudice.

2)    Defendants' motions to dismiss remaining portions of the TAC is denied.

If Plaintiffs wish to file a fourth amended complaint (to assert Lauren's Ohio claim for breach of contract based on a breach of the implied duty of good faith and fair dealing), then they must do so within 14 days from entry of this Order. The only

changes allowed are those which will relate to the now-dismissed claim for breach of an

implied duty of good faith and a new count for breach of contract.

      **DONE AND ORDERED** in Chambers, in Miami, Florida, March 23, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
All Counsel of Record