**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:14-cv-20474-GOODMAN**

**[CONSENT CASE]**

ENRIQUE MONTOYA, NEYSER COLONIA,
XI CHEN LAUREN, and MARK STUCKEY on
behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

PNC BANK, N.A., AMERICAN
SECURITY INSURANCE COMPANY, STANDARD
GUARANTY INSURANCE COMPANY, and
VOYAGER INDEMNITY INSURANCE COMPANY,

      Defendants.

_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS, CLASS
COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES,
AND INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Class counsel are proud to present for final approval a class action settlement that will provide more than $32.3 million in meaningful monetary relief to the 130,875 member settlement class and ensure that the controversial force-placed insurance ("FPI" or "LPI") practices that are the subject of this lawsuit nationwide will not re-occur.[1]  This settlement follows final approval of eight similar FPI settlements in this district and a ninth in the Northern District of New York,[2] all of which earned approval after many years of hard-fought litigation of largely the same claims and defenses that were at issue in this case.  Like the settlements in those cases, this settlement will provide near-complete monetary relief to over approximately 130,000 PNC borrowers nationwide who had hazard, flood, flood-gap, or wind insurance coverage forced on their properties. The $32.3 million in monetary relief, constitutes 50% to 100% of the best-case scenario damages recoverable by the class had the parties proceeded to trial.  The injunctive portion also guarantees that the FPI practices that were the subject of this litigation, including the termination of commission payments paid to PNC and its affiliates which totaled millions of dollars during the class period, will not recur in the future.  As of the date of this filing, the parties have received just one objection and only four opt-outs to final approval of the proposed settlement.  This is an extraordinary result.

This result is all the more extraordinary because it involved the resolution of complex issues against a rising tide of adverse decisions from federal district and appellate courts—decisions Class Counsel would certainly distinguish, but their opponents would just as vigorously assert.  For this

---

[1] Capitalized terms have the meanings given in the Settlement Agreement attached as **Exhibit A**.

[2] Courts in this district granted final approval to the settlements in *Braynen v. Nationstar Mortgage, LLC*, No. 14-cv-20726 (S.D. Fla.); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); and *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.). The district court in New York granted final approval to a settlement with a substantially similar structure in *Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y.).

1

achievement, Class Counsel are asking the Court to award them $4.75 million in fees and expenses, negotiated only after all class benefits had been secured under the direct supervision of a nationally recognized mediator, and payable by Defendants beyond and outside of the benefits to the class. Such a fee would amount to only 14.7% of just the monetary recovery to the class, and is well within the parameters established by the Eleventh Circuit, as that court recently confirmed in *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 629 (11th Cir. 2015).

Class counsel have earned this fee and more, litigating claims against the Defendants for more than two-and-a-half years.  It was these years of diligent work and hard-fought litigation in similar FPI matters that led to this Settlement.  This result was achieved in a climate where federal courts have dismissed many of the same claims raised here on motions to dismiss or denied motions for class certification.  Plaintiffs respectfully request that the Court grant final approval of the settlement, and approve the application for attorneys' fees and Plaintiffs' service awards.

## **FACTUAL BACKGROUND**

### 1.     **Defendants' FPI Practices**

PNC's standard form mortgage agreements require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  (D.E. 1-1 ¶ 5, 234 ¶ 50.)  The mortgage agreement advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage.  (D.E. 1-1 ¶ 5.)  Plaintiffs had insurance coverage force placed on their properties by PNC, and challenge PNC's alleged arrangement with Assurant Defendants and their subsidiaries or affiliates, to artificially inflate borrowers' premiums with costs well beyond the cost of coverage. (D.E. 234 ¶¶ 29-46, 49-54, 57-60, 62-68, 69-72.)  Plaintiffs allege that these costs include kickbacks to PNC or its affiliates, subsidies for below-cost servicing, and other costs unrelated to the procurement of new coverage.  (*Id.* ¶¶ 29-48.)

2.      **The Litigation**

The background and procedural history of this matter is set forth in Class Counsel's declaration and is incorporated herein.  *See* Joint Declaration of Class Counsel, attached as **Exhibit B** ("Joint Decl.").

3.      **The Settlement Terms and Agreement**

A.  *The Proposed Class*

The Settlement Agreement provides relief to all borrowers who had mortgage loans serviced by PNC and were charged amounts for LPI hazard, flood, or wind coverage issued by Assurant Defendants between January 1, 2008 and September 30, 2015.  (Ex. A ¶ 3.1, 3.2; D.E. 238.)[3]

B.  *Monetary and Prospective Relief*

The settlement affords class members significant monetary relief, and prohibits PNC from engaging in certain practices alleged to inflate the insurance charges imposed on mortgagors for a period of five years.  (*Id.* ¶¶ 4.2-4.6.)  The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the LPI premiums, either by crediting their PNC escrow accounts for their recovery amount, or by direct payment.  (*Id.* ¶ 4.6.)  Class members who paid the amounts charged them for LPI between January 1, 2008 and September 30, 2015 will receive a check in an amount equal to 12.5% of the net premium charged them for lender-placed insurance.[4]  (*Id.* ¶ 4.6.3.)  Class members who were charged, but did not pay and still owe PNC for

---

[3] This class will include borrowers with homes in foreclosure, negotiated short sales, deeds in lieu of foreclosure, or modified loan terms.  By contrast, the court in *Williams* specifically excluded numerous categories that are included in this settlement from the class that it certified in February 2012. *See Williams*, (D.E. 211).

[4] A claims-made process is appropriate, as the Defendants have represented that they cannot determine on a system-wide basis the amount of force-placed premiums paid or currently owed by a borrower.  This has also been confirmed in other litigation against the major mortgage lenders, the Assurant Defendants, and other insurers.  *See, e.g., Saccoccio*, 2014 US Dist. LEXIS 26002, at *31 (approving claims-made process and noting, "Defendants … presented evidence that they cannot, on a system-wide basis, determine which class members paid the [LPI] premium or what they paid or … what portion of the lender-placed insurance premium was paid without going individually through each of the 762,390 [loan] files."); Joint Decl. ¶ 34.

the amounts charged them will either receive a credit to their PNC escrow account of the 12.5% or a check for the same amount. (*Id.* ¶ 4.6.2.) The 12.5% payment is calculated based on the entire premium, rather than that portion that is alleged to have been inflated, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the property.

The prospective relief provided by the settlement will ensure that PNC does not engage in the practices that are the subject of this lawsuit. The Settlement Agreement prohibits PNC from charging what Plaintiffs allege are inflated amounts for LPI and accepting a financial interest in its placement. For a period of five years following the Final Settlement Date, PNC is prohibited from accepting commissions for LPI; entering into quota-share reinsurance arrangements with Assurant or any other insurer; and using PNC affiliates to place LPI coverage. (Ex. A ¶ 4.2.1.) This relief is significant as PNC collected millions of dollars in commissions and other benefits during the class period. (Declaration of Thomas E. Scott ("Scott Decl."), ¶¶ 13, 31 attached as **Exhibit C**). The Assurant Defendants will similarly be prohibited for five years from providing LPI commissions to PNC-affiliated agents, entering into reinsurance arrangements, and payments for any administrative or other service associated with force-placed policies, and from accepting from PNC payments for below-cost or free outsourced services. (Ex. A. ¶ 4.3.1.) PNC will also advance funds to continue coverage under the borrower's voluntary policy in the event the policy is eligible to be renewed, if PNC receives notice of a lapse for nonpayment of premium, and if the borrower's loan is escrowed for insurance, thus ensuring the number of LPI policies issued by Defendants is reduced. (*Id.* ¶ 4.2.1.) Finally, the settlement requires PNC to refund any amounts due the borrower once voluntary insurance is secured within fifteen days of receipt of proof of the voluntary coverage. (*Id.*)

### C. *Release of Claims against Defendants*

In exchange for the settlement relief, Settlement Class members will release Defendants and their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from, in sum, all claims, defenses, obligations, or damages that were or could have

been sought in this litigation or that relate, concern, arise for or pertain in any way to Defendants' conduct, policies, or practices concerning the LPI policies.  (*Id.* ¶ 10.)

### D. *Class Notice*

The Settlement Agreement provides that class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement.[5]  (*Id.* ¶ 6.1.)  The notice will be mailed no less than ninety days before the final approval hearing. (*Id.*)  The Settlement Administrator will establish a website on which class members can download or print a claim form and review the Settlement Agreement, and upload and file a claim form electronically.  (*Id.* ¶¶ 6.2, 7.1.)  The Settlement Administrator will also establish a toll-free number that class members can call for information, or to raise any questions or concerns. (*Id.* ¶ 7.3.1.)  The Settlement Administrator will also publish notice of the settlement twice in *USA Today* no fewer than forty-five days before the Final Fairness Hearing.  (*Id.* ¶ 6.3.)  Class members may opt out of the settlement by sending a request for exclusion to the Settlement Administrator.  (*Id.* ¶ 11.1.)

### E. *Claims Process*

To obtain relief from Defendants, the Settlement Agreement requires class members to submit a claim form before a deadline set by the Court, but that will fall no later than sixty days after the Final Settlement Date.  (*Id.* ¶¶ 2.23, 2.9, 7.1.)  The claims will be reviewed by the Settlement Administrator, who will then make the final determination of the amount owed each class member using Defendants' electronic records, and have 180 days after the Final Settlement Date to distribute checks to borrowers who paid the amounts owed them for LPI.  (*Id.* ¶¶ 7.2, 7.3, 7.3.3.)  Defendants will have 90 days after the Settlement Administrator provides a list of valid claims within which to either credit the appropriate amount or to cause the Settlement Administrator to issue checks to class

---

[5] In the event that a notice is returned as undeliverable, the Settlement Administrator will access the National Change of Address database and attempt to locate the class member.  (*Id.* ¶ 6.1.)

members who still owe amounts for LPI.   (*Id.* ¶ 7.3.4.)

> **F.  *Class Counsel Fees and Expenses and Named Plaintiffs Case Contribution Award***

The Court has already appointed the law firms of Kozyak Tropin & Throckmorton, Podhurst Orseck, and Harke Clasby & Bushman to serve as Lead Class Counsel for the class.  (D.E. 238.) Pursuant to Section 15 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $4,750,000.  (*Id.* ¶¶ 15.1, 15.2.)  Defendants also will not oppose a Case Contribution Award to each named plaintiff not to exceed $5,000.00.  (*Id.* ¶ 15.4.)  The Court will consider whether to grant or deny these awards separate and apart from its analysis of the fairness, reasonableness, and adequacy of the settlement.  (*Id.* ¶ 15.5.)

**4.      Preliminary Approval and Settlement Administration**

The Court preliminarily approved the settlement and certified the proposed Settlement Class on September 30, 2015. (D.E. 238.)  The Court approved all terms, including the proposed Notice and notice plan, and ordered the parties to mail the Notice, Claim Instructions, and Claim Form to all class members.  (*Id.*).

The Settlement Administrator, Heffler Claims Group ("Heffler"), obtained class member records from Defendants, including the last-known names and mailing addresses for all persons meeting the class definition.  (Declaration of Sandra Pappas ("Pappas Decl."), attached as **Exhibit D**, at ¶ 5.)  Heffler updated the mailing list and standardized the address information using the U.S. Postal Service database. (*Id.* ¶11.)  Heffler mailed notice packets to a total of 130,875 class members. (*Id.* ¶ 6.)  Heffler re-mailed notice packets to class members for whom it received a change of address notification.  (*Id.* ¶ 11.)  Heffler also activated the settlement website, published an internet banner ad that ran from December 8, 2015 through January 7, 2016, published notice in *USA Today* on December 28, 2015, and established a toll-free telephone line that is accessible 24 hours a day, 7 days a week for class members who seek additional information.  (*Id.* ¶¶ 7, 8.)

The deadline for opt-outs is February 6, 2016.  (D.E. 238.)  As of January 22, 2016, Heffler

had received only four valid requests, representing only .00003% of the settlement class.  (Pappas

Decl. ¶ 9.)   As of the date of this Motion, only one objection has been filed with the Court.

## LEGAL ARGUMENT

## I.      THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties

of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of

scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*,

No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation

omitted).  For these reasons, "there exists an overriding public interest in favor of settlement,

particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma*

*v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).  Courts in this

circuit consider the following factors:  (1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the

settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs'

success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class

representatives, and the substance and amount of opposition received.  *See Saccoccio* Order at 9;

*Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994). "In assessing

these factors, the Court 'should be hesitant to substitute ... her own judgment for that of counsel.'"

*Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991)).

Analysis of these factors here compels the conclusion that the Court should approve the proposed

settlement.

### A.  The *Montoya* Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.

The first factor requires the Court to consider whether the settlement was obtained by fraud

or collusion among the parties and their counsel.  Courts begin with a presumption of good faith in

the negotiating process.  *See Saccoccio* Order at 9 ("Where the parties have negotiated at arm's

length, the Court should find that the settlement is not the product of collusion"); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").  The settlement in this case was the product of significant give and take, and was negotiated at arms' length.  The parties participated in a mediation before Rodney Max and subsequent negotiations over several weeks.  (Joint Decl. ¶¶ 13-17, 39, 43.)

The parties met in person, as well as through regular telephonic sessions and email communications, negotiating first the terms of an initial memorandum of understanding and then a final settlement agreement.  Mr. Max has significant experience mediating complex commercial suits to resolution, and was involved at every step of the process.  (*Id.*)  The very fact of his involvement weighs in favor of approval.  *See, e.g., In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' negotiations were also informed by considerable discovery and institutional knowledge obtained by Class Counsel in litigating FPI claims involving the Assurant Defendants in at least thirteen class actions over the last four years.  (Joint Decl. ¶¶ 40-42, 45); *see, e.g., Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Saccoccio*, No. 13-cv-21107 (S.D. Fla.).

### B. The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal.

This case involves complex legal claims and defenses brought on behalf of 130,875 class members, (Pappas Decl. ¶ 6; Scott Decl. ¶¶ 15, 16, 24, 25), and includes claims for complex common law contractual, quasi-contractual, and tort claims. (D.E. 234.)  Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources.  Even if Plaintiffs were ultimately to have prevailed in this litigation (which Defendants contest), that success would likely have borne fruit for the Class only after years of trial and appellate proceedings

and the expenditure of millions of dollars by both sides.  (Scott Decl. ¶¶ 17-18); *see, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery….").

By contrast, the settlement provides immediate and substantial monetary relief to the Settlement Class, with payments and credits approximating 50%-100% of class members' actual damages.  (Joint Decl. ¶¶56, 57, 60; Scott Decl. ¶ 13.)  This range is extremely favorable, and constitutes an excellent result.  *See, e.g., Hamilton*, No. 13-cv-60749 (S.D. Fla.) (D.E. 178); *Saccoccio* Order at 12-13 (return of 12.5% of premiums charged for FPI with injunctive relief "very likely exceeds what Plaintiffs could have won at trial"); *In re Checking Account Overdraft Litig.*, 830 F.Supp. 2d 1330, 1346 (S.D. Fla. 2011) (range of 9% to 45% of damages was an "exemplary" result).  These benefits come without the expense, uncertainty, and delay of continued and indefinite litigation. In light of the costs, uncertainties, and delays of litigating through trial—to say nothing of an appeal—"the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

### C. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement.

Courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995).  At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Prior to settlement, Class Counsel and their co-counsel had been litigating claims against the Assurant Defendants for almost four years, and had familiarized themselves thoroughly with the

mechanics of Assurant's FPI program.  (Joint Decl. ¶¶ 39, 40, 45.)  The parties also conducted significant discovery in litigation: over ten thousand of pages of documents were produced; Plaintiffs deposed Defendants' corporate representatives and experts; and Defendants took the depositions of the named Plaintiffs, Plaintiffs' expert, and subpoenaed documents from third-parties. (*Id.* ¶ 11,) Further, before, during, and after mediation, Class Counsel confirmed details of Defendants' FPI program, the class members affected, and the amount at stake, to ensure that the settlement was fair and complete, and to confirm the value of the relief that would be provided to the class.  (*Id.* ¶¶ 13-17, 40, 46.)  Plaintiffs also confirmed through discussions with Defendants, and finally with the deposition of the PNC corporate representative, that a claims-made structure would provide the best possible relief to settlement class members.  (*Id.* ¶¶ 13-17, 35, 36.)

### D. Plaintiffs Faced Significant Obstacles to Obtaining Relief.

"[T]he likelihood and extent of any recovery from the defendants absent … settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("a court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise"). Class Counsel and Plaintiffs believe they have a compelling case, but also recognize that Defendants have raised significant defenses, including application of the filed-rate doctrine, failure to mitigate damages, statutes of limitation, and unclean hands.  (D.E. 235, 236; Scott Decl. ¶¶ 11, 16.)  The Assurant Defendants alone have raised fifty-five affirmative defenses to the operative complaint. (D.E. 236.)  Although Plaintiffs and Class Counsel maintain that these defenses lack merit, had litigation continued, Plaintiffs and class members would have faced the risk of not prevailing on their claims.  (Scott. Decl. ¶¶ 11, 12, 25, 33, 43.); *see Hall*, No. 12-cv-22700 (D.E. 225 at 12:23-25, 21:17-21, 92:2-3, 74:4-9, 92:21-23); *see also, e.g., Kunzelmann*, 2013 WL 139913 (noting obstacles created by application of multistate law, among other things).  Further, the court in *Saccoccio* noted

10

the "headwinds created by" the Eleventh Circuit in *Feaz v. Wells Fargo,* 2014 WL 503149 (11th Cir. 2014) and the Seventh Circuit in *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013). *See Saccoccio* Order at 11; *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2014 WL 4248208 at *1, *9 (S.D. Fla. Aug. 27, 2014) (noting same), and the Second Circuit has held that the filed-rate doctrine applies to bar claims against insurers in the FPI context.  *See Rothstein v Balboa Ins. Co..*, 790 F.3d 256 (2d Cir. 2015).  Had the parties continued to litigate, and the tide turned against Plaintiffs, they could have stood to recover nothing on behalf of a nationwide class.

**E.  The Benefits Provided by the Settlement Are Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery.**

As explained above, the settlement offers approximately $32.3 million in monetary benefits to the class, as well as injunctive relief and separately paid attorneys' fees.  This will provide 50%-100% recovery of claimants' actual damages, which far exceeds the standards established by this and other courts.  (Scott Decl. ¶ 13; Joint Decl. ¶¶ 56, 57, 60); *see, e.g., Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate … A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]").  In *Saccoccio*, this Court approved a similar settlement with payments to the class amounting to 12.5% of the net premium charged to them.  *See Saccoccio* Order at 12-13.  The Court noted that the alleged illegal commissions charged to class members were 12.5% of the net premium and that "the maximum rate premium would fall without the 'commissions' between Assurant and Chase is 12.5%."  *Id*.  The Court therefore reasoned that "the Class recovery is 50-100% of the damages."  *Id*.  The same reasoning applies here.

In *LiPuma v. American Express Co.,* 406 F. Supp. 2d 1298 (S.D. Fla. 2005), this Court finally approved a settlement that recovered 8.1% of the possible damages.  When valuing the total recovery, this Court included the cash fund, the proposed value of the injunctive relief, and the costs of notice and administration.  *Id*. at 1322.  The Court focused on "the possible recovery at trial" and

evaluated the settlement in its "totality" and not on a "claim-by-claim" or "dollar-by-dollar" basis. *Id*.   Further, the presence of "strong defenses to the claims" makes lower recoveries more reasonable, *id*; *see also Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 ("standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."),[6] and "when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *12 (S.D.N.Y. Sept. 16, 2011) (citation and quotations omitted).

Here, the settlement class fares far better than in *LiPuma*.   The Settlement Agreement provides that all class members are eligible to receive 12.5% of the net premium paid or charged, for force-placed coverage, in the form of either a check or a credit to their PNC escrow accounts. (Ex. A ¶ 4.6.)  This amount will be 12.5% of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which PNC was entitled to protect its interest in the borrower's property—*not* 12.5% of the premium charged in excess of the actual or competitive cost of coverage.   (*Id*.)  Moreover, all class members who submit a claim form will recover the 12.5% amount regardless of whether the class members paid any portion of that premium.   (*Id*.)  Thus, a mortgagor who paid premiums for four months of a given year will receive 12.5% of the annual premium without any deduction for the amount paid.  (Scott Decl. ¶ 27.)

The 12.5% made available to class members by the settlement is roughly the amount of the alleged unwarranted "commissions" paid by borrowers subject to other lenders' FPI arrangements with Assurant.  *See, e.g., Kunzelmann*, No. 11-cv-81373 (S.D. Fla.) (D.E. 115 at 2) (citing evidence

---

[6] *See also Bennett*, 737 F.2d at 986 (holding a 5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

that Wells Fargo and Assurant charged an 11% "commission").  Importantly, the percentage of the premium returned to class members in this settlement was recently approved as a reasonable rate reduction by more than forty-five state regulators as a new LPI product.  (Joint Decl. ¶ 57.)  These regulators have approved as reasonable a new LPI hazard insurance product developed by Assurant that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by *up to* 12.5% if the lender agrees to forego the commissions and reinsurance profits that are the subject of this lawsuit.  (*Id.*)  This Settlement provides 100% of the full savings from this new, approved product.  State regulators' approval of this product with regard to both straight commission and reinsurance lender-placed hazard programs supports a finding of reasonableness here.

The settlement will also provide valuable injunctive relief to the class.  (Joint Decl. ¶¶ 23, 24, 59; Scott Decl. ¶¶ 14, 28-31).  The Settlement Agreement effectively ensures that PNC will not implement the practices challenged in the Fourth Amended Complaint, which reaped millions of dollars in revenues for Defendants during the class period.  (Joint Decl. ¶¶23, 24, 62.)  Certain of these practices were proscribed by a settlement with New York state regulators before the parties here settled the class claims, but the New York injunction applies only to New York borrowers and binds only the Assurant Defendants, leaving PNC free to reinstitute the challenged practices with another insurer. *See* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2013), available at http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf ("NYDFS Consent Order").  There can be no question that this result is more than reasonable.

The fact that the parties agreed to a "claims-made" settlement does not render its terms unreasonable. *See, e.g., Saccoccio* Order at 18-19 (overruling objections to claims-made process because "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (citing *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011)); *Casey*, No. 12-cv-820 (N.D.N.Y.) (D.E. 222 at ¶ 6) (approving virtually identical claims-

13

made settlement and finding that regardless of the take rate, "[t]he settlement confers substantial benefits upon the Settlement Class members, is in the public interest, and will provide the parties with repose from litigation."); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (discussing claims-made settlement and affirming contingency fee award based on total possible recovery); *Shames v. Hertz Corp.*, 07-CV-2174-MMA WMC, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (approving claims-made settlement over objections because "there is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted);. The parties agreed to a "claims-made" process because PNC cannot determine on a system-wide basis the amount paid or currently owed by a borrower. (Joint Decl. ¶¶ 34-36.)

Discovery taken by Class Counsel in this action, specifically the sworn deposition of PNC's corporate representative, confirmed that PNC's mortgage servicing system has limitations similar to the systems used by other lenders in LPI litigation. (*Id.*)  In *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), for example, a Wells Fargo representative testified during his deposition that "[w]ithout a borrower-by-borrower manual examination of each loan file, [Wells Fargo's systems] cannot accurately determine the universe of borrowers who were 'charged' for lender placed insurance, those who 'paid' for lender placed insurance, those who still owe Wells Fargo Bank for lender placed insurance premiums, and those who may have entered into loan modification, short sale, refinance, or other agreements with Wells Fargo Bank." *See Williams,* (D.E. 307 Ex. A at 2).  Wells Fargo's Rule 30(b)(6) representative testified that the review could range from "maybe a few hours" to "four to five hours" per loan. *See Williams,* (D.E. 307 at Exhibit B at 46:16-19) ("If the loan was still active and that information is readily available on our system, I would say review would take maybe a few hours. If it is an older loan that is no longer viewable on our system, then that review process would probably double up to probably four to five hours because we would be working off of paper to calculate those dollar amounts as well as retrieving

archived documents in order to complete our review.").

Like Wells Fargo, PNC's systems cannot determine such information on a classwide basis, a manual review of each of the 130,875 class members' borrower files would be required to determine who paid, how much they paid, and who currently owes premiums for lender-placed insurance. (Joint Decl. ¶¶ 34-36.)  Notably, Assurant's settlement with New York state regulators was also a claims-made settlement.  *See* NYDFS Consent Order.

Plaintiffs and the class faced significant hurdles in litigating their claims to resolution.  Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement. These results fall well within the range of reasonableness.

### F.   The Opinions of Class Counsel, the Class Representative, and Absent Class Members Strongly Favor Settlement Approval.

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).  This Court has already found that Class Counsel and Plaintiffs will adequately represent the class in this action, and its conclusion was warranted.  (D.E. 238 at 5(e) ("Plaintiffs are capable of fairly and adequately protecting the interests of the members of the Settlement Class, in connection with the Settlement Agreement.")).

Class Counsel have been investigating FPI practices for more than four years, and fully support the Settlement.  They obtained certification of the first LPI class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla. Feb 21, 2012), litigated the motion for class certification in *Kunzelmann*, briefed and argued two motions to centralize FPI litigation in a nationwide MDL, obtained final approval of the settlements in *Saccoccio*, *Hall*, *Fladell*, *Diaz*, *Hamilton*, *Braynen*, and *Lee*, and are currently litigating additional cases against major mortgage lenders before this Court.[7]  Based on this experience, and decades of experience litigating consumer

---

[7] *See Ziwczyn v. Regions Bank*, No. 15-cv-22548 (S.D. Fla.);  *Fowler v. Caliber Home Loans, Inc.*, No. 15-cv-24542 (S.D. Fla.); *Patel v. Specialized Loan Servicing, LLC*, No. 15-cv-62600 (S.D. Fla.); *Edwards v. Seterus, Inc.*, No. 15-cv-23107 (S.D. Fla.); *Beber v. Branch Banking & Trust Co.*, No.

class action lawsuits, it is Class Counsel's informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  (Joint Decl. ¶ 95; *see also* Scott Decl. ¶¶ 10, 47.)

As of January 22, 2016, of the 130,875 class members, only one has objected and four have opted out.  (Pappas Decl. ¶¶ 6, 9, 10.)  This overwhelming class support is evidence of the settlement's fairness.  *See, e.g., Saccoccio* Order at 14 (opposition amounting to .018% of the class was termed as "low resistance to the settlement" and weighed "in favor of approving the settlement."); *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices).  Viewed either independently or taken together, the above factors confirm that the settlement is fair, reasonable, and adequate.

## II.   CLASS COUNSEL SHOULD BE AWARDED REASONABLE FEES AND COSTS AND PLAINTIFFS THE REQUESTED SERVICE AWARD.

For their extensive work prior to the filing of the complaint and throughout the pre-trial and settlement phases of this litigation, Class Counsel seek $4.75 million in attorneys' fees and expenses, equaling only 14.7% of the $32.3 million in monetary settlement benefits provided to the class, excluding the valuable and important injunctive relief.  A service award of $5,000 to each Class Representative is also appropriate.

### A.   The Court Should Award the Requested Attorney's Fees and Expenses.

Class counsel is entitled to an attorney's fee for the benefit obtained in a class settlement. *See Saccoccio* Order at 15-17 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 676 (1980); *see David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant).  In the

---

15-cv-23294 (S.D. Fla.); *Wilson v. Everbank N.A.*, No. 14-cv-22264 (S.D. Fla.) (final approval granted from bench; order pending); *Circeo-Loudon v. Green Tree Servicing, LLC*, No. 14-cv-21384; *Jackson v. U.S. Bank, N.A.*, No. 14-cv-21252 (S.D. Fla.); *Almanzar v. Select Portfolio Servicing, Inc*. No. 14-cv-22586 (S.D. Fla.).

Eleventh Circuit, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *see also Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007); *In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001). The percentage applies to the total benefits provided, even where the actual payments to the class following a claims process is lower. *See* 618 Fed. App'x 624, 630 (11th Cir. 2015); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295-96 (11th Cir. 1999); *see also Casey*, No. 12-cv-00820 (N.D.N.Y.) (D.E. 221) (the amount of claims made is "irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate"). Here, the requested percentage falls within or below the range provided by the Eleventh Circuit. *See Camden I,* 946 F. 2d at 774 (20%–50% of the value provided); *David*, 2010 WL 1628362 at *8 n.15 (20%-50% of common fund is "the customary fee in class actions that result in substantial benefits").

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the  attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I,* 946 F.2d at 772 n.3. The Court may also consider the time required to reach settlement, the existence of substantial objections and non-monetary benefits, and the economics of prosecuting a class action. *Id.* at 775. As explained below, the factors set forth in *Camden I* support the full award requested.

**1. The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action Support the 14.7% Award.**

A determination of a fair fee for Class Counsel must include consideration of the contingent

17

nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high. *See Pinto*, 513 F. Supp. 2d at 1339. These factors weigh in favor of awarding Class Counsel 14.7% of the cash benefits obtained. Class Counsel have received no compensation during the course of this litigation and have incurred expenses litigating on behalf of the Class, which they risked losing had Defendants prevailed. (Joint Decl. ¶¶86, 88-91; Scott Decl. ¶ 42)   There existed a real possibility that Class Counsel would receive no compensation. (Joint Decl. ¶¶ 86, 88-91; Scott Decl. ¶¶ 42, 43.)

### 2. The Requested Fees Reflect the Market Rate in Complex, Contingent Litigation.

A fee of 14.7% of the cash value is below the market for class actions. *See Saccoccio* Order at 16 ("20-30% fee that is customary in common fund cases.").  "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340.  In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients. (Scott Decl. ¶41.)  These percentages are the prevailing market rates throughout the United States for contingent representation. *See id.* at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)).  In making a determination of what constitutes a fair fee, this Court should be guided by such awards.

A fee of approximately 14.7% of the total monetary benefits obtained is consistent with and falls well within, if not below, the range of the customary fee awarded in common fund cases, many of which have awarded a higher percentage. *See, e.g., Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 at (D.E. 178) (awarding 16% of the total monetary benefits provided).

### 3. The Novelty and Difficulty of the Questions at Issue

This case presents novel questions of law and complex issues of fact.  Class actions are generally complex, but this one is particularly so, involving: insurance issues such as analyzing loss ratios, calculation of premiums, and identifying permissible costs of insurance; defenses that go to

the conduct of the borrower in allowing voluntary coverage to lapse (first breach, unclean hands); "consent" defenses involving payment/maintenance of FPI after disclosures that it would be expensive, *e.g.,* voluntary payment, waiver, and estoppel. The difficulty of litigating these issues amply supports the full award requested.  (Scott. Decl. ¶¶ 24, 25, 34, 35, 43.)

### 4.   The Skill, Experience, and Reputation of Class Counsel

Class Counsel have established their skill, experience, and reputation in the record, and in repeated cases before this court.  (Joint Decl. ¶¶ 76-79 & Ex. C; Scott Decl. ¶ 36.)  Indeed, this Court stated that "class counsel has been at the forefront of lender-placed insurance litigation."  *See Saccoccio* Order at 17.  Beyond that, Class Counsel's diligence, expertise, and skill are reflected in the results achieved.  They resolved this dispute efficiently despite the potential hurdles and the arguments raised by Defendants detailed above.  (Scott Decl. ¶ 33.)  The quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents, Reed Smith LLP, Homer Bonner Jacobs, and Carlton Fields Jorden Burt P.A., all reputable firms known for the skill of their attorneys.  This factor thus also favors awarding the requested fee.

### 5.   The Result Achieved for the Class

The result achieved is a major factor to consider in making a fee award and here, it is extraordinary and perhaps best establishes the propriety of the requested fee award.  *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").  In considering the results, courts examine the value of *both* monetary and injunctive relief.  *See Poertner*, 618 Fed. App'x at 629; *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007).  The results here, $32.3 million in cash and the injunctive relief, are excellent.  (Scott Decl. ¶¶ 13, 26-31.)  Defendants are mandated to cease the key practices which are the gravamen of the Fourth Amended Complaint.  These results are powerful evidence supporting the fee award.

### 6.   The Time and Labor of Class Counsel

Prosecuting and settling the claims here demanded considerable time and labor. (Joint Decl. ¶¶ 71-76.)   The complexity of this case required organization by Class Counsel, including assignment of work and regular meetings and calls to ensure coordinated, productive work efforts to maximize efficiency and minimize duplication of effort.   (*Id*.) Class Counsel spent many hours investigating the claims of many of the potential plaintiffs against Defendants in this action.   (*Id*.) Class Counsel interviewed PNC borrowers and potential plaintiffs to gather information about Defendants' conduct and its impact upon consumers; obtained, reviewed, and analyzed PNC mortgages, LPI policies and the LPI notices sent to borrowers, and other discovery.   (*Id*.)

### 7.   The Reaction of the Class to the Settlement.

To date, there is one objection and only four valid opt-out requests, which supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343; (Pappas Decl. ¶¶ 9, 10; Scott Decl. ¶ 45).

### B.   A Service Award of $5,000 Is Appropriate.

The Court should approve a service award of $5,000 for the Representative Plaintiffs.   The detailed notice advised class members that the Representative Plaintiffs would apply for a service award of $5,000 each, and no class member has objected to this reasonable request.   *See Saccoccio* Order at 17 (granting $5,000 service award).   In instituting this litigation, the Representative Plaintiffs have acted as private attorney generals seeking a remedy for what appeared to be a public wrong. *See Pinto,* 513 F. Supp. 2d at 1344.   The Class Representatives aided in the investigation of these claims and settlement.   (Joint Decl. ¶¶ 64-68.)     Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.

### <u>CONCLUSION</u>

Plaintiffs respectfully request the Court grant final approval of the settlement, as well as the applications for Class Counsel's fees and expenses and class representative service awards.

Respectfully submitted this 25th day of January, 2016.

By: /s/ *Adam M. Moskowitz*

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Settlement Class Counsel* | Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>Florida Bar No. 617113<br>jgravante@podhurst.com<br>Matthew Weinshall<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Settlement Class Counsel* |
| Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Settlement Class Counsel* | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 25th day of January, 2016 and served by the same means on all counsel of record.

By:   <u>/s/ Adam M. Moskowitz</u>

F78513