**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE No. 14-20474-CIV- GOODMAN**

**[CONSENT CASE]**

ENRIQUE MONTOYA, NEYSER
COLONIA and XI CHEN LAUREN,
on behalf of themselves and all others
similarly situated,

       Plaintiffs,

vs.

PNC BANK, N.A., et al.,

       Defendants.

_____/

**ORDER APPROVING CLASS SETTLEMENT**

    *"Nothin' from nothin' leaves nothin'"*

       -   Singer/songwriter Billy Preston[1]

Some things get better with age: Wine.  A new baseball glove. Single malt scotch

(in the cask, before it's bottled). A cast iron skillet. Judgment (and its cousin, wisdom).

Some types of cheeses. Antiques. Pickles. Cooking skills. Leather. Compost. Fruit trees.

And common sense.

---

[1]     From the song "Nothing From Nothing," on <u>The Kids & Me</u> album (A&M, 1974).

But not, apparently, class action lawsuits involving lender-placed insurance ("LPI").

In fact, these lawsuits, also known (at least by plaintiffs' attorneys) as force-placed insurance claims, have confronted a significant array of adverse legal rulings in the past two to three years. Although some courts have approved settlements, others never reach that stage because the claims have been dismissed, dropped, subjected to adverse summary judgment rulings or otherwise kept in a procedural limbo.

So it's currently not easy being a plaintiff pursuing a class action lawsuit asserting myriad claims against lenders, insurance companies and others involved in the home loan/mortgage/insurance business. In fact, it is quite a challenge, and it is now sometimes even an uphill challenge. It is probably more difficult now than three or four years ago, before some appellate court rulings which undermine some or all of the typical claims asserted by plaintiffs in force-placed insurance lawsuits.

And it is for this reason, at least in part, that the Undersigned is in this Order approving the class action settlement reached here. Determining the likelihood of success in the absence of a settlement is one of the more-significant factors used to evaluate the fairness of a class action settlement. And given the recent adverse rulings, it is far from clear that these plaintiffs would have prevailed on the merits. To the contrary, there is a possibility (and defendants suggest it is a **probability**) that most or

2

all of the claims would not succeed beyond the summary judgment stage, which makes the settlement reached particularly attractive.

In fact, the Undersigned is currently presiding over another, relatively new class action lawsuit asserting similar claims involving lender-placed insurance -- and confronting substantial legal hurdles. Specifically, in *Fowler v. Caliber Home Loans, Inc.*, Case No. 15-24542 (S.D. Fla.), the defendants have filed motions to dismiss which, if granted, would lead to a with-prejudice dismissal. Given the nature of the motions and their reliance, in part, on a recent Second Circuit Court of Appeals case[2] which agrees with their case-dispositive filed-rate doctrine argument, the Undersigned has scheduled those *Caliber Home* motions for oral argument on May 16, 2016. Although the Undersigned has previously rejected the filed-rate doctrine argument in this case [ECF Nos. 124; 198] and other cases, there is no guarantee that I will continue to follow that view in *Caliber Home* now that the well-respected Second Circuit Court of Appeals has

---

[2]     *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256 (2d Cir. 2015). The Undersigned recognizes, of course, that *Rothstein* is a non-binding, out-of-circuit opinion. In addition, I also understand that another appellate court has adopted a contrary rule and permitted lender-placed claims to go forward despite the filed-rate doctrine argument asserted by Defendants. *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009). On the other hand, a district court judge in the Southern District of Florida recently relied on *Rothstein* to grant a motion to dismiss with prejudice the inflated premium claims which it found were barred by the filed-rate doctrine. *Trevathan v. Select Portfolio Servicing, Inc.*, No. 15-61175, 2015 WL 6913144 (S.D. Fla. Nov. 6, 2015). Moreover, the *Trevathan* Court extended *Rothstein's* reasoning to the loan servicer, "as failing to do so would contravene the purpose of the filed-rate doctrine"). *Id.* at *3. *See also Lyons v. Litton Loan Servicing LP*, No. 1:13-cv-513, 2016 WL 415165 (S.D.N.Y. Feb. 2, 2016) (filed rate doctrine applied to preclude claims against insurer defendants and loan servicing defendants).

embraced it (or that I would have maintained that conclusion in the instant, now-settled case should the issue have arisen again, such as in a summary judgment context).

In addition, a very recent Eleventh Circuit case involving class certification also suggests that this class action lawsuit would have encountered significant challenges in obtaining a final class certification order had the case not settled. More on this later, where this Order discusses the risks Plaintiffs would have faced going forward.

As outlined in greater detail in this Order, the results reached in the settlement are extraordinary and are likely *significantly* better than results that class members could have obtained on their own.  To use a more-formal, slightly-modified version of the theme mentioned by Billy Preston in the song lyric excerpted above, something is better than nothing, and there is a decent chance that class members here would receive nothing if their claims had not been resolved in a settlement. The results here are surely significantly more than merely something, and the Undersigned approves the settlement.

## **INTRODUCTION**

On March 9, 2016, the Undersigned held a hearing on the parties' request that the Court grant final approval to the proposed class action settlement, overrule all objections and grant Class Counsel's fee application.  The Court granted preliminary approval of the settlement on September 30, 2015.  [ECF No. 238.]  The hearing was held pursuant to Fed. R. Civ. P. 23(e)(1)(A), which mandates judicial review of any

"settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." The Court has carefully considered the parties' written submissions, including post-hearing memoranda and exhibits, the evidence and arguments presented, and the applicable law.

For the reasons that follow, the proposed class action settlement and Class Counsel's fee application are **APPROVED** in their entirety, and all objections are hereby **OVERRULED.**

As explained by class counsel, the Settlement before the Court would make more than $32.3 million in monetary relief available to 130,875 PNC borrowers from across the country whom Plaintiffs have alleged were charged inflated amounts for lender-placed or "force-placed" insurance. The monetary relief provided by the Settlement will likely offer each class member a far superior recovery than they could have won at trial, while the injunctive relief provided by the Settlement will enjoin all Defendants from engaging in specific practices complained of for a period of five years. For their efforts, Class Counsel have requested a fee in an amount equal to 14.7% of the total monetary benefits that have been made available to the Class by the Settlement, and an even lower percentage when taking into account the considerable value of the injunctive relief.

That this is an extraordinary result for the Settlement Class is reflected in the negligible opposition to the Settlement -- from a class of 130,875 members nationwide,

only five class members have pending objections, three of whom objected *pro se* and did not appear at the Final Fairness Hearing, and one married couple, Barbara and Gary Long (collectively, "the Longs"), who appeared at the hearing through their counsel. Counsel for the Longs admitted at the hearing that they had done no research or investigation to support the Longs' objections and had never reviewed the extensive orders issued by this Court in two other lender-placed insurance class actions, *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649 (S.D. Fla.), and *Braynen v. Nationstar Mortgage, LLC*, No. 14-cv-20726 (S.D. Fla.), both of which directly addressed the specific points raised by the Longs. The Court granted Class Counsel's *ore tenus* motion to take the Longs' deposition to inquire as to the basis for their objections. Class Counsel agreed that the depositions would be limited in nature and the Longs' counsel agreed to make the Longs available deposition.

After carefully reviewing the submissions, including the deposition transcripts of the Longs, as discussed in detail below, the Court finds that all four objections are based on basic misunderstandings of either the terms of the Settlement or the law that applies to class action settlements. To the extent that these objectors were not happy with the significant recovery that the Settlement offers, or felt that it would not cover their individual losses, they were given the opportunity to opt out and pursue their own claims in separate litigation, an avenue that twenty-one other class members have chosen to undertake.

The soundness of the proposed Settlement is also confirmed by the unanimous approval that district courts have given substantially similar settlements in lender-placed insurance litigation in this district and elsewhere. *See, e.g., Almanzar v. Select Portfolio Servicing, Inc.*, No. 14-cv-22586 (S.D. Fla.); *Wilson v. EverBank, N.A.*, No. 14-cv-22264 (S.D. Fla.);  *Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726 (S.D. Fla.); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.); *Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of Am., N.A.*, No. 12-cv-22700 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y.).

## History of Force-Placed Insurance Litigation

Before assessing the reasonableness of the Settlement, it is important to understand some of the history of force-placed insurance litigation. LPI is purchased by the mortgage servicer when the homeowner allows his or her policy to lapse. The Southern District of Florida has been at the epicenter of the LPI litigation, having handled at least twenty separate LPI class action cases.

In early 2011, Class Counsel here filed the first of this wave of force-placed insurance class actions in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), an action that was vigorously litigated before this

Court. On February 21, 2012, this Court certified a Florida class of borrowers in *Williams* and also found that the plaintiffs' expert, Birny Birnbaum, was "qualified to proffer the testimony rendered in this case regarding the class-wide determination of whether the force-placed insurance premiums were excessive, and if so at what rates." *Williams*, No. 11-cv-21233-RNS, ECF No. 211, p. 5 (S.D. Fla. Feb. 21, 2012). The defendants petitioned to appeal the class certification order, but certification to appeal was denied by the Eleventh Circuit on May 10, 2012. The parties ultimately settled the *Williams* action on behalf of a Florida-only hazard insurance class, and their settlement was granted final approval on September 11, 2013. *See Williams*, No. 11-cv-21233-RNS, ECF No. 356 (S.D. Fla. Sept. 11, 2013).

Class Counsel subsequently filed sixteen additional nationwide class actions in the Southern District of Florida against most of the major mortgage lenders and servicers and their partner insurers, including this litigation against Assurant, its subsidiaries, and PNC. They have now reached nationwide settlements in most of the cases, offering more than $3.5 billion in relief to millions of homeowners across the country. As in this case, there has been negligible opposition to these nationwide force-placed insurance settlements.

By the parties' count, district courts, including this Court, have granted final approval to at least eleven force-placed insurance class action settlements with the same structure as the Settlement here, as well as several others that are structured differently

and provide much *less* monetary relief to class members. Indeed, one district court touted settlements like this -- that provide near-complete relief to class members on a claims-made basis -- as extraordinary, and particularly so when compared to direct-pay force-placed insurance settlements that compensate all members of a settlement class, but provide far less relief to each class member and with payments that bore little, if any, relation to the actual losses suffered by individual class members. *See Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372, 2014 U.S. Dist. LEXIS 130903, at *35-37 (D. Or. Sept. 18, 2014).

### The Underlying Litigation

The litigation that was conducted in this LPI class action prior to the Settlement appears to be more than, or at least as extensive, as any other lender-placed case that has been settled in this district. Plaintiff Enrique Montoya filed suit against PNC, Assurant, and ASIC in February 2014, alleging that they had conspired to charge PNC borrowers inflated and impermissible amounts for LPI in violation of express and implied provisions of borrowers' mortgage agreements, PNC's fiduciary duties to its borrowers, the federal Truth in Lending Act ("TILA"), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and the federal RICO statute.   Montoya also brought a claim for tortious interference with a business relationship against Assurant and ASIC, and claims for unjust enrichment against all defendants.  [ECF No. 1.]

Plaintiff Colonia filed a class action complaint in the Southern District of Florida in March 2014, based on the same allegations and raising the same claims. *See Colonia v. PNC Bank, N.A.*, No. 14-cv-21085 (S.D. Fla.)  The Assurant Defendants moved to dismiss the claims in *Montoya* on April 8, 2014 [ECF Nos. 33, 34], but on April 23, 2014, Plaintiff Montoya amended the complaint to include Plaintiff Colonia's claims [ECF No. 42]. Defendants moved to dismiss the new complaint on May 14, 2014 [ECF Nos. 56; 57], and the Court heard extensive argument on the motions on July 17, 2014.  On August 27, 2014, the Court denied the motions in part and granted them in part, giving Plaintiffs leave to amend certain causes of action.  [ECF No. 124.]

Plaintiffs filed the Second Amended Complaint on September 10, 2014. [ECF No. 126]. Two weeks later, Plaintiffs sought leave to file a third amended complaint [ECF No. 127], adding the plaintiff and claims from *Lauren v. PNC Bank, N.A.*, No. 13-cv-00762, filed in the Western District of Pennsylvania on June 4, 2013, and subsequently transferred to the Southern District of Ohio. *Lauren* involved claims similar to those raised in Montoya. *See Lauren*, No. 13-cv-00762, ECF No. 78-1 (W.D. Pa.). In the Third Amended Complaint, Plaintiffs asserted claims for breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a business relationship, and violations of the New Jersey Consumer Fraud Act and federal RICO statute. [ECF No. 127-1.]

All Defendants moved to dismiss the Third Amended Complaint. [ECF Nos. 132; 133]. The Court held hearings on the motions on November 20, 2014, and on March 23, 2015, the Court granted them in part and denied them in part. [ECF No. 198.] Defendants then answered the Third Amended Complaint. [ECF Nos. 204; 205]. In their answers, the Defendants denied any liability and asserted various affirmative defenses. [*Id.*].

[In the initial Complaint, Plaintiffs alleged that the artificially inflated premiums charged to consumers resulted in premiums "up to **ten times** greater than those available to the consumer in the open market." [ECF No. 1, ¶ 6] (emphasis in complaint). In the Third Amended Complaint, however, Plaintiffs eliminated the "but-the-premium-is-10-times-as-great" allegation and claimed only that the alleged collusion (between the major lenders and servicers and two major force-placed insurers) leads to "higher prices for force-placed insurance that servicers then charge to consumers." [ECF No. 127-1, ¶ 5)].

Plaintiffs filed an agreed motion to file a Fourth Amended Complaint [ECF No. 228]. The Undersigned granted the motion, and the Fourth Amended Complaint was filed [ECF No. 230]. Defendants answered the Fourth Amended Complaint. [ECF Nos. 233; 235].

During the litigation, the parties conducted substantial discovery, with Defendants producing tens of thousands of pages of documents. This was in addition to

the more than two million pages of documents previously produced in other LPI litigation involving the Assurant Defendants before this Court and across the country. Each party took numerous depositions, including those of Defendants' representatives, the Named Plaintiffs, and both sides' extensive experts.

On January 14, 2015, Plaintiffs filed their class certification motion, which was fully briefed as of March 3, 2015, and is still pending before the Court. [ECF Nos. 165; 181; 184; 192]. The Assurant Defendants' motion to strike Plaintiffs' expert report and Plaintiffs' motion to exclude Defendants' expert, Sherri L. Scott, are also still pending. [ECF Nos. 212; 218]. The parties filed a joint motion [ECF No. 222] to stay the case pending approval the class-wide settlement, and the Undersigned granted the motion. [ECF No. 223].

## The Settlement

On May 12, 2015, a formal mediation of this matter was held before mediator Rodney Max. [ECF No. 226-3]. The parties reached a settlement-in-principle at the formal session, and the parties' counsel agreed on a settlement outline that identified the material terms of the settlement. [ECF No. 241-2, ¶ 14]. The parties announced their settlement to the Court on May 13, 2015, and, as noted above, the Court then stayed litigation pending settlement approval. [ECF Nos. 222; 223]. The parties documented their agreement in a memorandum of understanding in the weeks that followed, and subsequently finalized the settlement agreement. [ECF No. 241-1].

As negotiated, the settlement would compensate PNC borrowers for 12.5% of the amount that PNC had charged them for force-placed insurance coverage, regardless of whether they had paid or were simply charged the invoiced amounts. [*Id.*]. There is no dispute that Defendants were allowed to charge each homeowner for insurance, and Plaintiffs allege that the 12.5% recovery would cover most of the alleged inflated portion of borrowers' charges.  The settlement would also enjoin PNC and the Assurant Defendants from engaging in the practices complained of for a period of five years after final approval. [*Id.*].

On June 11, 2015, the parties moved to stay all proceedings pending their mediation, and the Court granted the motion. [ECF No. 222; 223]. All counsel agreed to mediate with Defendants toward a nationwide settlement, and moved forward with a Fourth Amended Complaint addressing hazard, flood, and wind LPI, and bringing suit against all Assurant subsidiaries that had cooperated with PNC during the class period. [ECF No. 234]. Class Counsel conducted numerous telephone discussions with Defendants' counsel regarding the details of a possible settlement in this matter. These discussions were based, in part, on the prior nationwide settlements that had been reached in this district by undersigned counsel with Defendants' counsel in this case, as well as the specific information regarding PNC that was produced in this matter. [ECF No. 241-2, ¶¶ 14-17].

The Court granted the Settlement preliminary approval on September 30, 2015, also certifying the proposed class for settlement purposes and approved procedures for giving Class Notice to the members of the Settlement Class. [ECF No. 238]. The Court finds that the Class Notice substantially in the form approved by the Court in was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate.

Objections to the Settlement were filed and briefed [ECF Nos. 240; 243; 244; 248; 249; 251; 252], and on March 9, 2016, the Court held a hearing to consider whether:  (1) the terms and conditions of the Settlement Agreement are fair, reasonable and adequate; (2) the objections had merit; (3) a judgment should be entered dismissing the Named Plaintiffs' Fourth Amended Class Action Complaint on the merits and with prejudice in favor of the Defendants and against all persons or entities who are Settlement Class Members herein who have not requested exclusion from the Settlement Class; (4) to award Attorneys' Fees and Expenses to Class Counsel for the Settlement Class, and in what amount; and (5) to award a Case Contribution Award to each of the Named Plaintiffs, and in what amount. After the hearing, the Court entered an order allowing counsel to take the depositions of the Longs, two objectors represented by counsel. [ECF No. 262]. Class Counsel took the Longs' deposition on March 23, 2016, with counsel for PNC and the Assurant Defendants attending by telephone.  [ECF Nos. 270-2; 270-3].

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Court has personal jurisdiction over the parties and the Settlement Class Members, venue is proper, the Court has subject-matter jurisdiction to approve the Settlement Agreement, including all exhibits thereto, and to enter this Final Order.

2.      The Settlement Agreement was negotiated at arm's length by experienced counsel who were fully informed of the facts and circumstances of this litigation (the "*Montoya* Litigation") and of the strengths and weaknesses of their respective positions. There is no evidence of collusion. Further, settlement occurred only after the parties negotiated over a period of many weeks, and participated in a formal mediation overseen by a highly respected mediator, Rodney A. Max. Counsel for the parties exchanged information before, during, and after the mediation, to support the Defendants' assertion that Defendants cannot query their databases system-wide to identify how much borrowers have paid for their lender-placed insurance and, for those who were charged but have not paid for lender-placed insurance, how much they currently owe. Counsel for the Parties were therefore well positioned to evaluate the benefits of the Settlement Agreement, taking into account the expense, risk, and uncertainty of protracted litigation with respect to numerous difficult questions of fact and law.

3.      The Court finds that the prerequisites for a class action under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b) have been satisfied for settlement purposes for each

15

Settlement Class Member in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Named Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Named Plaintiffs have and will continue to fairly and adequately represent the interests of the Settlement Class for purposes of entering into the Settlement Agreement; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; (f) the Settlement Class is ascertainable; and (g) a class action settlement is superior to the other available methods for the fair and efficient adjudication of the controversy.

4.       Pursuant to Fed. R. Civ. P. 23, this Court hereby finally certifies the Settlement Class, as identified in the Settlement Agreement, which shall consist of the following:

> All borrowers in the United States who, within the Settlement Class Period (as defined in paragraph 5 below), were charged by PNC under a hazard, flood, flood gap or wind-only LPI Policy for Residential property, and who, within the Settlement Class Period, either (i) paid to PNC the Net Premium for that LPI Policy or (ii) did not pay to and still owe PNC the Net Premium for that LPI Policy.  Excluded from the Settlement Class are:  (i) individuals who are or were during the Settlement Class Period officers or directors of Defendants in the Action or any of their respective Affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers who only had an LPI Policy that was canceled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or to the borrower's escrow account; and (iv) all borrowers who file a timely and proper request to be excluded from the Settlement Class.

5.      The Settlement Class Period shall commence on January 1, 2008 and shall continue through and including September 30, 2015.

6.      The Court appoints Kozyak Tropin & Throckmorton LLP, Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP as Class Counsel for the Settlement Class.

7.      The Court designates Named Plaintiffs Enrique Montoya, Neyser Colonia, Xi Chen Lauren, and Mark Stuckey as the Class Representatives.

8.      The Court makes the following findings on notice to the Settlement Class:

(a)      The Court finds that the distribution of the Mail Notice, the creation of the IVR toll-free telephone number system, and creation of the Internet site, all as provided for in the Settlement Agreement and Preliminary Approval Order (i) constituted the best practicable notice under the circumstances to Settlement Class Members; (ii) constituted notice that was reasonably calculated to apprise Settlement Class Members of the pendency of the Action, their right to object or to exclude themselves from the proposed Settlement, and their right to appear at the Final Approval Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice; and (iv) complied fully with the requirements of Fed. R. Civ. P. 23, the United States Constitution, the Rules of this Court, and any other applicable law. The Parties have complied with their notice

obligations under the Class Action Fairness Act, 28 U.S.C. § 1715, in connection with the proposed settlement.

(b)     The Court finds that the Class Notice and methodology set forth in the Settlement Agreement, the Preliminary Approval Order, and Final Order (i) constitute the most effective and practicable notice of the Final Order, the relief available to Settlement Class Members pursuant to the Final Order, and applicable time periods; (ii) constitute due, adequate, and sufficient notice for all other purposes to all Settlement Class Members; and (iii) comply fully with the requirements of Fed. R. Civ. P. 23, the United States Constitution, the Rules of this Court, and any other applicable law.

### *The Settlement Is Fair, Reasonable, and Adequate*

9.     Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted). "There exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).

10.     "Before approving a settlement, the district court must find that it 'is fair, adequate and reasonable and is not the product of collusion between the parties.'" *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)). The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.*

11.     Courts in the Eleventh Circuit evaluate six factors in determining whether to approve a class action settlement:  (1) the existence of fraud or collusion among the parties in reaching the settlement; (2) the complexity, expense, and duration of the litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, the class representatives, and the substance and amount of opposition to the settlement. *Leverso v. S. Trust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986. "In considering the settlement, the district court may rely upon the judgment of experienced counsel for the parties." *Nelson*, 484 F. App'x at 434 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "Absent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Id.* (quoting *Cotton*, 559 F.2d at 1330).

12.     Review of these considerations compels the conclusion that the Settlement warrants final approval:

(a)     **There is no evidence of fraud or collusion among the parties.**   "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (citing *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002)); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").

There is every indication that this settlement was negotiated at arm's length. The parties' mediation process was fully overseen by Rodney A. Max, a nationally-renowned mediator with a sterling reputation, who submitted a sworn declaration to the Court providing details of the parties' mediation efforts. [ECF No. 226-3]. Mr. Max testified that the *Montoya* Settlement is the product of "lengthy and particularly hard-fought negotiations[,]" and that the "settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." [*Id.*, ¶¶ 12, 15]. He also observed that "the caliber of representation on both sides was extraordinary," and he did not sense collusiveness among the parties at any point during the mediation process. [*Id.*]. The very fact of Mr. Max's involvement -- let alone his sworn declaration -- weighs in favor of approval. *See, e.g., In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ.

4816, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).  There is no suggestion of fraud or collusion here.

(b)      **The *Montoya* litigation involved complex claims that were litigated over the course of two years.**  The Settlement covers legal claims and defenses brought on behalf of 130,875 class members, including complex common law contractual, quasi-contractual, and tort claims, as well as claims for violations of state consumer fraud statutes and the federal RICO statute. The facts of these cases are complex as well, involving allegations that Defendants inflated the amounts charged to PNC borrowers for force-placed insurance with kickbacks disguised as commissions and below-cost servicing subsidies, among other things. As district judges have observed in prior force-placed insurance class actions, courts nationwide that have considered these same claims have reached different conclusions about whether plaintiffs can state claims for relief based on the facts alleged, whether dispositive defenses such as the filed-rate doctrine apply, and whether classes can be certified on the facts and legal theories presented.  *See Braynen*, 2015 WL 6872519, at *8-9 (discussing challenges facing plaintiffs had they continued to pursue their claims); *Saccoccio*, 297 F.R.D. at 693-94 (comparing *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) with *Cannon v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 11163 (N.D. Cal. Jan. 29, 2014)).

And even more recently, in *Rothstein v. Balboa Insurance Co.*, the Second Circuit Court of Appeals held that the filed-rate doctrine barred all of the plaintiffs' claims against their force-placed insurer and Assurant's main competitor, Balboa/QBE. No. 14-2250, 2015 U.S. App. LEXIS 12623 (2d Cir. July 22, 2015). Class Counsel have presented arguments explaining why the filed-rate doctrine would not preclude the claims here, and have provided expert factual testimony to support those claims. It suffices to state here that these issues have been raised and would have been confronted by Class Counsel on summary judgment and class certification.

Litigating these claims to resolution would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed, that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides.  This factor weighs in favor of approving the settlement.  *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this . . . factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

This Settlement offers the Settlement Class extraordinary relief that "very likely exceeds what [they] could have won at trial." *Hall*, No. 12-cv-22700, 2014 U.S. Dist.

LEXIS 177155, at *18 (internal quotation omitted). There was nothing to be gained from litigating the complex claims presented for years more; doing so would only have cost the Court, the parties, and absent class members valuable time, resources, and money.

(c)   **The parties finalized a settlement after two years of litigation and the completion of critical discovery.**   The stage of proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted).  At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992); *see, e.g., In re Remeron End-Payor Antitrust Litig.*, No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *62 (D.N.J. Sept. 13, 2005) ("Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements, especially in complex class action cases, should be done.") (citation omitted); *Lipuma*, 406 F. Supp. 2d at 1324 ("courts favor early settlement").

The parties to this action agreed to the terms of the Settlement after two years of extensive litigation -- Plaintiff Lauren filed her original complaint in June 2013, Plaintiffs Montoya and Colonia filed suit in February and March 2014, respectively, and the parties announced their settlement in May 2015 [ECF No. 222]. The parties briefed

and argued multiple motions to dismiss in the *Lauren* and *Montoya* actions, briefed class certification, deposed numerous experts and briefed motions to exclude one of Defendants' experts Sherri Scott and Plaintiffs' expert Birny Birnbaum in *Montoya*. Significant discovery was completed on Plaintiffs' claims. Additionally, Class Counsel have been investigating and litigating claims against the Assurant Defendants for almost five years, reviewing millions of pages of documents and taking dozens of depositions, and have become thoroughly familiar with the program and practices that Assurant and its subsidiaries implement with most of the major mortgage lenders. Class Counsel also took confirming discovery post-mediation.

(d)   **Plaintiffs faced significant risks had they proceeded with litigation.**

Plaintiffs might have recovered **nothing** for themselves or the class had they proceeded with litigation.  Plaintiffs would have faced motions for summary judgment, orders on their class certification motion and Defendants' motion to exclude their expert, and possibly a lengthy trial and an appeal.  Claims based on similar facts and the same or legal theories as those advanced here have met with mixed results in courts across the country, on both dispositive motions and class certification. Compare *Feaz*, 745 F.3d at 1104-11 (affirming dismissal of force-placed flood insurance "kickback" claims); *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) (affirming dismissal of force-placed hazard insurance "kickback" claims) with *Hamilton*, 6 F. Supp. 3d 1300 (S.D. Fla. 2014) (rejecting application of *Cohen* and *Feaz* and denying motion to dismiss); *Simpkins v.*

*Wells Fargo Bank, N.A.*, No. 12-cv-768, 2013 U.S. Dist. LEXIS 120730 (S.D. Ill. Aug. 26, 2013) (denying all defendants' motions to dismiss). Compare *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373, 2013 U.S. Dist. LEXIS 139913 (S.D. Fla. Jan. 10, 2013) (denying certification of nationwide class) with *Ellsworth v. U.S. Bank, N.A.*, 30 F. Supp. 3d 886 (N.D. Cal. 2014) (certifying multistate classes).

Indeed, as flagged above, there is considerable reason to believe that plaintiffs might not have prevailed here had the case not settled. The Undersigned has reviewed *Rothstein v. Balboa,* a Second Circuit Court of Appeals case which had not yet been decided when I earlier evaluated the filed-rate doctrine argument in this case during the motions to dismiss stages, and I cannot simply reject it now summarily. Moreover, I note that a Southern District of Florida judge followed it recently to dismiss the claims in *Trevathan*.

And, as previously noted, I grapple with the plausibility of the argument that Plaintiffs "would not have paid or would have contested the charges for force-placed insurance if [only] Defendants had disclosed that the amounts included unearned kickbacks and did not represent simply the 'cost' of the insurance coverage." [ECF No. 127-1, p. 44].

In fact, in an earlier order granting in part and denying in part motions to dismiss the Third Amended Complaint, I noted that "Plaintiffs likely will need to confront the argument that letters urging them to obtain their own insurance and

warning them of the adverse financial consequences of LPI could be deemed the *last* thing a bank bent on perpetrating a fraudulent scheme based on its residential borrowers' failure to maintain adequate insurance would pursue." [ECF No. 198, p. 31]. At that time, I described the causation requirements as "problematic and not intuitively logical." *Id.*

In addition to battling the risks associated with the merits of the claim, such as the filed-rate doctrine and the plausibility of the contention that any misstatements or omissions in the notices caused the claimed damages, Plaintiffs might not have been able to have the requested class certified in a light of a very recent Eleventh Circuit opinion, *Brown v. Electrolux Home Products, Inc.*, a case about "smelly washing machines." No. 15-11455, 2016 WL 1085517, at *1 (11th Cir. Mar. 21, 2016).

In *Electrolux*, Plaintiffs filed class action lawsuits against the manufacturers of front-loading washing machines because the rubber seal on the front door of the initial models retains water, which allows mildew to grow. The mildew then stains clothes and creates a foul odor. Consumers from California and Texas filed a class action against Electrolux, a Delaware corporation headquartered in Georgia, and the district court certified two statewide classes. The Eleventh Circuit held that the district court abused its discretion in determining the predominance requirement of Fed. R. Civ. P. 23(b)(3), and vacated the order.

In doing so, the *Electrolux* Court articulated several broad principles which might have made it extremely difficult for Plaintiffs to have obtained class certification had Defendants not settled and opposed the class certification. Specifically, the appellate court held that the district court misstated the law when it said that (1) it "resolves doubts related to class certification in favor of certifying the class," (2) it "accepts the allegations in the complaint as true," and (3) it would "draw[] all inferences and present all evidence in the light most favorable to" the party seeking class certification. *Id.*, at *2. The Eleventh Circuit held that the party seeking class certification has a "burden of *proof,* not a burden of pleading." And it noted that the trial court must conduct a "rigorous analysis" to determine whether the class certification movant has met his burden of proving that the requirements are "in fact" met. *Id.*

Moreover, the Eleventh Circuit also addressed the need for plaintiffs to show reliance on the defendant's conduct in order to recover under the Texas Deceptive Trade Practices Consumer Protection Act. The appellate court held that the plaintiffs could not prove reliance on a classwide basis and that the Texas class will need to prove reliance on an individual basis. In the instant case, of course, Plaintiffs need to demonstrate reliance in order to prevail on their RICO claims. In holding that individual reliance must be established, the *Electrolux* Court noted that no Texas court has ever certified a class action under the Act and that the Texas Court of Appeals

explained that it was a "near-impossibility" that a plaintiff could prove reliance on a classwide basis.

*Electrolux*, therefore, is a significant legal hurdle which Plaintiffs here would need to clear, and this obstacle generates an additional risk of failure. Although Defendants do not specifically mention *Electrolux* in their proposed Order, they contend that the "Plaintiffs' ability to obtain certification of a litigated class also is suspect." They note that it appears as though no state or federal court "has granted a contested motion to certify a national class of borrowers asserting comparable LPI claims" and they point out that "many courts have declined to do so." [ECF No. 266-1, pp. 13-14].

All of these risk factors weigh strongly in favor of final approval. At the risk of again invoking the "something-is-better-than-nothing" maxim, the legal challenges afflicting this case are hardly insignificant, and they provide a compelling reason to approve a settlement which provides relief when a non-settlement script might lead to an adverse result.

(e)     **The Settlement offers class members near-complete monetary relief as well as valuable injunctive relief.** "The range of potential recovery 'spans from a finding of non-liability through varying levels of injunctive relief,' in addition to any monetary benefits to class members." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1326, (S.D. Fla. 2007) (citing *Lipuma*, 406 F. Supp. 2d at 1322). "In considering the question of possible recovery, the focus is on the possible recovery at trial." *Saccoccio*,

297 F.R.D. at 693 (citation omitted). "[T]he Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id.* (citation omitted).

The monetary relief made available to the Settlement Class will provide class members who submit claims substantial recovery, particularly considering that this result was borne of compromise. Class members who opt to file a claim will recover 12.5% of the amounts that they paid or were charged and still owe for force-placed insurance, regardless of their individual circumstances. According to the parties, this 12.5% recovery is very close to near-complete relief, and one court in this district has found the same percentage paid in a similar settlement to "very likely exceed[] what Plaintiffs could have won at trial." *Saccoccio*, 297 F.R.D. at 693; *see also, e.g., Braynen*, 2015 WL 6872519, at *7 ("This Settlement is generous to Class Members, providing relief approximating a trial win and, for many Class Members, exceeding a trial win."). To put this into perspective, the 12.5% made available to class members by the settlement is roughly the full amount of the "commission" or kickback paid by borrowers subject to other lenders' force-placed insurance schemes with Assurant. *See, e.g., Kunzelmann*, No. 11-cv-81373, ECF No. 115, p. 2 (S.D. Fla. Nov. 9, 2012) (citing evidence that Wells Fargo and Assurant charged an 11% "commission"); *Fladell*, No. 13-cv-60721, ECF No. 139-6, pp. 3, 25 (S.D. Fla. Jan. 10, 2014) (same).

Moreover, according to Class Counsel, regulators have approved as reasonable a new lender-placed hazard insurance product that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by *up to* 12.5% if the lender agrees to forego the commissions and reinsurance profits that are the subject of this lawsuit. Thus, this Settlement will provide 100% of the full savings from this new, approved product. State regulators' approval of this product with regard to both straight commission and reinsurance lender-placed hazard programs supports a finding of reasonableness here. District courts have approved similar settlements offering class members 12.5% or less. *See, e.g., Braynen*, 2015 WL 6872519 (approving return of 12.5% of amounts charged borrowers); *Lee*, 2015 WL 5449813 (same); *Saccoccio*, 297 F.R.D. at 689 (same); *Hall*, 2014 U.S. Dist. LEXIS 177155; *Hall*, No. 12-cv-22700, ECF No. 443 (S.D. Fla. Dec. 17, 2014) (approving tiered settlement offering 11%, 6.5% or 5% of amounts charged, depending on when coverage was forced); *Hamilton*, No. 13-cv-60749, ECF No. 178 (S.D. Fla. Oct. 23, 2014) (approving 10.5% recovery).

The Settlement's claims-made structure also satisfies the applicable standard. The Court is not charged with choosing the payment structure that will provide the best possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the settlement presented is fair, reasonable, and adequate given the inherent risks and expense of further litigation. *See, e.g., Casey v. Citibank, N.A.*, No. 13-cv-820, 2014 WL 4120599 (N.D.N.Y. Aug. 21,

2014) (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

Thus, although direct-pay smaller settlements have been approved as reasonable by district courts in smaller LPI class actions, claims-made settlements have been found to be fair, reasonable, and in fact more than adequate in LPI litigation, and have been found to be so in every instance on final approval. *See, e.g., Hall*, No. 12-cv-22700, ECF No. 443, pp. 9-10 (S.D. Fla. Dec. 17, 2014) ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (quoting *Saccoccio*); *Saccoccio*, 297 F.R.D. at 696 (same); *Hamilton*, No. 13-cv-60749, ECF No. 178, p. 11 (S.D. Fla. Oct. 23, 2014) ("Filing a claim form is a "reasonable administrative requirement" which generally does not impose an undue burden on members of a settlement class.") (citation omitted); *Casey*, 2014 U.S. Dist. LEXIS 118252 (granting final approval of claims-made force-placed insurance settlement). *See also, e.g.,* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2012), *available at* http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf (providing claims-made structure for New York homeowners with LPI).

The Eleventh Circuit has affirmed claims-made settlements affording far less relief to class members than that afforded here. *See, e.g., Poertner v. Gillette Co.*, 618 F. App'x 624 (11th Cir. 2015) *cert. denied sub nom. Frank v. Poertner,* No. 15-765, 2016 WL

31

1079040 (U.S. March 21, 2016) (unpublished) (affirming approval of claims-made settlement offering class members between six and twelve dollars for filing a claim, as well as injunctive relief); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 F. App'x at 432, 434-35 (upholding claims-made settlement where defendant agreed to send claimants free product up to a certain aggregate value).

Class Counsel have taken extensive discovery on the issue of whether the Defendants could feasibly identify and provide direct refunds to class members. PNC initially offered the declaration of a corporate representative Charles Abourezk, establishing that PNC cannot determine systematically whether charges for lender-placed insurance have, in fact, been paid by any borrower.  [ECF No. 181-1, ¶ 10.]  Mr. Abourezk explains further that electronic searches of PNC's systems would not reveal whether borrowers' LPI charges were paid by someone other than the borrower, for example, through the U.S. Treasury's Hardest Hit Fund, or by PNC or another source when a borrower's LPI debt is absorbed due to short sale, foreclosure, or some other means.  [*Id.*, ¶ 12].

Class Counsel also took Mr. Abourezk's deposition on June 16, 2015, specifically with regard to the necessity of a claims-made settlement. Mr. Abourezk confirmed the

accuracy of his declaration and elaborated on its substance at his deposition. When asked why PNC cannot determine systematically whether LPI charges have been paid by any borrower, Mr. Abourezk explained:

> All escrow funds are held in a single bucket, so any funds that come in aren't specifically directed towards any specific escrow item [e.g., LPI, other types of insurance, and taxes]. In addition, customers have other sources of potentially paying – getting assistance to pay back escrowed items, like the Hardest Hit Funds program that various states have or other community-based programs that may provide funds to the customer, so they're not paying those funds back.
>
> You know, they could have a deed in lieu or short sale where that could terminate the escrow account prior to them paying those funds back; so, systematically, it's literally impossible to figure that out without going loan by loan and doing an individual accounting.

[Abourezk Dep. 8:15-9:24, 6/16/15.]

Mr. Abourezk went on to explain that PNC cannot segregate all other sources of escrow funds from funds for LPI -- that is, PNC cannot determine whether funds that went into escrow were paid by the borrower for LPI, private mortgage insurance, some other kind of insurance, or taxes. [*Id.*, at 9:16-10:22]. Similarly, PNC cannot discern whether funds paid into escrow came from third-party sources like the Hardest Hit Fund, other government programs. [*Id.*, 8:15-9:24, 10:23-11:8]. Finally, Mr. Abourezk testified that in order to determine how much a borrower had paid for LPI, PNC would be required to perform "a line-item accounting of each loan that would be done manually, basically, with a calculator and a piece of paper[,]" which would take, for each of the 130,875 class members, "somewhere in the neighborhood of 30 to 40

33

minutes," with the "more complicated loans" taking even longer to analyze. [*Id.* at 14:2-24]. The Court is satisfied that a claims-made process is not only preferable, it was **necessary** given the delay and increased costs that would have come with a manual, file-by-file review.

With 130,875 PNC borrowers owed overcharges, direct payment is not only less feasible than a claims-made model, but also a harder sell -- a claims process may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010). This is particularly important where a case presents a class of this size, and determining amounts to be paid directly would potentially make settlement more costly than litigation. *See Saccoccio*, 297 F.R.D. at 696 (citing evidence that manual review of all borrowers files for a class of 800,000 "would take a thousand people . . . every month").

Pursuant to the Settlement's terms, Settlement Class members who submit a simple claim form will recover 12.5% of the amounts they were charged for force-placed coverage -- near-complete relief that very likely exceeds what they could have recovered at trial, which is extraordinary for any settlement. The court in *Arnett* recognized this, opining that "the results obtained [in *Arnett*] were not extraordinary, particularly when compared to the settlements achieved in *Fladell* . . . and *Casey*[,]"

34

where the parties had negotiated claims-made settlements that would provide participating class members with relief comparable to that offered here. *See Arnett*, 2014 U.S. Dist. LEXIS 130903, at *35-37 (settlements in *Fladell* and *Casey* were extraordinary because they provided "longer injunctive relief and better monetary relief" of between 7% and 12.5% percent of their actual premiums with no pro rata reduction).

The results in claims-made LPI settlements have been extraordinary for class members who have submitted claims. Class Counsel has provided examples to the Court that in similar LPI settlements, class members already received tens of thousands of dollars in relief -- a class member in *Williams v. Wells Fargo, supra,* for example, received a check for $43,302.50; in *Saccoccio, supra,* class members received checks for $22,066.77 and $14,802.27; in *Fladell, supra,* a class members received a $21,947.25 check; in *Hamilton, supra,* a $13,172.01 check; and in *Hall, supra,* a class member received a check for $9,758.04. This recovery is far more significant than even the negligible relief paid to class members in direct-pay LPI class actions that had no relation to the specific charges which they have already paid.

The Court must also consider the risks of continued litigation or the problems that might be presented by using a direct-pay structure for a 130,875-member class. Plaintiffs and the class here would have faced significant hurdles had the parties proceeded with litigation, including dispositive defenses at summary judgment and

class certification stages with the potential application of the filed-rate doctrine. And

direct-pay settlements pose problems of their own:

> Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. Non-class members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important in a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially be more costly than litigation.

*Hamilton*, No. 13-60749, ECF No. 178, p. 12 (S.D. Fla. Oct. 23, 2014); *see also, e.g., Hall*,

2014 U.S. Dist. LEXIS 177155, at *22 ("And the Settlement Agreement's claims process is

needed for other reasons, including to ensure that only aggrieved individuals receive

monetary relief and to reduce the risk of fraud, waste, and abuse that might arise from

sending unsolicited checks to unverified addresses and recipients.").

Finally, courts rightly consider the value of injunctive *and* monetary relief in

assessing whether a class action settlement provides sufficient relief to the class. *See, e.g.,*

*Poertner*, 618 F. App'x at 630 (noting that objector's valuation of settlement based on

monetary benefits alone was "flawed," and affirming approval based on inclusion of

injunctive and *cy pres* relief); *Hamilton*, No. 13-60749, ECF No. 178, p. 7 (S.D. Fla. Oct. 23,

2014) ("The Court finds the injunctive changes provided in the Settlement Agreement

are important and have significant value to the class members nationwide"); *Perez*, 501

F. Supp. 2d at 1381 (describing important injunctive relief in discussing range of

possible recovery); *Lipuma,* 406 F. Supp. 2d at 1323 (valuing injunctive relief as part of

"significant relief" made available to class and determining that settlement was fair, adequate, and reasonable).

Approval of the Settlement will put an end to the practices complained of for at least five years, protecting current and future PNC borrowers with force-placed insurance from allegedly paying inflated charges for coverage. This should reduce the amounts passed on to *all* borrowers with force-placed insurance moving forward, effectively putting money back in their pockets and significantly increasing the value of the Settlement.

In this Court's judgment, a claims-made settlement here offers Settlement Class members the best and only real relief possible from this Settlement. Defendants have stated that they would not have agreed to a direct-pay model for a class of this size because the costs of administration and the risk of fraud would have been prohibitive. Even had Defendants agreed, the additional costs and increased risk would have reduced the amounts paid to individual class members. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593-94 (N.D. Ill. 2011) (approving claims-made settlement with costs associated with investigating how much was owed each Class Member; "[h]ad the onus of that process been placed on Defendant, there may have been less money available for them to pay claims."); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 198 (D.D.C. 2011) ("the case might not have settled if a condition of the agreement required PNC to mine [its] computer systems for such data").

37

The Court finds that the Settlement is more than "fair, reasonable, and adequate" -- it exceeds what one might expect given that settlements are borne of compromise. The Eleventh Circuit has affirmed claims-made settlements or settlements that provided far less relief to class members than that afforded here. *See, e.g., Poertner*, 618 F. App'x at 630 (affirming approval of claims-made settlement offering class members up to $12 in monetary relief); *Faught*, 668 F.3d at 1238 (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 F. App'x at 432, 434-35 (upholding claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value); *Bennett*, 737 F.2d at 986 (5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (recovery of between 9% and 45% was "exemplary result").

As such, the fifth factor weighs strongly in favor of final approval.

(f)     **There is little opposition from members of the Settlement Class, and Class Counsel and the class representatives support the Settlement.**  From a class of 130,875 members, only five Settlement Class members, two of whom are a married couple -- representing 0.003% of the class -- object to terms of the Settlement, and only twenty-one more have opted to exclude themselves from the class. As discussed more

fully below, the objections are based on fundamental misunderstandings or misconstructions of the Settlement's terms.

Class counsel advocate for final approval of the settlement, and their opinion is firmly based in their significant experience with force-placed insurance litigation. Class Counsel have been investigating force-placed insurance practices for almost five years, and obtained certification of the first class in the current wave of force-placed insurance litigation in *Williams*, No. 11-cv-21233 (S.D. Fla. 2012), which was also settled and granted final approval. They have litigated (or are engaged in litigating) twenty-two lender-placed insurance class actions in this district, ten of which have already been granted final approval after settlement; five more of which have settled, and five that remain in litigation.[3] As part of this effort, by their own account, Class Counsel have reviewed millions of pages of documents from Assurant and its subsidiaries alone, participated in dozens of depositions, and become thoroughly familiar with the major mortgage lenders' force-placed insurance practices, as well as the claims and legal theories advanced in these cases.

Based on this experience, and their decades of experience litigating consumer class action lawsuits, it is Class Counsel's well-informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  The Court gives "great

---

[3]     Of the two cases that remain, one was denied class certification, while the other was subsumed by the *Casey* settlement in the Northern District of New York.

weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).

13.     For the reasons set forth above, the Court finds that the *Montoya* Settlement is fair, reasonable, and adequate, and not the product of collusion. The Parties are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

14.     The terms of the Settlement Agreement and of this Final Order, including all exhibits thereto, shall be forever binding in all pending and future lawsuits maintained by the Named Plaintiffs and all other Settlement Class Members, as well as their family members, heirs, guardians, assigns, executors, administrators, predecessors, successors, and assigns.

### *Class Counsel's Fee Award Is Well Within the Range Set Forth by the Eleventh Circuit*

15.     Class Counsel has filed an application for attorney's fees in the amount of $4.75 million.    As discussed more fully below, Class Counsel's application is **GRANTED.**

16.     Both the United States Supreme Court and the Eleventh Circuit have expressly approved calculating fees by applying the percentage-of-recovery method to the total value of the settlement.  *See Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or lawyer who recovers a common fund for the benefit of persons other than

himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999) (affirming fee award of 33-1/3% of total amount made available to class, and determining that attorney's fees may be determined based on total fund, not just actual payout to class); *see also*, *Poertner*, 618 F. App'x at 628 (quoting *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("attorney's fees awarded from a common fund shall be based on a reasonable percentage of the fund established for the benefit of the class")); *David v. Am. Suzuki Motor Corp.*, No. 08-cv-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). Fees are based on a percentage of the total benefits made available, regardless of the actual payout to the class.  *See Waters*, 190 F. 3d at 1295-96.

17.     The Eleventh Circuit recently reaffirmed its support for this approach in *Poertner v. Gillette Co.*, stressing that class counsel's fee award should also be based on consideration of "any non-monetary benefits conferred upon the class by the settlement," such as injunctive relief, as well as "the economics involved in prosecuting a class action." 618 F. App'x at 629 (citation omitted).

18.     Moreover, in the Eleventh Circuit, "the lodestar approach should not be imposed through the back door via a 'cross-check.'" *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91

41

n. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases")). In *Camden I*, the court criticized the inefficiencies of lodestar approach, 946 F.2d at 773-75, and other courts have called it into question because it "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1363 (citation omitted).

19.     The result here is extraordinary and therefore supports Class Counsel's requested fee award. To be sure, the result achieved by counsel is a major factor to consider in making a fee award. *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1342 (S.D. Fla. 2007); *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). In considering the results, courts examine the value of *both* monetary and injunctive relief. *See Poertner, supra*; *Perez*, 501 F. Supp. 2d 1360; *Lipuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. Oct. 24, 2003). The results here, $32.3 million in monetary benefits and injunctive relief, are excellent -- Settlement Class members will recover near-complete relief and Defendants will be mandated to

cease the key practices at the core of Plaintiffs' complaint.  These results are powerful support for the fee award.

20.     The $4.75 million sought by Class Counsel for fees and expenses constitutes 14.7% of the value of just the monetary relief made available to the Settlement Class, which is well within the range approved by the Eleventh Circuit. *See, e.g., Camden I*, 946 F.2d at 774 (20%-50% of value provided); *David*, 2010 U.S. Dist. LEXIS 146073, at *26 n.15 (20% to 50% of common fund is "the customary fee in class actions that result in substantial benefits"). It is also well in keeping with fee awards approved by other courts in lender-placed insurance litigation.  *See, e.g., Hamilton*, No. 13-cv-60749, ECF No. 178 (S.D. Fla. Oct. 23, 2014) (approving award of 16% of the total monetary benefits made available to the settlement class); *Saccoccio*, 297 F.R.D. at 694 (approving 6.7% award); *Hall*, 2014 U.S. Dist. LEXIS 177155, at *29 (approving 7% fee award as "well in line with the bulk of the fee awards in class action litigation"). *See also, e.g., Casey*, No. 13-cv-820, ECF No. 227-2, p. 14 (N.D.N.Y. Sept. 12, 2014) (approving award of 8% of monetary value of settlement).

21.     This amount seems all the more reasonable taking into account the potential value of the injunctive relief, and the considerable risk undertaken by Class Counsel. The fee award was contingent on a good result -- Class Counsel would have recovered nothing if it had not secured recovery for the class.  "For a complex and

sophisticated case such as this one, class counsel took considerable financial risk in pursuing the case." *Saccoccio*, 297 F.R.D. at 695.

22.     The risks undertaken by class counsel in class actions are often "exacerbated by the existence of competing parallel proceedings in other courts, which may reach settlement or certification first, and the considerable amount of labor that is usually undertaken to litigate a class action to resolution." *Wilson*, 2016 WL 457011, at *19 (S.D. Fla.  Feb. 3, 2016). "This is particularly the case when the law firms prosecuting the case are of small size, as they are here, and thus the time devoted to the class action precludes other employment." *Gordon v. Pub. Storage*, No. 14-cv-21559-UU, ECF No. 407, p. 21 (S.D. Fla. Mar. 10, 2016) ("Gordon Final Approval Order").

23.     As Judge Ungaro recently observed, other district courts within this Circuit have found that this measure of risk supports fee awards exceeding 30%. *See id.*, pp. 21-22 (citations omitted) (approving 33% fee award). Here, Class Counsel seeks just 14.7% of the monetary relief made available to the class.

24.     Class Counsel and their co-counsel undertook significant risk in pursuing this litigation, and invested considerable effort in seeing it through to settlement. Class Counsel would not have recovered any fee had the Court declined to certify a class or dismissed the case on summary judgment, or had they lost at trial. And these results were real possibilities -- courts in this Circuit and others have dismissed force-placed insurance class actions and denied class certification. *See, e.g., Feaz*, 745 F.3d 1098

(affirming dismissal of force-placed insurance class action based on Alabama law); *Gustafson*, 294 F.R.D. 529 (denying class certification); *Kunzelmann*, 2013 U.S. Dist. LEXIS 139913 (denying class certification).

25.     This Court, too, already expressed skepticism that Plaintiffs claims would survive at later stages of litigation.  *See Montoya*, 2014 WL 4248208 (S.D. Fla. Aug. 27, 2014) (the claims "confront a blustery legal atmosphere" and will "need to weather the legal squalls which will later blow their way again"). In a later order entered in this case [ECF No. 198, pp. 28-29) on a more-recent dismissal motion, I noted that the Court in *Wilson,* No. 14-CIV-22264, 2015 WL 265648, at *14 (S.D. Fla. Jan. 6, 2015) held that similar RICO allegations were "implausible" because they did not demonstrate how the bank's "scheme proximately caused injury to Plaintiffs." *See also Trevathan* (filed rate doctrine applied).

26.     Class Counsel also spent considerable time litigating the class claims, which involved complex issues of fact and law, and negotiating and administering the Settlement, which offers extraordinary relief to Settlement Class members. During litigation, they defended against motions to dismiss, investigated the class claims, and took discovery. The parties negotiated at arm's-length; briefed preliminary and final approval, argued at hearings on those motions; and prepared notices and claim forms that were mailed to 130,875 PNC borrowers.

27.     Further, the Settlement requires a continuing role for Class Counsel after final approval in reviewing the payments made to Class Members, as well as information on denied claims and reasons for denial. Class Counsel have negotiated a procedure to resolve any disagreements with Defendants regarding denied claims and will not involve the Court unless those procedures fail to result in a mutually agreeable solution. Class Counsel have also responded to thousands of Class Member calls and written inquiries concerning the Settlement and will continue to do so. Finally, Class Counsel will be responsible for responding to any appeal and handling all other post-approval proceedings.  These efforts more than justify the requested $4.75 million fee.

28.     Finally, the Court takes no issue with the reversion of unclaimed funds to Defendants or the so-called "clear-sailing" provision. Though these terms may warrant giving a settlement closer scrutiny, they should not compel the Court to reject a settlement, like this one, that is otherwise reasonable and not the product of collusion. *See, e.g., Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 925 (9th Cir. 2014) ("it is sufficient that a district court recognizes and balances potentially collusive provisions, such as the reversion to the defendants of unclaimed funds, against the other terms of the settlement agreement"); *Blessing v. Sirius XM Radio, Inc.*, 507 Fed. App'x 1, 6 (2d Cir. 2012) (reversionary and clear-sailing provisions did not provide grounds for vacating fee award where "fee was negotiated only after settlement terms had been decided and

did not … reduce what the class ultimately received"). There is evidence in the record that there was no collusion among the parties. [ECF No. 226-3.]

29.     Accordingly, the Court finds that $4.75 million is a reasonable amount for attorneys' fees in this action. Class Counsel's application for attorneys' fees is **GRANTED.**

### *Class Representative Service Awards*

30.     The Court also awards Case Contribution Awards in the amount of $5,000.00 each to Named Plaintiffs Enrique Montoya, Neyser Colonia, Xi Chen Lauren, and Mark Stuckey, payable pursuant to the terms of the Settlement Agreement. Private class action suits are a primary weapon in the enforcement of laws designed for the protection of the public. *See Pinto*, 513 F. Supp. 2d at 1344. In instituting this litigation, the Named Plaintiffs have sought to remedy what appeared to be a public wrong. They have made significant contributions to this litigation, stepping forward on behalf of a nationwide class, contributing to the investigation of the claims, participating in documentary discovery and depositions, and conferring with class counsel throughout the litigation. For their service, above and beyond that provided by any other class member, a $5,000 award is fair, reasonable, and adequate. *See, e.g., Wilson*, 2016 WL 457011, at *15 (approving $5,000 service award); *Lee*, 2015 WL 5449813, at *26 (same).

31.     Therefore, Class Counsel's application for a $5,000 service award for each Settlement Class representative is **GRANTED.**

### *Objections to the Settlement*

32.     The four objections to the Settlement generally challenge four of its related aspects: (1) the value of the monetary relief; (2) its claims-made structure; (3) Class Counsel's proposed fee award; and (4) the service awards to the Named Plaintiffs. The *pro se* objectors also raise individual concerns, which the Court will address separately. None of the objections is persuasive, as explained below.

**The Claims-Made Structure**

33.     It appears that in many class actions, neither the objectors nor their counsel opt to appear at the Final Fairness Hearing. In some instances, this appears to be a conscious decision by objectors' counsel to avoid subjecting themselves to the jurisdiction of the district court, while still preserving their rights for appeal for possible questionable purposes. Accordingly, some courts, including the Tenth Circuit, have required the attendance by objectors in order to preserve their appellate rights. *See, e.g.,* *In re Integra Resources, Inc.,* 354 F.3d 1246 (10th Cir. 2004).  While the Eleventh Circuit has not specifically addressed the issue, it was very productive for this Court to have the Longs' counsel appear at the final approval hearing. All district courts have a duty to serve as a gatekeeper for asserted objections before they rise to the appellate level, which may delay relief to class members for many years.

34.     The Longs' counsel appeared at the Final Fairness Hearing. At the hearing, it became apparent that neither of the Longs' counsel had reviewed any of the

Court's prior orders overruling the same objections in the same type of class action lawsuits. The Court granted Class Counsel's *ore tenus* motion to take depositions of the Longs.

35.     Where there are indicia that objectors lack knowledge of the terms of a settlement and the basis for their objection, or where the objection might be lawyer-driven and filed with ulterior motives, it is not only appropriate, but also advisable, to allow Class Counsel and Defendants to take the objectors' depositions with certain restrictions.  Such depositions not only serve to inform the Court as to the true grounds and motivation for the objection, but they also help develop a full record should the objector file an appeal. *See, e.g., Gordon*, Final Approval Order at 32 (overruling objection in part because of lack of knowledge exposed at deposition); *Wilson*, 2016 WL 457011, at *1 ("After carefully reviewing the submissions on that objection, including recent deposition testimony given by the objectors, the Court finds that the objection lacks merit and is based on fundamental misunderstandings of the terms of the Settlement and the law.").

36.     Objections can serve an important function under Federal Rule 23 and may assist the Court under certain circumstances, but they are also often also be abused by counsel who assert objections for financial gain. *See Gordon* Final Approval Order at 32 ("While the Court recognizes that in a small fraction of cases these objections are

legitimate, the vast majority have nothing to do with the merits of the actual settlement but are motivated by attorneys attempting to extort a payout from class counsel.").

37.     Class Counsel took the Longs' depositions on March 23, 2016, with Defendants' counsel in attendance by telephone.  It is clear to the Court that the Longs lack comprehensive knowledge of the general -- let alone specific -- elements of the settlement to which they have objected,[4] and they likewise lack substantial knowledge of the basis for their objections.

38.     Mrs. Long admitted that she had never reviewed the class action notice, the claim form, the Settlement Agreement, or even her own objection, deferring to her husband's judgment. (B. Long Dep. 12:20-16:17.)  [ECF No. 269-1]. Mr. Long testified at his deposition that he believed that if his counsel was "successful in changing the settlement he can go to the Court for attorneys' fees." (G. Long Dep. 14:7-9). He admitted that he had never visited the Settlement website, did not do any research regarding the settlement besides talking to his counsel, did not review the motions for preliminary approval and final approval, and had never reviewed the Settlement Agreement.  (*Id.* at 16:7-20:4).  Neither Mr. nor Mrs. Long had any knowledge regarding the substantial injunctive relief mandated by the settlement, though Mr. Long offered

---

[4]     As of March 22, 2016, the Longs withdrew their claims. [ECF No. 267-1, p. 41, n. 13]. Specifically, in identical letters sent to the Settlement Administrator, the Longs provided the following notice: "We withdraw our claim submitted in this matter." [ECF No. 269-1]. According to their proposed order, "in light of their objections and so as to represent the Class' best interest, the Longs withdrew their claims on March 22, 2016." [ECF No. 267-1, p. 41, n. 13].

that the injunctive terms are "a great idea."  (*Id.* at 27:17).   In sum, the Longs' testimony reveals that they lack a sound basis for their objections.  *See Gordon* final Approval Order at 33 ("[a]n objector's knowledge of the objection matters in crediting (or not) the objection and determining the objector's motivations") (citation omitted).

39.     The Longs' primary objection is also legally unconvincing. As already discussed, *supra*, the Court is not tasked with either choosing the payment structure that it believes will provide the *best* possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the claims-made settlement presented is fair, reasonable, and adequate given the inherent risks and expense of further litigation. *See, e.g., Casey*, 2014 WL 4120599, at *3 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

40.     There is nothing inherently suspect about the use of a claims-made process, *Poertner*, 618 F. App'x at 628; *see also Saccoccio*, 297 F.R.D. at 696.  Furthermore, this Settlement, like other claims-made LPI class settlements approved by this Court, is designed to incentivize Class Member participation. It is substantively fair, offering complete relief (or better) to every interested Claimant who submits a valid Claim Form -- relief that will be worth hundreds of dollars to the average Claimant. It also is procedurally fair. "Filing a claim form is a reasonable administrative requirement which

generally does not impose an undue burden on members of a settlement class."

*Hamilton*, 2014 WL 5419507, at *6. Class members can receive monetary relief merely by

submitting a simple Claim Form and confirming their identity in one of several ways.

The Claim Form should take no more than a few minutes for the average person to fill

out.

> 41. Where, as here, a claims-made process is a reasonable method for
> providing prompt and substantial relief to the class, requiring
> class members to file claim forms also maximizes the relief
> available to class members who opt to submit a claim. A
> settlement's fairness is judged by the opportunity created for the
> class members, not by how many submit claims. What matters is
> the settlement's value to each class member – it is ultimately up to
> class members to participate or not.

*Hamilton*, 2014 WL 5419507, at *7; *see also Wilson*, 2016 WL 457011, at *17; *Braynen*, 2015

WL 6872519, at *14; *Lee*, 2015 WL 5449813, at *18; *Hall*, 2014 WL 7184039, at *7.[5]

42.    The Longs' prefer a direct-payment settlement, but a direct-payment

settlement "is not necessarily any fairer." *Lee*, 2015 WL 5449813, at *18. A direct

payment settlement creates a "choke" on the per-capita amount made available to class

members.  In direct-payment settlements, defendants will not agree to pay each class

member their entire alleged damages. This is particularly true where, as here,

---

[5]     The Longs rely on *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), [*see* ECF No.
247, ¶ 7] but this Court distinguished that and other Seventh Circuit decisions in other
orders approving similarly structured LPI class settlements. *See Wilson*, 2016
WL 457011, at *11-12; *Braynen*, 2015 WL 6872519, at *17-18; *Lee*, 2015 WL 5449813, at *21-22;
*Hall*, 2014 WL 7184039, at *3 n.4, *6.  The egregious facts of *Eubank* are not the facts of
this Settlement. This Order will discuss and distinguish those cases in further detail.

defendants believe the class claims lack merit and cannot be certified. Direct-payment settlements thus tend to offer recoveries at much lower percentages of class members' alleged damages than in claims-made settlements.[6]  On the other hand, where the per-capita recovery is fair, as here, claims-made settlements benefit the true stakeholders who genuinely believe they were wronged and who will therefore submit claim forms:

> 43. Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those who would take the minimal step of returning the simple Claim Form to receive the larger amount. While a claims-made settlement structure does not guarantee an award to all class members, it does tend to maximize the opportunity available to each class member.

*Lee*, 2015 WL 5449813, at *18. "Thus, although direct-pay settlements have been approved as reasonable by district courts in smaller [LPI] class actions, claims-made settlements can also be fair, reasonable, and adequate in LPI litigation, and have been found to be so in every instance where they have been presented for final approval." *Wilson*, 2016 WL 457011, at *16.

44.     Moreover, as discussed above, a direct-payment settlement structure was never a realistic option here.   A claims process is the only practicable means of administering this Settlement. The Settlement offers cash relief to borrowers who paid

---

[6]     *See Faught*, 668 F.3d at 1242 (affirming approval of claims-made settlement where class members could receive full compensation "rather than mere pennies on the dollar for a uniform cash payment"); *Lee*, 2015 WL 5449813, at *18 (finding that "a direct-payment settlement structure would have been negotiated to provide recovery at a much lower percentage of Settlement Class Members' LPI Net Premiums").

any portion of Premium charges assessed to their mortgage escrow accounts and a credit to those who did not and who still owe those charges. But many Settlement Class Members have not, and will never, pay or continue to owe Premiums. Many are no longer PNC borrowers. Those Class Members should not receive a windfall from the Settlement, but PNC cannot query its systems to identify on a class-wide basis whether class members had paid or still owed some portion of the amounts they were charged for LPI. [*See* ECF Nos. 241-2, ¶¶ 34-36; 252, p. 3;  252-1, pp. 8:2-11:8, 12:15-21, 14:2-24; 181-1, p. 10]. And, "even if it was possible to identify some unnamed class members, that does not mean that the [Court] lack[s] the discretion to approve the settlement as fair absent the identification of these class members." *Poertner*, 618 F. App'x at 630.

45.     Nor have the Longs considered the risks of continued litigation or the problems that might be presented by using a direct-pay structure for a 130,875-member class.  Their proposed 43-page Order (denying the motion for final approval of the class action settlement) does not mention *Rothstein*, nor does it discuss *Electrolux* or *Feaz*. Moreover, in the section of their proposed order entitled "The Likelihood of Success of the Montoya Case," the Longs do not at all discuss the cases which have ruled against the types of claims being asserted here. Indeed, they focus on positive cases, and note that several other cases "have also defeated the filed-rate doctrine defense." [ECF No. 267-1, p. 30]. None of the cases are circuit court appellate cases, however. Thus, the Longs portray this case in purely positive terms by ignoring adverse legal authority.

The Undersigned therefore views this portion of their presentation as unrealistic and unconvincing.

46.     Given the Longs' failure to accurately address the risks associated with ongoing litigation, their objection does not alter the Court's view that the Settlement is a fair compromise.[7] *See, e.g., Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confer[red] . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (noting "very real potential that the [c]lass could come away from a long expensive trial with nothing," and rejecting notion "that the Class should get more").

47.     The Longs' arguments against a claims-made structure also fail to account for any of the injunctive relief secured for the class, which is properly considered as part of the "settlement pie." *Poertner*, 618 F. App'x at 629, 630; *Perez*, 501 F. Supp. 2d at 1381 (describing important injunctive relief in discussing range of possible recovery); *LiPuma*, 406 F. Supp. 2d at 1323 (valuing injunctive relief as part of "significant relief" made available to class and determining that settlement was fair, adequate, and

---

[7]     In their proposed Order [ECF No. 266-1, pp. 12-13], Defendants describe their filed rate doctrine argument as "strong" and note that "numerous courts have applied the filed-rate doctrine to dismiss comparable LPI claims, including fraud-based claims, at the pleadings stage." They also stress that "Defendants assert that none of the Premiums collected are 'kickbacks' or other improper benefits, and that the claims are meritless and cannot be certified in a class format."

reasonable); *Hamilton*, (D.E.178 at 7) ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class members nationwide.").

48.     Finally, the Court rejects the Longs' contention that the Court should not approve the Settlement without first requiring class counsel to disclose the claims rate. But "courts often grant final approval of class action settlements before the final claims deadline." *Lee*, 2015 WL 5449813, at *23 (quoting *Hamilton*, 2014 WL 5419507, at *4). Furthermore, scheduling the Claim Deadline after the Final Approval Hearing has the salutary effect of maximizing the claim period's duration." *Id.* (quoting *Hamilton*, at *5).

49.     Moreover, class settlements featuring low claims rates are routinely approved. *See, e.g., Poertner* (approving 7.26 million-member settlement class when only 55,346 -- less than 1% -- filed claims); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183 million -- less than 4% -- filed claims. *See generally Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (claims rates in consumer class action settlements "rarely" exceed 7%, "even with the most extensive notice campaigns").

50.     Basing approval of the Settlement on the claims rate would be neither reasonable nor equitable. A low claims rate would not necessarily compel the conclusion that the settlement as a whole is not fair, reasonable, or adequate. *See, e.g., Moore v. Verizon Commc'n Inc.*, No. C 09-1823, 2013 WL 4610764, at *8 (N.D. Cal.

Aug. 28, 2013) (explaining that the number of class members who object is a factor to be considered, noting that only 28 objections were received out of a potential 8,089,893 class members and approving settlement with 3% rate).

51.    A claims-made settlement here is not only fair, reasonable, and adequate, but it most likely offers Settlement Class members the best relief possible.

*The Value of the Settlement*

52.    Objectors Sandusky, Brown, and Williams challenge the adequacy of the value of the settlement, claiming that class members should receive more than 12.5% of the force-placed insurance premiums they paid, without providing any basis, any evidence, or any facts relating to the actual issues in this litigation.  [ECF Nos. 240; 243; 244]. Their objections are unpersuasive because they misconstrue the value of the relief afforded by the settlement and forego any consideration of the relative strengths and weaknesses of the Class's claims. *See Nwabueze v. AT&T Inc.*, No. C 09–01529, 2013 WL 6199596, *8 (N.D. Cal. Nov. 27, 2013) ("That a settlement could potentially have reached a more favorable result for certain individuals in the class does not demonstrate that the agreed-upon settlement is not fair, adequate, and reasonable."); *Henderson v. Volvo Cars of N. Am.*, No. 09–4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) (collecting cases rejecting objections that complained about the lack of full relief and holding that "[o]bjections based solely on the amount of the award lack merit").

53.     The 12.5% that will be returned to class members is near-complete relief. There has never been a dispute that Class members who let their voluntary insurance lapse were properly charged the cost of the lender-placed insurance coverage Defendants' provided; Plaintiffs alleged they were not properly charged any amount *in excess* of that actual cost. Accordingly, had they prevailed at trial, Class members would only be entitled to recover the *inflated* portion of the amounts properly charged them under their agreements. Evidence in the record establishes that the monetary relief made available by the Settlement constitutes 50-100% of the total possible relief that would have been made available at trial.

54.     Additionally, evidence in the record suggests that regulators in 45 states have approved an Assurant lender-placed product that would reduce the premiums charged to lenders and passed through to borrowers by 12.5%. Thus, from this perspective, the Class recovery is also 50-100% of the damages. "Factoring in the injunctive relief . . . the settlement very likely exceeds what Plaintiffs could have won at trial." *Saccoccio*, 297 F.R.D. at 693 (S.D. Fla. 2014). And, as the district court judge reasoned in *Saccoccio*, "[e]ven assuming that the monetary figure represents only 12.5% of Plaintiff's damages, which the Court is satisfied they do not, this recovery would still be adequate." *Id.* (citing *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (recovery of 9% to 45% was an "exemplary result")).

*Class Counsel's Fees*

55.     The Longs and Mr. Williams also object to counsel's proposed fee award as being "too high," in part on the ground that it should have been calculated as a percentage of the value of the claims actually paid to class members rather than as a percentage of the total relief made available to the Settlement Class.  [ECF Nos. 243; 248]. But the court was clear in *Poertner*: calculating class counsel's fees as a percentage of the value of the claims actually paid to class members is *not* the appropriate method for awarding fees and expenses in the Eleventh Circuit. *Poertner*, 618 F. App'x at 630. The court held:

> [The Objector] claims that the settlement is unfair because class counsel's slice of the settlement pie is too large (i.e., the fees-and-costs award is unreasonable).  But this objection is based on [his] *flawed valuation of the settlement pie*:  limiting the monetary value to the amount of Gillette's actual payments to the class along with excluding the substantial nonmonetary benefit and the *cy pres* award.

*Id.* (emphasis added).

56.     As already noted, Class Counsel's fees were calculated in keeping with the Eleventh Circuit's methodology (*see, e.g., id.* at 626-27, 630 (fee award reasonable under percentage-of-fund method); *Camden I,* 946 F.2d at 774 (11th Cir. 1991) ("attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class")), and also fall well within the range set by the Eleventh Circuit. *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) ("[F]ederal district courts across the country have, in the class action

settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases.") (emphasis added). The proposed fee amounts to 14.7% of the total monetary relief made available to the nationwide class, and even less when the value of the settlement's injunctive relief is taken into account.

57.     A better policy is that the valuation of counsel's fees should be based on the opportunity created for the Settlement Class -- courts should give considerable weight to counsel's efforts to afford class members the opportunity to recover meaningful relief by availing themselves of a claims process that is procedurally fair. And counsel should not be penalized for class members' failure to take advantage of such a settlement.

> There may be many reasons or no reasons why class members decide to participate in a settlement, *e.g.*, a desire not to be involved in litigation, ideological disagreement with the justice system, their individual experiences with lender-placed insurance, or sympathy for the defendant. Further, class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form. Whatever the underlying reason, that is a decision to be made by each class member. Those decisions, however, do not affect whether the settlement provided to the Class is fair, adequate, and reasonable.

*Hall,* 2014 WL 7184039, at *8.

58.     Class counsel has also undertaken significant economic risk in litigating this class action. Taken together, these considerations render the Eleventh Circuit's approach sound and equitable, and compel the Court to overrule the objections to Class Counsel's fee award.

59.     The Court finds factually distinguishable a pair of recent Seventh Circuit cases reversing the district courts' final approval of two consumer class settlements employing claims processes -- *Eubank*, 753 F.3d 718, and *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014).

60.     The Seventh Circuit's reversal of the *Eubank* settlement approval hinged on the fact that, unlike this Settlement, "almost every danger sign in a class action settlement" was present in that case. 753 F.3d at 728. There were "grave conflict[s] of interest," including that the lead class counsel was the son-in-law of the lead class representative (Saltzman). *Id.* at 721. Early in the case, lead counsel added four additional named plaintiffs and then removed these four plaintiffs when they opposed the settlement's approval; "naturally their replacements joined Saltzman in supporting it." *Id.* at 722. The conflict was heightened by the fact that lead class counsel was subject to misappropriation lawsuits and bar disciplinary proceedings, indicating that counsel "may have been desperate to obtain a large attorney's fee in this case before his financial roof fell on him." *Id.* The financial needs resulting from these suits "drove the settlement of this case." *Id.* Moreover, the bar disciplinary proceedings culminated in lead class counsel's suspension from practicing law for 30 months. *Id.*

61.     Additionally, unlike this Settlement, the *Eubank* settlement did not offer a complete (or better) recovery to class members, but imposed multiple caps on monetary relief. *Id.* at 724-25. The settlement "strew[] obstacles in the path" of every class

member, imposing a convoluted claims process, requiring certain class members who submitted claims to arbitrate them and submit "a slew of arcane data." *Id.* The two claim forms used were 12 and 13 pages long. *Id.* at 725. For this, some claimants were entitled only to "coupons" -- "discounts on *future* purchases of Pella windows, discounts that may be worth very little to current owners of Pella's defective windows" -- "a warning sign of a questionable settlement." *Id.*

62.    Further, the *Eubank* settlement ignored that two separate classes had been previously certified and instead "purport[ed] to bind a single nationwide class consisting of all owners of Pella Proline windows containing the defect, whether or not the owners have already replaced or repaired the windows." *Id.* at 721.

63.    Not one of these "danger signs" is present here. The flawed *Eubank* settlement is simply not comparable to this Settlement, given that there are no conflicts of interest alleged and this Settlement offers complete (or better) relief under a simple "check the box" claims process requiring minimal information readily known by the Class Members, but not Defendants. Class Counsel are not subject to any lawsuits or bar disciplinary proceedings that have clouded their judgment. While the Seventh Circuit admonished the district court for not quantifying the total benefits to class members, 753 F.3d at 723, it did so only in the context of the above conflicts and circumstances, without requiring such a quantification in *every* class settlement. Nor did the Seventh Circuit explain how such a quantification would be meaningful where, as

here, an unknowable number of class members might not submit claims because they never paid anything or lost money.  The factually dissimilar *Eubank* decision does not guide the Court in connection with this Settlement.  *See Hall*, 2014 WL 7184039, at *3 n.4 & *6 (distinguishing *Eubank*).

64.     Nor does the *Pearson* decision. The settlement there did not remotely resemble this Settlement. The *Pearson* settlement offered just $3 for each bottle of glucosamine pills purchased up to four bottles, or $5 up to ten bottles if the class member provided proof of purchase. 772 F.3d at 783. Here, the average Settlement Class Members stands to recover hundreds of dollars of Claim Settlement Relief. And unlike this Settlement's comprehensive direct mail notice program and streamlined claims process, *Pearson* class members received only a postcard notice of the settlement and were required to provide detailed claim information, including "cash register receipts or other documentation indicating the date and place at which he or she had bought the product." 772 F.3d at 783. For this, the Seventh Circuit chastised *Pearson* class counsel, who "must have known that the notice and claim forms, and the very modest monetary award that the average claimant would receive, were bound to discourage filings." *Id.*

65.     No such criticism can be made here.  By employing a robust Class Notice program[8] and guaranteeing a generous monetary payout to each Class Member

---

[8]     To increase the chances that class members will file claims, class counsel has established a master LPI website which is now live and which can be accessed at: www.lenderplacedlawsuit.com. [ECF No. 265].

submitting a simple Claim Form, the Parties have *encouraged* participation in the Settlement.  *See Poertner*, 2015 WL 4310896, at *4 (distinguishing *Pearson* on this basis). The Settlement is structured to offer every Class Member who submits the simple Claim Form the opportunity to receive a full recovery.  Finally, the *Pearson* court took to task that settlement's inclusion of a *cy pres* award and "superfluous" injunctive relief.  *See id.* at 784-86.  This Settlement, in contrast, does not include a *cy pres* component and its injunctive relief is not superfluous, but quite valuable.

### Service Awards

66.    The Named Plaintiffs have made significant contributions to this litigation.  Moreover, Named Plaintiffs who undertake litigation against sophisticated defendants also "undert[ake] substantial risk … that [the defendant might] pursue[] cost-shifting remedies had a settlement not been reached or Plaintiff[s] not prevailed." *Gordon* Final Approval Order at 31.  For their service, a $5,000 award is fair, reasonable, and adequate.  *See, e.g., Wilson*, 2016 WL 457011, at *15 (approving $5,000 service award); *Lee*, 2015 WL 5449813, at *26 (same).

### Individual Objections

67.    Mr. Williams also objects to the Named Plaintiffs' service awards, contending simply that his recovery should be equal to that the Named Plaintiffs are receiving, without providing any basis. But Mr. Williams has done nothing to earn such an award: "Service awards 'compensate named plaintiffs for the services they provided

and the risks they incurred during the course of the class action litigation.'" *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1357-58 (citation omitted). "Numerous courts, including this one, have found it appropriate to specially reward named class plaintiffs for the benefits they have conferred." *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-cv-61677, 2008 WL 649124, at *16 (S.D. Fla. Jan. 31, 2008) (citations omitted).

68.     The *pro se* objectors complain that the Settlement does not address certain of their own specific, individual issues with the Defendants -- Mr. Sandusky takes issue with forced "double coverage" and Ms. Young with financial hardship she endured as a result of purportedly unauthorized flood insurance -- but these "objections lack merit because they can **simply opt out** if they have concerns about releasing their claims." *Lee*, 2015 WL 5449813, at *13 (emphasis in original) (quoting *In re Managed Care Litig.*, No. 00–1334, 2003 WL 22850070, at *5 (S.D. Fla. Oct. 24, 2003); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104, 2014 WL 5488161, at *3 (S.D. Fla. Oct. 29, 2014); (citing *Faught*, 668 F.3d at 1241–42 (objection that "the settlement is unreasonable because it strips class members of their class rights while failing to resolve their individual claims" and "that the settlement does not adequately compensate them" deemed "unconvincing" since class members were "free to opt out of the class and still have the option of . . . filing an individual suit")); *Saccoccio*, 297 F.R.D. at 700  ("[T]o the extent that these objectors believe that they are entitled to additional relief due to unique cases, they were entitled to opt out of the settlement. They chose not to do so.") (citation omitted*). These

objectors chose to remain members of the class, potentially releasing their claims against Defendants by their own will.

69.     They chose, however, to stay in the Settlement, apparently feeling "entitled to the bird in the hand while pursuing the flock in the bush. If the objectors felt they could do this, that was their prerogative but in so doing they accepted the risk that they would be precluded." *Corrugated Container Antitrust Litig.*, 643 F.2d at 222-23. Their failure to take advantage of the opportunity to opt out and pursue what they characterize as unique claims justifies rejecting their objections.  *See In re WorldCom*, 388 F. Supp. 2d at 343 (rejecting similar objection on the grounds that, "[b]ecause [the objector] chose to remain a Class Member, there is no unfairness in applying the Release to all of her claims").

70.     All objections to the Settlement are **OVERRULED** in their entirety.

### *The Releases*

71.     "In class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, known and unknown claims, or even claims over which the court lacked jurisdiction." *Faught v. Am. Home Shield Corp.*, 2010 U.S. Dist. LEXIS 146382, *46 (N.D. Ala. Apr. 27, 2010) (citations omitted); *see also Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 420 (11th Cir. 2009) ("Given a broad enough settlement agreement . . . and provided that [a class member] had notice

of it and an opportunity to opt out, it is perfectly acceptable for the [settling class] action to preclude his claims, even if they could not have been part of that action itself.").

72.   Too narrow a release would leave future defendants with little incentive to settle class action lawsuits on a claims-made basis. A release of the Settlement Class' claims is a necessary precondition to Defendants' agreement to settle; without it, Defendants could be subject to individual lawsuits by individual class members for years to come, and would incur the additional costs associated with litigating those actions. Class members who wish to retain their claims and except themselves from the settlement's terms, including the release, have been given the opportunity to do so by opting out. This is fair, reasonable, and adequate under the law: "There is nothing unusual or unfair about Defendant's interest in finality and repose, nor in its desire to be released from Class Members' claims, and not be threatened with the prospect of potential double recoveries. Indeed, there would be no reason for a defendant to enter into a settlement of a class action that would leave it subject to additional class actions asserting the same or similar claims." *Faught*, 2010 U.S. Dist. LEXIS 146382, *46 (citations omitted).

73.   The Releases, which are set forth in Section 10 of the Settlement Agreement and which are also set forth below, are expressly incorporated herein in all respects and are effective as of the date of this Final Order; and the Released Persons (as that term is defined below and in the Settlement Agreement) are forever released,

relinquished, and discharged by the Releasing Persons (as that term is defined below and in the Settlement Agreement) from all Released Claims (as that term is defined below and in the Settlement Agreement).

        (a)    <u>Release and Waiver Definitions</u>

        (i)    "PNC" or the "PNC Defendants" means PNC Bank, N.A. and Alpine Indemnity Limited.  Additionally, when "PNC" is referenced herein in connection with conduct predating the acquisition of National City Corporation by The PNC Financial Services Group, Inc., "PNC" means National City Mortgage Company or any of its relevant affiliates.

        (ii)    "Affiliate" of an entity means any person or entity which controls, is controlled by, or is under common control with such entity.

        (iii)    "Assurant Defendants" means ASIC, SGIC, and VIIC.

        (iv)    "Defendants" means all named defendants in the Montoya Litigation, including the PNC Defendants and the Assurant Defendants.

        (v)    "Lender-Placed Insurance" or "LPI" means the placement of hazard, flood, flood gap, or wind-only insurance pursuant to a mortgage loan agreement serviced by PNC Mortgage, a Division of PNC Bank, National Association, or by National City Mortgage Company, to cover a borrower's failure to maintain the required insurance coverage on the Residential property securing the loan.

(vi)    "LPI Policy" means a lender-placed Residential hazard, flood, flood gap, and/or wind-only insurance policy issued by the Assurant Defendants placed pursuant to a mortgage loan agreement, home equity loan agreement, or home equity line of credit serviced by PNC Mortgage, a Division of PNC Bank, National Association, or by National City Mortgage Company, to cover a borrower's failure to maintain the required insurance coverage on the Residential property securing the loan.

(vii)    "Net Premium" means the amount of premium charged to a Settlement Class Member for an LPI Policy during the Settlement Class Period less any refund paid or credited to the Settlement Class Member.

(viii)    "Release" or "Releases" means the releases of all Released Claims by the Releasing Persons against the Released Persons.

(ix)    "Released Claims" means all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, demands, and any other forms of liability released pursuant to this Final Order and Judgment and defined Section 10 of the Settlement Agreement (which definition is hereby incorporated by reference).

(x)    "Released Persons" means (a) the PNC Defendants, the Assurant Defendants, National City Mortgage Company, National City Insurance Group, Inc., Allinco, Inc., David P. Huttenlocher, Assurant, Inc., and each of their

respective past or present divisions, parents, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies (which shall include any person or entity which controls, is controlled by, or is under common control with any such party), including but not limited to the PNC Defendants, the Assurant Defendants and any direct or indirect subsidiary of any of Defendants and each of their respective past or present divisions, parents, subsidiaries, investors, parent companies, and affiliated companies, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities; and (b) any other insurance carriers that issued or may have issued LPI insuring real property owned by any Settlement Class Member for the PNC Defendants and/or for any of the PNC Defendants' past or present divisions, parents, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies (which shall include any person or entity which controls, is controlled by, or is under common control with any such party), including but not limited to any direct or indirect subsidiary of any of them, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

(xi)    "Releasing Persons" means the Named Plaintiffs and all Settlement Class Members, and their respective family members, heirs, guardians, executors, administrators, predecessors, successors, and assigns.

(b)    <u>Released Claims.</u>  Each Releasing Person shall, by operation of this

Final Judgment, be deemed to have fully, conclusively, irrevocably, forever, and finally

released, relinquished, and discharged the Released Persons from any and all claims,

actions, causes of action, suits, debts, sums of money, payments, obligations,

reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments,

and demands of any kind whatsoever that each Settlement Class Member may have

until the close of the Settlement Class Period or may have had in the past, whether in

arbitration, administrative, or judicial proceedings, whether as individual claims or as

claims asserted on a class basis, whether past or present, mature or not yet mature,

known or unknown, suspected or unsuspected, whether based on federal, state, or local

law, statute, ordinance, regulations, contract, common law, or any other source, that

were or could have been sought or alleged in the Litigation or that relate, concern, arise

from, or pertain in any way to the Released Persons' conduct, policies, or practices

concerning LPI Policies placed or charged during the Settlement Class Period.

(i)    The Release stated in Paragraph 73(b) above shall include, but not

be limited to, all claims related to any LPI placement regardless of whether the LPI

Policy was entirely or partially canceled; all claims related to PNC's insurance

requirements; the relationship, whether contractual or otherwise, between the PNC

Defendants and the Assurant Defendants regarding LPI, including, but not limited to,

the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the

71

coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by PNC; the payment or receipt of commissions, income or benefits relating to reinsurance agreements, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by PNC; any alleged "tying" arrangement involving PNC and LPI; any alleged breach of contract, breach of an implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, or any other alleged breach of any common law duty or obligation or any alleged violation of any federal or state statute or regulation, by PNC concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by PNC; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by PNC; the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by PNC; the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by PNC; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by PNC.

(ii)    The Release stated in Paragraph 73(b) above shall <u>include,</u> but not be limited to, all claims related to charges for the placement of LPI Policies during the Class Period regardless of whether the LPI Policy was entirely or partially

canceled; PNC's insurance requirements; any reinsurance agreements involving the PNC Defendants concerning the LPI Policies; the relationship, whether contractual or otherwise, between the PNC Defendants and the Assurant Defendants regarding LPI, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by the PNC Defendants; the payment or receipt of commissions, income or benefits relating to reinsurance agreements, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by the PNC Defendants; any alleged "tying" arrangement involving the PNC Defendants and LPI; any alleged breach of contract, breach of an implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, or any other alleged breach of any common law duty or obligation or any alleged violation of any federal or state statute or regulation, by PNC concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans or contracts serviced by the PNC Defendants; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies placed or charged by the PNC Defendants; the receipt or non-disclosure of any benefit under any LPI Policies placed or charged by the PNC Defendants; the content, manner, or accuracy of any communications regarding the placement of any insurance policy by the PNC Defendants; and to the regulatory

approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by the PNC Defendants.

(iii)    Except to the extent that any such obligation is being released pursuant to Paragraph 73(b) above, this Final Judgment shall not be deemed a release of Defendants from any existing obligation to any Releasing Person under any loan, note, mortgage, or deed of trust.  This provision is not meant to and does not limit the Releases in this Final Judgment, the Final Order or in the Settlement Agreement.

(c)    The Named Plaintiffs and Class Counsel have represented that there are no outstanding liens or claims against the Montoya Litigation, it being recognized that the Named Plaintiffs will solely be charged with the responsibility to satisfy any other liens or claims asserted against the Montoya Litigation.

(d)    Without in any way limiting its scope, the Release stated in Paragraph 73(b) above covers by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, or any other fees, costs, and/or disbursements incurred by Class Counsel, the Named Plaintiffs, or any Settlement Class Members in connection with or related in any manner to the Montoya Litigation, the settlement of the Montoya Litigation, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in this Final Order.

(e)     In connection with the Release stated in Paragraph 73(b) above, the Releasing Persons expressly waive, and shall be deemed to have waived to the fullest extent permitted by law, any and all provisions, rights, benefits conferred by Section 1542 of the California Civil Code, and any statute, rule and legal doctrine similar, comparable, or equivalent to California Civil Code Section 1542, which provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor**.

The Releasing Persons agree, and shall be deemed to agree, that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished, and released. The Releasing Persons will be deemed to recognize, that, even if they may later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of the Final Order, they fully, finally, and forever settle and release any and all claims covered by the Releases.

(f)     The Releases were bargained for and are a material element of the Settlement Agreement.

(g)     The Releases do not affect the rights of persons who would otherwise fall within the definition of the Settlement Class who timely and properly submitted a Request for Exclusion from the Settlement Class in accordance with the

requirements of the Preliminary Approval Order and in Section 11 of the Settlement Agreement.

(h)     The administration and consummation of the Settlement as embodied in the Settlement Agreement shall be under the authority of the Court.

(i)     The Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members, and the Released Persons shall not be subject to liability or expense for any of the Released Claims to any Settlement Class Member(s).

(j)     The Releases shall not preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.  The Releases set forth herein and in the Settlement Agreement are not intended to include the release of any rights or duties of the Parties arising out of the Settlement Agreement, including the express warranties and covenants contained herein.

74.     Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein, nor this Final Order, nor any of its terms and provisions, nor the Final Judgment to be entered pursuant to this Final Order, nor any of its terms and provisions, shall be:

(a)     offered by any person or received against the Defendants as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by the Defendants of the truth of the facts alleged by any person or the

validity of any claim that has been or could have been asserted in the Montoya

Litigation or in any litigation, or other judicial or administrative proceeding, or the

deficiency of any defense that has been or could have been asserted in the Litigation or

in any litigation, or of any liability, negligence, fault or wrongdoing of the Defendants;

(b)    offered by any person or received against the Defendants as

evidence of a presumption, concession, or admission of any fault, misrepresentation, or

omission with respect to any statement or written document approved or made by the

Defendants or any other wrongdoing by the Defendants;

(c)    offered by any person or received against the Defendants as

evidence of a presumption, concession, or admission with respect to any liability,

negligence, fault, or wrongdoing in any civil, criminal, or administrative action or

proceeding;

(d)    offered or received in evidence in any action or proceeding

against any Party hereto in any court, administrative agency, or other tribunal for any

purpose whatsoever, other than to enforce or otherwise effectuate the Settlement

Agreement (or any agreement or order relating thereto), including the Releases, or the

Final Order, or the Final Judgment to be entered pursuant to this Final Order.

75.    Permanent Injunction.  The Releasing Persons have released the Released

Claims as against the Released Persons, and are, from this day forward, hereby

permanently barred and enjoined from directly or indirectly (i) filing, commencing,

prosecuting, intervening in, or participating in (as class members or otherwise), any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this action and/or the Released Claims; or (ii) organizing any Settlement Class Members into a separate class for purposes of pursuing as a purported class action any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this action and/or the Released Claims.

76.     This Final Order, the Final Judgment to be entered pursuant to this Final Order, and the Settlement Agreement (including the exhibits thereto) may be filed in any action against or by any Released Person (as that term is defined herein and the Settlement Agreement) to support a defense of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

77.     All Releasing Persons shall promptly dismiss with prejudice all claims, actions, or proceedings that have been brought by any Releasing Person in any jurisdiction and that have been released pursuant to the Settlement Agreement and Final Order and enjoined pursuant to this Final Judgment.

78.     Notwithstanding the dismissal of this entire action with prejudice, the Court shall retain jurisdiction over the construction, interpretation, consummation,

implementation, and enforcement of the Settlement Agreement, including jurisdiction to enter such further orders as may be necessary or appropriate.

79.     Without further order of the Court, the Parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement.

80.     This Final Order, and the Final Judgment to be entered pursuant to this Final Order, shall be effective upon entry.  In the event that the Final Order and the Final Judgment to be entered pursuant to this Final Order are reversed or vacated pursuant to a direct appeal in this Action or the Settlement Agreement is terminated pursuant to its terms, then all orders entered and releases delivered in connection herewith shall be null and void.

        **DONE and ORDERED**, in Chambers, in Miami, Florida, April 13, 2016.

                                                    _____
                                                    Jonathan Goodman
                                                    UNITED STATES MAGISTRATE JUDGE


**Copies furnished to**:
All counsel of record